UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIZA ENGESSER, MARISOL GETCHIUS, GEETANJALI SEEPERSAUD by her Next Friend SAVITRI SEEPERSAUD, and MARIA JAIME on her own behalf and as Next Friend to Y.P.S. and C.P., individually and on behalf of all persons similarly situated; BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, and REGIONAL CENTER FOR INDEPENDENT LIVING, | Dkt. No.: |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| -against- | |
| JAMES V. MCDONALD, as Commissioner of the New York State Department of Health, | |
| Defendant. | |

## PRELIMINARY STATEMENT

1.     Named Plaintiffs Liza Engesser, Marisol Getchius, Geetanjali Seepersaud, Maria Jaime, Y.P.S., and C.P., and all members of the class they seek to represent are Medicaid consumers who have chronic illnesses and disabilities that make them dependent on long-term home care services in order to continue living in the community.  All of them receive those services through the Consumer Directed Personal Assistance Program ("CDPAP"), which allows them to select and train the assistants who provide care in their homes (referred to as "Personal Assistants").  They are now at immediate risk of suspensions or terminations of their care in

violation of the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

2.      In April 2024, New York State enacted legislation that changes one administrative element of CDPAP.  Whereas previously, CDPAP participants could choose among hundreds of entities called Fiscal Intermediaries to act as their human resources and payroll function to ensure that their in-home assistants are paid, the Legislature mandated that starting on April 1, 2025 there can be only one Fiscal Intermediary for the whole State.  The contract to be the single Fiscal Intermediary was awarded to a company called Public Partnerships, LLC ("PPL"), a limited liability company organized under the laws of Delaware with its principal place of business in Georgia.

3.      This legislative change does not alter any CDPAP participant's authorization to receive these medical services.

4.      Defendant, as Commissioner of the New York State Department of Health ("DOH"), is responsible for ensuring that CDPAP participants transition from their prior Fiscal Intermediary to PPL without a loss or suspension of services.

5.      Defendant created a transition process in which CDPAP participants must initiate enrollment directly with PPL rather than creating an auto-enrollment mechanism.

6.      Due to problems with PPL's technology and systems, combined with informational, educational, and language barriers, this process is difficult to navigate for many CDPAP participants.  Even among those who understand how to complete the enrollment process, many are unable to enroll because of errors in the PPL system (e.g., the names of the consumer and their personal assistant being switched, or a participant's Medicaid number being entered incorrectly in the PPL system).  Moreover, PPL simply lacks the capacity to handle the volume of calls occuring

in the final weeks of this extremely short transition period.  Many consumers and personal

assistants are unable to get through the PPL hotline to someone who can answer their questions

and complete their enrollment.

7.      This transition process began on January 6, 2025, and the deadline to complete

transition is March 28, 2025.

8.      Beginning on April 1, 2025, no other Fiscal Intermediary will be permitted to act in

this capacity.

9.      CDPAP Consumers and personal assistants as well as advocates, unions, legislators,

the press, and members of the public have called upon DOH to extend the March 28 deadline

because of the severe health risks facing Consumers implicated by the dealine.  Instead, on March

24, DOH announced a plan to provide a "late registration window" during which personal

assistants "who have not yet completed the transition" but do so by April 30 will be paid

retroactively.

10.     However, this "late registration" plan has only caused more questions, confusion,

and concern for Consumers and their personal assistants.  For example, no one understands—not

even experienced Medicaid industry professionals and advocates—how far in the enrollment

process Consumers have to get to be eligible for the "late registration" window.  Nor does anyone

understand whether personal assistants will be covered by health, unemployment, or workers

compensation insurance.  Even if all of these issues are ignored, the plan, at best, requires personal

assistants who manage to register by April 30 to work for up to a month without pay.  Personal

assistants are low wage workers who literally cannot afford to go without pay.  As a result, many

Assistants will be forced to seek other employment, in turn, forcing Consumers out of their homes

and into hospitals or institutions to avoid serious and often life-threatening harm.

15624516v.1

11.    As of January 1, 2025, approximately 280,000 New York State residents participated in CDPAP.

12.    Defendant has announced that as of March 24, 2025, approximately 165,000 of those 280,000 have begun or completed enrollment with PPL.

13.    Another 55,000 have chosen to leave the CDPAP program and receive their homecare services another way.

14.    This means that 60,000 have not even begun this transition, and an unknown percentage have not yet completed the transition.

15.    Defendant has not created or implemented a transition plan that ensures CDPAP consumers will be provided timely and adequate notice, and an opportunity to be heard with aid continuing, before their services are suspended or terminated on April 1, 2025.

16.    Indeed, DOH will not even know which CDPAP participants have failed to enroll until March 28, at which point there will simply not be time to send an individualized notice the required ten days in advance of the adverse action, which is scheduled to begin on April 1.

17.    The Named Plaintiffs are six individuals, all of whom live in New York, are severely disabled, and receive CDPAP services.  The Named Plaintiffs require the support of their CDPAP personal assistants to ambulate, bathe, dress, and feed themselves, such that it would be devastating for them to even temporarily lose their CDPAP services.  All have experienced difficulties completing enrollment with PPL and are highly unlikely to do so before the March 28 deadline.

18.    Organizational Plaintiffs Brooklyn Center for the Independence of the Disabled ("BCID") and Regional Center for Independent Living ("RCIL") have thousands of members and

15624516v.1

constituents participating in CDPAP who are experiencing similar difficulties transitioning to PPL, and fear that they will lose services on April 1 without notice and an opportunity to be heard.

19.     Defendant's failure to provide sufficient time to surmount these barriers, as well as notice and an opportunity to be heard before any loss of services, violates Plaintiffs' statutory and Constitutional rights to timely and adequate notice of a "reduction, suspension, or termination of benefits," as well as continuing care, in violation of the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, and its implementing regulations, and procedural due process rights guaranteed by the Fourteenth Amendment to the U.S. Constitution.

20.     Plaintiffs bring this lawsuit on behalf of themselves and all CDPAP participants to seek an extension of the deadline and other relief, which will give participants adequate time to work with PPL to complete the transition without putting their health or lives at risk.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. This action is authorized by 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory and Constitutional rights under color of law.

22.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because it is the judicial district in which a substantial part of the events giving rise to the claims occurred and where three of the six Named Plaintiffs reside and BCID is located.

## PARTIES

*Plaintiffs*

23.     Plaintiff Liza Engesser is a 45 year-old woman who resides in Queens, New York and receives CDPAP services.  She has been diagnosed with radiculopathy of the cervical region, abnormalities of gait and mobility, asthma with acute exacerbation, urinary incontinence,

depression, diabetes, dizziness, insomnia, migraines, obesity, fatigue, muscle spasms, seasonal allergic rhinitis, pain, and a history of falling. She receives 24-hours of CDPAP care per day from three Personal Assistants working in 12-hour shifts; two are her sons. This care includes helping Ms. Engesser walk, toilet, get in and out of bed, sit down, get up, bathe and dress, prepare meals, attend doctors' appointments, put on pain creams and patches, and remind her to take her medicine.

24.     Ms. Engesser learned about the PPL transition through a phone call from her managed care plan. Ms. Engesser was able to enroll herself with PPL the week of March 10, 2025, but her Personal Assistants have had difficulty doing so. To date, the status for two of her assistants on the PPL website is "in review," so Ms. Engesser does not know whether they will be paid for work they do starting April 1. Her third Personal Assistant has not been able to register on the website because she does not understand how to use technology, and she needs someone to help her upload her documents.

25.     Plaintiff Marisol Getchius is a 54 year-old woman who resides in Suffolk County, New York and receives CDPAP services. She has cerebral palsy since birth, high blood pressure, a thyroid issue, and is deaf in one year. She uses a walker and a power wheelchair to get around. Her cerebral palsy impacts her speech, such that people often do not understand her. Cerebral palsy also affects her mobility and hands, rendering her unable to cut up her own food, hold a drinking glass, or open a pill bottle.

26.     Ms. Getchius receives 20 hours of CDPAP care per week. Her daughter, Kathleen is her Personal Assistant. Ms. Getchius learned about PPL from her case manager at Advance Care Alliance, as well as received letters from her managed care plan and the Department of Health. Ms. Getchius enrolled herself with PPL around the middle of February, but has been unable to

6

register Kathleen because the PPL representative who took Kathleen's information over the phone used it to register under Ms. Getchius's name. Because of these complications, Kathleen is unable to register as Ms. Getchius's Personal Assistant. Kathleen cannot afford to take care of Ms. Getchius without being paid, and without her help, Ms. Getchius will not be able to open her medications or do any laundry or cleaning, and will be limited to a few foods that do not require preparation or cutting.

27.     Plaintiff Geentanjali Seepersaud is a 36 year-old woman who resides in Brooklyn, New York and receives CDPAP services. She has been diagnosed with a severe intellectual disability, urinary incontinence, and vitamin deficiency. She receives 24 hours of CDPAP care per day; her four Personal Assistants assistants work in 12-hour sifts. Her mother and one of her brothers, Raj, are two of her Personal Assistants.

28.     In early March, Ms. Seepersaud's Mediciad Plan case manager called to inform her about the transition to PPL. A few weeks later, the Plan sent her a letter with generic instructions about how to enroll. When Ms. Seerpsaud's family tried to enroll her, the PPL website rejected her Medicaid Client Identification Number saying it "did not match PPL's records." Her family has tried calling PPL multiple times, including "every day starting on March 21" and multiple times on March 24. There have been long wait times on the phone, and when they press "1" for a call back, the call is never returned. Compounding these difficulties, Ms. Seepersaud must first be enrolled before her four Personal Assistants can register with PPL, and they do not know how long this will take or what it will involve.

29.     Plaintiff Maria Jaime is a 44 year-old woman who resides in the Bronx, New York. She has been temporarily authorized to receive 30 hours per week of CDPAP services following wrist surgery that left her unable to lift more than 10 pounds or fully move her wrist. She has two

15624516v.1

disabled minor children, both of whom receive CDPAP services, and each of whom are also Plaintiffs in this action.

30.     Her daughter, Plaintiff Y.P.S., is 12 years old.  She was born at 24 weeks gestation and has a variety of medical conditions as a result, including autism, global developmental delay, speech rescession, aggressive behavior, sleeping disorder, feeding disorder, depression, chronic constipation, a blood clot in her brain, a catheter in her heart, extreme prematurity, and urinary and bowel incontinence.  Y.P.S. receives 24-hours of CDPAP care a day from three Personal Assistants who work 12-hour shifts.  Her Personal Assistants bathe her, prepare her meals, feed her, change her diaper overnight, change her clothing during the day when she has incidents of incontinence, and perform all other activities of daily living for her.

31.     Ms. Jaime's son, Plaintiff C.P., is 4 years old. He was born at 26 weeks gestation, and has been diagnosed with global developmental delay, extreme prematurity, speech delay, abnormal movements, patent ductus arteriosus, left ventricular systolic dysfunction, slow transit constipation, asthma, poor appetite, toe-walking, hyperactivity, sleep apnea, sleep disturbances, a sleeping disorder, and urinary and bowel incontinence.  He receives 30 hours of CDPAP services per week from one Personal Assistant.

32.     Ms. Jaime received notice about the PPL transition through the mail from PPL and HRA, and through a phone call from her current Fiscal Intermediary.  Enrolling her children was difficult because the PPL system required her to provide different email addresses and phone numbers for each of her children and herself—and for herself, a different email address and phone number when she was registering herself as a CDPAP participant versus as the legal guardian of her children.  This has required her to provide PPL with *five* different unique, working phone numbers and email addresses.  On March 18, Ms. Jaime was on the phone with PPL for 3 hours,

but they could not confirm whether either of her children had been enrolled.  Although the PPL website says Y.P.S.'s paperwork is completed, none of her Personal Assistants are confirmed, rendering Y.P.S.'s registration incomplete.  The PPL website says C.P.'s enrollment and Ms. Jaime's own enrollment as a CDPAP consumers, and the registration of both of their Personal Assistants, are under review.

33.    Y.P.S.'s three Personal Assistants only speak Spanish.  But the website is in English and they have not been able to get a Spanish-speaking person on the PPL phone line.  None of Ms. Jaime, Y.P.S., or C.P.'s enrollment with PPL can be completed until all of their Personal Assistants complete registration.  Ms. Jaime does not know how the family will manage without CDPAP care for Y.P.S. and C.P.

34.    Plaintiff BCID is a consumer-based, not-for-profit independent living center with over 500 constituents that provides services and advocacy toward independent living for people with disabilities throughout Brooklyn and New York City. All of BCID's board members and the majority of its staff are people with disabilities, including six board members and staff who are CDPAP Participants themselves or have family members who are CDPAP Participants.

35.    Each year, BCID serves approximately 1,400 to 1,700 people with disabilities.

36.    BCID's mission is to ensure full integration, independence, and equal opportunity for all people with disabilities.

37.    Among other things, BCID strives to accomplish this goal by assisting its constituents in obtaining State-funded healthcare benefits, including services through CDPAP. BCID staff does so through benefits counseling, presentations, and support for constituents transitioning to the community from nursing homes.

38.     BCID's constituents, volunteers, staff, and board members who participate in CDPAP are presently being harmed by Defendant's failure to effectuate a successful transition to PPL because, like Named Plaintiffs and members of the class, they have not completed their enrollment and will lose care on April 1 without notice and an opportunity to be heard.

39.     In particular, Milagros Franco, who works for BCID as an Intake/Housing Specialist and has Cerebral Palsy, depression, dyslexia, impaired vision, and uses a motorized wheelchair, has had several difficulties enrolling with PPL.  Although she began the process with PPL on March 23, she was repeatedly timed out of the website because her dyslexia and impaired vision require her to type slowly.  She called PPL numerous times to try and obtain paper applications for her two personal assistants—who speak Spanish and are not computer-literate—but has waited on hold, connected with an English-only speaker, left messages, and not received any calls back.

40.     On March 20, Ms. Franco called the Spanish language PPL line again and was told to visit an in-person office in Manhattan to register herself and her personal assistants.  They travelled by cab to the office the following day, March 21, but it was closed.  When she called the Spanish line again, they gave her directions to *another* in-person site in the Bronx.  After they took another cab to that location, Ms. Franco discovered there was no PPL registration site at that location—instead, it was a traditional homecare agency that was trying to register her and her assistants as traditional homecare staff, rather than for the CDPAP program.

41.     Despite all this effort, Ms. Franco believes her personal assistants are not registered with PPL.  Every time she tries to register and/or check her status using the PPL website, the website times her out.  If her personal assistants cannot be paid, they will need to stop working for

her and Ms. Franco will be unable to get dressed or go to work.  She also fears she might fall and be unable to get back up.

42.     BCID has also expended time and resources responding to complaints and inquiries from constituents, staff, and volunteers who participate in CDPAP or their assistants, regarding their difficulties completing the enrollment and registration process or understanding how failure to enroll or register will affect them.

43.     Defendant's seriously flawed transition process is therefore an issue of urgent and immediate concern for BCID.

44.     Consequently, BCID brings these claims on behalf of its constituents as well as members of the class, namely, all individuals who receive Consumer Directed Personal Assistance Program services, who have not completed enrollment, or whose Personal Assistant(s) have not completed registration and received confirmation from PPL that the Personal Assistant has been approved to continue providing services.

45.     Plaintiff RCIL is a disability-led membership organization that uses a peer model to provide services and advocate on behalf of people with disabilities.   The organization traces its history to September 1966 during the New York State Republican Convention, when a group of disabled students staged a protest to raise awareness and obtain support for making the State University of New York system accessible to people with disabilities.

46.     RCIL has over 5,500 members throughout the State of New York. An estimated 4,200 of those members use CDPAP to remain in the community.

47.     RCIL's mission is to empower people with disabilities to self-advocate, live independently, and enhance the quality of community life.  Its services and programs are of an

advocacy nature, seeking to overcome the barriers faced by people with disabilities who choose to live independently.

48.    To that end, RCIL provides core independent living services such as referrals, independent living skills training, peer counseling or peer mentoring, individual advocacy, and support with major life transitions, including transitioning from an institution into the community. RCIL also provides employment services and helps consumers understand eligibility requirements and navigate applications, appeals, and hearing systems in connection with public benefits such as Medicaid, including CDPAP.

49.    RCIL's members, volunteers, staff, and board members who participate in CDPAP are presently being harmed by Defendant's failure to effectuate a successful transition to PPL because, like Named Plaintiffs and members of the class, they have not completed their enrollment and will lose care on April 1 without notice and an opportunity to be heard.

50.    Indeed, Susan Stahl, an RCIL member who works for RCIL part-time, was born with cerebral palsy.  CDPAP services allow her to remain in the community rather than being institutionalized, but she has encounterd several roadblocks trying to enroll with PPL and ensure her services can continue.

51.    She has called the PPL phone line repeatedly, but never got through and never received a call back.  She worked with a PPL facilitator but found the facilitator was still learning about the system and did not know how to complete the tasks required for enrollment. She finally used the PPL@home website to register, but she found the program very confusing and is anxious that she may not have completed her registration correctly.  She has received confusing notices, none of which give her a clear answer about what she still needs to do, or how to do those things.

52.     She also has not been able to determine what her personal assistant should do to register, how her assistant will be paid, and how many hours her assistant can work.  Ms. Stahl's assistant cannot afford to go without a paycheck, and Ms. Stahl believes she will have to be institutionalized if she loses her current assistant.

53.     RCIL has also expended time and resources responding to complaints from members, staff, board members, and volunteers who participate in CDPAP regarding the lack of clarity in DOH's outreach and their problems enrolling with PPL.  In addition, because RCIL is so concerned about the health of these individuals, it is developing an information packet regarding the hospital admissions process to help them ensure continuity of care and avoid institutionalization.

54.     Defendant's failure to effectuate a safe and smooth transition is therefore an issue of urgent and immediate concern for RCIL.

55.     RCIL thus brings these claims on behalf of its members as well as members of the class, namely, all individuals who receive Consumer Directed Personal Assistance Program services, who have not completed enrollment, or whose Personal Assistant(s) have not completed registration and received confirmation from PPL that the Personal Assistant has been approved to continue providing services.

*Defendant*

56.     Defendant JAMES MCDONALD is the Commissioner of DOH, and as such, is responsible for the administration of the Medicaid program in the State of New York.  He maintains an office at Corning Tower, Empire State Plaza, Albany, New York.

15624516v.1

## THE APPLICABLE LEGAL FRAMEWORK

*The Medicaid Act*

57.    The Medical Assistance Program ("Medicaid") is a joint federal-state program established under Title XIX of the Social Security Act ("Medicaid Act") to ensure that rehabilitation, medical assistance, nursing, and other services are provided to low-income and indigent people.  42 U.S.C. § 1396 *et seq*.

58.    Under the Medicaid Act, medical assistance includes payment of part or all of the cost of community based long-term care services.  *See* 42 U.S.C. § 1396d(a)(1)-(29).  These services are furnished to an individual who is not in an inpatient or institutionalized setting; are authorized by a physician; and are provided in accordance with the State's Medicaid service plan. *See e.g.*, 42 C.F.R. §§ 440.167(a), 440.70, 440.110, 440.180, 440.181.

59.    States that elect to participate in the Medicaid program must comply with requirements set out in federal law and regulations to be eligible for federal funds.  42 U.S.C. §§ 1396a, 1396c.

60.    Federal law requires participating states to administer the Medicaid program through a "single state agency."  42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b)(1).

61.    While the single state agency may delegate certain functions, it is prohibited from delegating "the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters."  42 C.F.R. § 431.10(c), (e).

62.    The single state agency responsible for the administration of the Medicaid program in New York is DOH, of which Defendant is the Commissioner.  N.Y. Soc. Serv. L. § 363-a(1).

The Consumer Directed Personal Assistance Program

63.    In New York, chronically ill and/or disabled Medicaid beneficiaries have two options to receive personal care services in their homes.

64.    The first option provides at-home personal care services under the supervision of a licensed home care services agency ("LHCSA").  The LHCSA "is responsible for hiring, training, supervising and providing . . . home care worker[s] with salary and benefits."[1]  Home care workers who are employed by LHCSAs are supervised by registered nurses and cannot be family members of the Medicaid beneficiaries they serve.[2]

65.    The second option—the Consumer Directed Personal Assistance Program ("CDPAP")—permits Medicaid beneficiaries ("Participants") to directly recruit, hire, supervise, and train their home care worker(s) ("Personal Assistants").  Unlike home care workers employed through an LHCSA, CDPAP Personal Assistants are permitted to be members of the Participant's family (with some limited limitations, such as, e.g., the Participant's spouse),[3] and they are exempted from having a nursing license.[4]

66.    This distinction is critical for CDPAP Participants.  It means that CDPAP Participants can receive care from family members, members of their communities, and others with whom they have personal relationships or with whom they feel most comfortable interacting in their own homes.  And because of the licensing exemption, these caregivers can forego other employment in order to serve as Personal Assistants, without obtaining additional training.  The ability to hire family, friends, neighbors, or community members who speak the same language is

---

[1] New York State Medicaid Plan, Attachment 3.1-A, Supplement New York 3(d)(i) (effective as of July 1, 1991), *available at* https://www.hcrapools.org/medicaid_state_plan/Attachment_PDF_PROD/attach_3-1a_supp.pdf.
[2] *Id.*
[3] N.Y. Soc. Serv. Law § 365-f (3).
[4] N.Y. Edu. Law § 6908 (1)(a)(iii).

especially beneficial for CDPAP Participants in light of the highly personal nature of the care they receive, and which they require to remain at home and retain their independence.

67.    Indeed, as DOH's own website proclaims, "CDPAP services empower Medicaid-eligible recipients to stay independent and receive care at home from someone they choose and train."[5]

68.    The personal nature of this care is evident from the categories of tasks with which Personal Assistants may assist, as defined in New York's regulations.  Such tasks include "personal care services," which cover "(1) bathing of the patient in the bed, the tub or in the shower; (2) dressing; (3) grooming, including care of hair, shaving and ordinary care of nails, teeth and mouth; (4) toileting; this may include assisting the patient on and off the bedpan, commode or toilet; (5) walking, beyond that provided by durable medical equipment, within the home and outside the home; (6) transferring from bed to chair or wheelchair; (7) turning and positioning; (8) preparing of meals . . . ; (9) feeding; (10) administration of medication by the patient, including prompting the patient as to time, identifying the medication for the patient, bringing the medication and any necessary supplies or equipment to the patient, opening the container for the patient, positioning the patient for medication and administration, disposing of used supplies and materials and storing the medication properly; (11) providing routine skin care; (12) using medical supplies such as walkers and wheelchairs; and (13) changing of simple dressings."  18 N.Y.C.R.R. § 505.14(a)(5)(ii)(a).

69.    Personal Assistants may also assist with "home health aide services," defined as "simple health care tasks, personal hygiene services, housekeeping tasks essential to the consumer's health and other related supportive services."  18 N.Y.C.R.R. § 505.28(b)(10).  As but

---

[5] New York State Dep't of Health, *Consumer Directed Personal Assistance Program (CDPAP)*, https://www.health.ny.gov/health_care/medicaid/program/longterm/cdpap/ (last visited March 23, 2025).

a few examples, these tasks include "performance of simple measurements and tests to routinely monitor the consumer's medical condition; performance of a maintenance exercise program; and care of an ostomy after the ostomy has achieved its normal function." *Id.*

70.    Homecare workers provided by a LHCSA are unable to assist with "home health aide services."

71.    Without CDPAP services, a Medicaid recipient who requires assistance with these skilled services – such as insulin injections, wound dressing, or insertion of a feeding tube – must either be placed in an institutional setting or a nurse must be sent to the recipient's home on a regular basis to provide these services.

72.    The CDPAP program thus allows Participants to remain safely in their home while also saving the Medicaid program money.

Fiscal Intermediaries

73.    The flexible and personal nature of this care hinges on a crucial component of CDPAP: Fiscal Intermediaries.  Fiscal Intermediaries are private entities that contract with DOH to handle a variety of administrative, financial, and compliance responsibilities associated with receiving home care, so that CDPAP Participants need not do so.

74.    To name a few, these responsibilities include:

- wage and benefit processing for consumer directed personal assistants;

- processing all income tax and other required wage withholdings;

- complying with workers' compensation, disability and unemployment requirements;

- maintaining personnel records for each consumer directed personal assistant, including time records and other documentation needed for wages and benefit

> processing and a copy of the medical documentation required pursuant to regulations established by the commissioner;

- ensuring that the health status of each consumer directed personal assistant is assessed prior to service delivery pursuant to regulations issued by the commissioner; and

- maintaining records of service authorizations or reauthorizations.[6]

75.    As explained in the New York statute authorizing CDPAP, N.Y. Soc. Serv. Law § 365-f(4-a), Fiscal Intermediaries perform these services "on behalf of" each CDPAP Participant, "to facilitate" the Participant's "role as the employer."[7]  In other words, Fiscal Intermediaries are the linchpin that allow CDPAP Participants to benefit from CDPAP's highly personalized and self-directed model, without being burdened by the tasks that would ordinarily be required to employ the Personal Care Assistants they hire.  Indeed, this would be impossible to do for many CDPAP Participants who require around-the-clock care to engage in simple daily living activities.

76.    There are currently over 600 Fiscal Intermediaries in New York.[8]  Many are small or minority-owned businesses.  In the thirty years since CDPAP's inception in 1992, many Fiscal Intermediaries have developed geographic specializations, cultural competencies in specific ethnic populations, and language-specific expertise.  These additional levels of specialization are yet another reason why CDPAP is so popular—on top of the freedom to directly choose and train their Personal Assistants, CDPAP Participants can also select the Fiscal Intermediary that suits their individual needs.

---

[6] N.Y. Soc. Serv. Law § 365-f(4-a)(a)(ii).
[7] *Id.*
[8] Johan Sheridan, *Hochul admin selects statewide fiscal intermediary* News 10.com (Oct  1,2024), https://www.news10.com/news/ny-news/hochul-admin-selects-statewide-fiscal-intermediary/#:~:text=CDPAP%20spending%20could%20hit%20$9,care%20or%20even%20supervising%20caregivers..(Last visited March 24, 2025) (hereinafter October 10, 2024, Sheridan Article)

77.     In light of CDPAP's popularity, the program supported over 280,000 Participants and employed over 300,000 Personal Assistants at the start of 2025.

Procedural Requirements Upon Termination of Medicaid Funded Services

78.     Federal law and regulations, and the Due Process Clause, require timely and adequate notice to Medicaid applicants and recipients of any action to deny, discontinue, suspend or reduce medical assistance authorization or services.  *See* 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.206(b)-(c), 431.210, 431.211, 438.210(c)-(d), 438.404; U.S Const. Amend. XIV, § 1.

79.     Federal law and regulations also require that a state's Medicaid program provide Medicaid applicants and recipients an opportunity for an administrative Fair Hearing when Medicaid benefits are reduced, suspended or terminated.  42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.220, 438.402.

80.     The required notice must, among other things, explain the proposed action; state the reasons for the action; explain the recipient's right to a Fair Hearing; and explain the right to "aid continuing," which means continuation of their services pending the outcome of the Fair Hearing. 42 C.F.R. §§ 431.206, 431.210, 438.404.

81.     These notices must be sent to Medicaid recipients at least ten days before the proposed action is taken.  42 C.F.R. §§ 431.211, 438.404(c)(1).

82.     Medicaid recipients who are enrolled in Medicaid Managed Care Organizations ("MCOs") are entitled to a notice of an initial adverse determination explaining their right to internally appeal the adverse determination.  If this internal appeal is unsuccessful, the Medicaid recipient must receive a notice of final adverse determination, explaining the right to a Fair Hearing.  42 C.F.R. § 438.404(c)(3).

83.     When determinations are made to reduce, suspend or terminate Medicaid benefits, recipients who request a Fair Hearing in a timely manner are entitled to receive benefits unchanged

pursuant to aid continuing directives until a decision after a Fair Hearing is issued.  *See* 42 U.S.C.

§ 1396a(a)(3); 42 C.F.R. § 431.230(a), 431.231(c), U.S. Const. Amend. XIV, § 1.

84.    Fair Hearing systems must meet the due process standards set forth in *Goldberg v.*

*Kelly,* 397 U.S. 254 (1970).  42 C.F.R. § 431.205(d).

85.    Once a plan of care is created and services are authorized for a Medicaid recipient,

those services may be reduced, suspended or discontinued for reasons such as a change in the

client's medical, mental, economic, or social circumstances such that the prior level of care is no

longer appropriate; a mistake occurred in the previous assessment; the client refused to cooperate

in having a required reassessment; a specifically identified technological development rendered the

services unnecessary or less time-consuming; the client resides in a facility or participates in a

program that provides the services; or the client can be more appropriately served through other

specifically identified Medicaid programs and services.   18 N.Y.C.R.R. § 505.14(b)(5)(iv)(a),

(b)(5)(iv)(c).

86.    Closure of a Fiscal Intermediary is not a permissible reason for reducing or

terminating a Medicaid recipient's care.

87.    In fact, when a Fiscal Intermediary ceases operation, "[t]he local social services

district or managed care plan, as appropriate, shall supervise the transition of services and transfer

of records and maintain provision of services by the personal assistant(s) chosen by the individual"

CDPAP participant.  Soc. Serv. Law § 365-f(4-d)(e).

88.    This transfer from one Fiscal Intermediary to another "shall not diminish any of an

individual's rights relating to continuity of care, utilization review or fair hearing appeals and aid

continuing." Soc. Serv. Law § 365-f(4-d)(f).

## FACTS CONCERNING THE CLASS

*The Class Members' Connection to CDPAP*

89.     Members of the class are CDPAP Participants who have hired and trained their own Personal Assistants to help with crucial activities of daily living.  These class members rely on Fiscal Intermediaries to verify their Personal Assistants' employability and provide the Personal Assistants with payment for hours worked.

90.     Members of the class are very vulnerable.  By definition, they cannot manage alone. They have multiple chronic conditions, many of which will not improve and which are in fact degenerative.

91.     Some Medicaid beneficiaries choose to participate in CDPAP because they have a need for assistance with a skilled task, such as administration of medication, that an aide employed by a traditional personal care services agency is not permitted to do.

92.     Others choose to participate in CDPAP because it allows them the freedom to choose the individuals who provide highly personal care.

93.     For Medicaid recipients in more rural areas, CDPAP is often the only opportunity to receive services in the home in a timely manner due to a shortage of aides working for traditional personal care services agencies.

94.     For example, Named Plaintiff Ms. Engesser is able to live in the community with the support of her two sons as Personal Assistants, who help her walk, toilet, sit down, get up, bathe, dress, and prepare meals.  Likewise, Named Plaintiff Ms. Getchius is able to remain safely in her home with the support of her Personal Assistant, and daughter, Kathleen, who helps her to prepare meals, eat, move around, and open medication.

95.     Numerous members, volunteers, staff, and board members of associational plaintiffs BCID and RCIL also receive services through CDPAP.

96.     Regardless of why an individual chooses to receive care through CDPAP, all participants have been determined eligible for homecare services, have been authorized for a given number of hours of care per week based on their medical needs, and are currently in receipt of those hours of homecare services.

The CDPAP Amendment

97.     On April 20, 2024, the New York legislature enacted Part HH of Chapter 57 of the New York Session Laws of 2024 (the "CDPAP Amendment"), which stated that as of April 1, 2025 there could only be one Fiscal Intermediary for the entire State.  It further provided that the single Fiscal Intermediary would be selected by DOH through a Request for Proposals ("RFP").

98.     The CDPAP Amendment also set forth the minimum criteria a Fiscal Intermediary must have in order to be considered for the role of single, state-wide Fiscal Intermediary.  None of the existing 600 Fiscal Intermediaries met those criteria, because none of them were providing fiscal intermediary services on a statewide basis in another state.

99.     This meant that as of March 31, 2025, all existing Fiscal Intermediaries would be required to cease operation.

DOH Selects Public Partnerships, LLC as the Single Fiscal Intermediary

100.     On September 30, 2024, Governor Kathy Hochul publicly announced that Public Partnerships, LLC ("PPL") had been chosen as the single, state-wide Fiscal Intermediary.[9]

---

[9] Office of the Governor of N.Y., *Governor Hochul Announces Next Steps in plans to Strengthen Home Care Services for New Yorkers* (Sept. 30, 2024), https://www.governor.ny.gov/news/governor-hochul-announces-next-steps-plans-strengthen-homecare-services-new-yorkers https://www.governor.ny.gov/news/governor-hochul-announces-next-steps-plans-strengthen-homecare-services-new-yorkers (last visited March 24, 2025) (hereinafter "September 30, 2024 Press Release").

15624516v.1

101.    New York's existing Fiscal Intermediaries are based in New York and exclusively support and employ New Yorkers.  In contrast, PPL is a Georgia service-provider that supports self-directed care programs in 19 other states.[10]

102.    PPL has a history of mismanagement and operational failures, including in connection with transitioning healthcare consumers to PPL.

103.    For example, in January 2012, PPL was selected as the service provider for approximately 20,000 consumers in three regions of Pennsylvania.[11]  In January 2013, the Pennsylvania Department of Public Welfare ("PDPW") transferred payroll services from 36 vendors—only about 6% of the number of current Fiscal Intermediaries in New York—to PPL.[12]

104.    To put it bluntly, the transfer was disastrous.  It immediately left 20,000 home care workers without pay—in some cases, for months—and consumers "afraid they could lose the personal care services that allowed them to remain in their homes."[13]

105.    A March 2013 audit by the Pennsylvania Auditor General Euguene DePasquale found that PDPW "ignored many red flags that PPL was not fully prepared to pay all direct care workers by January 1, 2013."[14]  For example, at a meeting in November 2012, less than three months before the deadline, PPL noted that only 8,000 information packets had been sent out to consumers and that PPL was still unable to contact approximately 4,000 of them.[15]  For those consumers contacted by PPL, "thousands . . . were confused and did not understand the complex

---

[10] Public Partnerships, *State Programs,* https://pplfirst.com/programs/ (last visited March 24, 2025).
[11] Pa. Dep't of the Auditor Gen., *Performance Audit: Department of Public Welfare's Oversight of Financial Management Services Providers* (Nov. 2013), available at https://www.paauditor.gov/wp-content/uploads/audits-archive/Media/Default/Reports/speDPWPPL111413.pdf (hereinafter "Pa. Performance Audit of DPW/PPL Agreement"), at 13-14.
[12] *Id.*
[13] *Id.* at iv.
[14] *Id..*
[15] *Id.* at 30.

information" they had received."[16]  As a result, PPL's customer service telephone line could not

handle the influx of calls from consumers and home care workers.[17]  Many could not get customer

service representatives to answer the phone and were forced to leave voicemails, which were not

returned for several weeks and sometimes over a month.[18]

106.    Confirming these inefficiencies, an internal PDPW report conducted in September

2012 found that PPL had completed only five of 15 tasks required to meet the January 2013

deadline.[19]  The report recommended that a "new time line be constructed to reflect updated

priorities and risk areas."[20]  But this was not done.

107.    PPL's mismanagement continued for years after the transition, leading to a class-

action lawsuit filed by home care workers in the Eastern District of Pennsylvania, alleging that

PPL repeatedly failed to pay them for overtime.[21]

108.    In 2021, Pennsylvania replaced PPL with Tempus Unlimited, Inc. as its healthcare

services provider.[22]

109.    PPL faced similar complaints with regard to its mismanagement of two Department

of Human Services programs in New Jersey for individuals with disabilities on Medicaid.  Like

CDPAP, these programs allowed participants to "live in the community by selecting and directing

the services they need" for home care.[23]

---

[16] *Id.* at 32.
[17] *Id*. at 28.
[18] *Id.* at 39.
[19] *Id.* at 29.
[20] *Id.*
[21] *Talarico v. Public Partnerships, LLC*, No. 5:17-cv-2165 (E.D. Pa.) (Complaint filed May 11, 2017).
[22] Pa. Health L. Project, *Changes Coming for People Using PPL for Participant-Directed Services* (Dec. 14, 2021), https://www.phlp.org/en/news/changes-coming-for-people-using-ppl-for-participan-directed-services.(Last visited, March 26, 2025)
[23]*Egregious Fiscal and Operational Failures By Public Partnerships, LLC Were Predictable*, Alliance for the Betterment of Citizens with Disabilities (ABCD)https://abcdnj.org/wp-content/uploads/2020/08/ABCD-PPL-Operational-Failures-White-Paper.pdf. (Last visited March 26, 2024) (hereinafter "ABCD Article")

15624516v.1

110.    According to a 2020 report by the Alliance for the Betterment of Citizens with Disabilities ("ABCD"), "PPL's poor performance . . . caused interruptions in services" including "long delays enrolling new participants and unresponsive customer service" as well as weeks-long payment delays.[24]  Home care workers resigned, leaving participants without "life-critical" care.[25]

111.    Despite PPL's documented failures to timely provide information and ensure continuity of care, following Governor Hochul's public announcement of its selection, New York proceeded towards the PPL transition with less than six months left before the April 1, 2025 deadline.

*The Botched Transition to PPL*

112.    On December 6, 2024—now under four months before the deadline—DOH issued a demand (the "Demand") to existing Fiscal Intermediaries, instructing them to provide lists of their enrolled Participants and Personal Assistants, along with their personal information such as social security numbers and dates of birth.[26]  As is evident from the Demand, DOH hoped to facilitate an easy transition to PPL by obtaining direct access to this information, which it could then provide to PPL.[27]

113.    Instead, DOH faced a backlash of litigation by Fiscal Intermediaries on privacy and constitutional grounds, among others.  This resulted in the Supreme Court, Nassau County issuing a temporary restraining order on January 27, 2025, enjoining DOH from enforcing this directive as to the Fiscal Intermediary plaintiffs.[28]

---

[24] *Egregious Fiscal and Operational Failures By Public Partnerships, LLC Were Predictable, Alliance for the Betterment of Citizens with Disabilities* (ABCD) https://abcdnj.org/wp-content/uploads/2020/08/ABCD-PPL-Operational-Failures-White-Paper.pdf. (Last visited March 26, 2024) (hereinafter "ABCD Article")
[25] *Id.*
[26] New York State Department of Health, Memo re: Consumer Directed Personal Assistance Program (CDPAP) Statewide Fiscal Intermediary Transition Policy for Current Fiscal Intermediaries (Dec. 6, 2024).
[27] *Id.*
[28] *Caring Professionals, Inc. v. New York State Department of Health et al*, Index No. 601181/2025 (N.Y. Sup. Ct.

114.    While these litigations were pending, on January 6, 2025, Defendant announced a new process by which CDPAP participants would transition from their current Fiscal Intermediaries to PPL.[29]

115.    Under this process, each CDPAP participant must proactively contact PPL to enroll.

116.    To that end, PPL opened its hotline and website, and began accepting enrollment requests on the same date.

117.    Enrollment with PPL is a multi-step process.

118.    That process begins when the CDPAP Participant calls or uses the PPL website to begin enrollment.  During that initial contact, the Participant provides their name, contact information, and Medicaid number.  They are then provided with two long codes they must have to log into the PPL website at any future point.

119.    The Participant also gives PPL contact information for each of their Personal Assistants.

120.    PPL is then supposed to send each Personal Assistant a registration link.

121.    Each Personal Assistant must then create their own account and provide their personal information, including name, address, and tax information.

122.    The Personal Assistant must complete eight documents on the "forms" tab of the PPL website.

123.    One of these documents – the I9 tax form – is not considered complete until the Personal Assistant has uploaded proof of their identity and employability.

---

Nassau Cty.); *see also Glidedowan, LLC v. New York State Department of Health et. al*, Index No. 000009/2025 (N.Y. Sup. Ct. Livingston Cty.)

[29] Office of the Governor of N.Y., *Governor Hochul Announces New CDPAP Partnership with Independent Living Centers as Part of Plan to Strengthen Home Care Services for New Yorkers* (January 7, 2025), https://www.governor.ny.gov/news/governor-hochul-announces-new-cdpap-partnership-independent-living-centers-part-plan (last visited March 26, 2025) (hereinafter "January 7, 2025 Press Release).

124.    However, the PPL website does not clearly explain to Personal Assistants what documents are necessary for the I9 to be considered complete.

125.    After the relevant documents have been uploaded, and the Personal Assistants and Participant have all signed agreements with PPL, PPL staff must review the Personal Assistants' employability documents.

126.    After all of these steps are completed, Personal Assistants are informed that their employment is confirmed.

127.    At each of these steps, both Participants and Personal Assistants may have questions, such as the hourly wages and benefits offered by PPL and PPL's system for tracking hours worked.  None of that information is provided on PPL's website.

128.    In order to get answers to any of these questions, Participants and Personal Assistants must call PPL's hotline to speak with a customer representative.

129.    Unfortunately, Participants and Personal Assistants have found it extremely difficult to reach PPL representatives by phone.

130.    The PPL system allows callers to hang up and receive a call back, but callers report that no one ever returns their call.

131.    Other callers have found that the system automatically ends the call after approximately ten minutes.

132.    This process is particularly challenging for elderly CDPAP Participants or those with intellectual disabilities, or for educationally disadvantaged CDPAP Participants or Personal Assistants.

133.     On January 17, 2025, Defendant announced that the deadline for all CDPAP Participants to complete the enrollment process is March 28, 2025.[30]  This gave approximately 280,000 CDPAP Participants and 300,000 Personal Assistants a little over two months to enroll or register.

134.     By comparison, both New York itself and other states have given healthcare consumers much more lead time when undergoing similar transitions.  In January 2024, Massachusetts set a timeline of 19 months to transition only 70,000 caregivers to a single Fiscal Intermediary.[31]  And New York's roll-out of Managed Long Term Care plans for most home care consumers began in 2011 but took several years to ensure continuity of care.[32]

135.     In the January 17 announcement, DOH reported that 5,000 CDPAP Participants had begun enrolling with PPL.  But it did not explain what would happen to any CDPAP Participant or Personal Assistant who had not begun or completed the enrollment or registration process by the deadline.

136.     To DOH's credit, following this announcement, DOH attempted to alert CDPAP Participants and Personal Assistants of the upcoming change in a number of ways—continuing to post updates regarding the transition on its website; requiring Fiscal Intermediaries to mail outreach letters; sending text messages; and directing PPL to place advertisements on the radio, on television, and in newspapers.

---

[30] NY Department of Health, *NY Department of Health Announces Progress Following Launch of Statewide CDPAP Transition Efforts* (January 17, 2025) https://www.health.ny.gov/press/releases/2025/2025-01-17_cdpap_transition.htm (Last visited, March 26, 2025) (Hereinafter "January 17, 2025 Press Release)

[31] Rebeca Lewis, *Department of Health and PPL: CDPAP transition issues are not our fault,* (City & State New York) (March 24, 2025)  https://www.cityandstateny.com/policy/2025/03/department-health-and-ppl-cdpap-transition-issues-are-not-our-fault/404014/?oref=csny-author-river (Last visited March 26, 2025) (hereinafter "Lewis March 24, 2025 Article)

[32] NY Department of Health – *Building for the Future Managed Long Term Care Programs in New York* (March 2016) (https://www.health.ny.gov/health_care/medicaid/redesign/ltc_forum_white_paper.htm. (Last visited March 26, 2025)

137.    However, upon information and belief, the outreach letters from the Fiscal Intermediaries were not consistently sent, so enrollees of some Fiscal Intermediaries were deprived of this communication.

138.    Further, upon information and belief, many outreach letters were sent only in English and Spanish—not in the relevant consumer's preferred language.

139.    More importantly, none of these communications of which Plaintiffs' counsel is aware explained what will happen if CDPAP Participants or their Personal Assistant(s) do not timely enroll or register by March 28: *that Participants will no longer receive State-funded care on April 1, because there will be no way to pay for it.*  Nor did they inform Participants of their right to a Fair Hearing and aid continuing before any such loss of care.  Indeed, these communications did not even purport to provide "notice" of these rights.

140.    For example, Defendant directed Local Departments of Social Services ("LDSS") to mail certain CDPAP Participants a one-page letter "alert[ing]" them of the March 28 deadline to "change to PPL."  (Ex. 1).  The letter, dated March 13, 2025, explains that DOH "has partnered with . . . PPL . . . as the single Statewide Fiscal Intermediary for the CDPAP" and that their Personal Assistants "will not get paid to take care of [them] unless [they] register with PPL."  (*Id.*).  The letter goes on to provide options for beginning the registration process—a process that, according to the letter, must be completed in ten days.

141.    Yet the letter does not make clear that PPL will be replacing the Participant's current Fiscal Intermediary.  Nor does it contain the legal basis for this change or inform the Participant of their options to contest it.  The word "notice" is never used, not even once.[33]

---

[33] In contrast, true "notices" of an impending reduction or loss of care are typically several pages long; written in multiple languages; contain the legal bases for the change; explain the Fair Hearing process; and most importantly, explicitly inform the recipient that their services will be "reduce[d], suspend[ed], or stop[ped]" if no further action is taken. (Ex. 2 at 1).

142.    And confusingly, just a few lines down, the letter describes the effect of failing to register as "an interruption in . . . services"—suggesting that any payment lapse will be temporary and downplaying the potential devastating effect that even a temporary loss of CDPAP services would have on Participants.[34]

143.    Moreover, there is reason to believe that these "letters" have not reached every CDPAP Participant.  In the last several weeks, Plaintiffs' counsel has conducted outreach to as many clients and class members as possible to inform them of the upcoming transition.  Some of the CDPAP Participants contacted by Plaintiffs' counsel were unaware of any impending change, and had no idea that they needed to take action.

144.    Furthermore, many clients and class members who did receive these letters do not understand what they say, or what they should do to start the transition process.  Others fail to appreciate the urgency and complexity of this task, or what will happen to them if they do nothing.

145.    Still other class members are making every effort to timely enroll with PPL, but have encountered a wide variety of difficulties completing the process.  They report problems including but not limited to long call wait times, ending in disconnections or the option to get a call back, resulting in no call back; incorrect or missing information that no PPL representative can fix; incorrect tracking number or PPL identification codes (which are 14 digits and 16 digits long, respectively, and are separate and distinct numbers from the Participant's Medicaid ID number); PPL representatives who are untrained or provide inaccurate information; system errors; and difficulty getting through to a PPL representative who speaks their language.

---

[34] Another "letter" received by certain CDPAP Participants on March 13, 2025, is even more cryptic. (Ex. 1).  While that letter references Fiscal Intermediaries' upcoming cease of operations, it does not state what will happen if Participants fail to enroll by March 28 or what that cease of operations means.  And like the LDSS "letter," it does not reference an individual right to a hearing or aid continuing pending a hearing.

146.     Defendant McDonald also directed the MCOs to send a letter to their CDPAP Participants who had not yet enrolled with PPL by March 18, but has not made a template of that letter available publicly.  Plaintiffs' counsel has asked Defendant for samples of the letters that were sent by the LDSS and the MCOs, but has not received them.

147.     CDPAP Participants at risk of losing vital care on April 1, 2025 present a cross-section of Medicaid's most vulnerable beneficiaries.  These include children and adults with severe disabilities; those with chronic illnesses; and the elderly—any of whom may need assistance with basic daily living activites or administration of oxygen, feeding tubes, or other medications to stay alive or continue living in the community.

148.     Even CDPAP Participants who have been able to register themselves with PPL risk losing care if their Personal Assistants cannot register and be set up to receive payroll by April 1. These low-wage workers cannot continue coming to work if they are not getting paid, as they need to provide for themselves and their own families.  Indeed, to the extent Defendant assumes that Personal Assistants will continue their work on April 1 without pay, this would expressly violate New York wage-and-hour laws.

149.     As of March 24, 2025, 55,000 CDPAP participants had voluntarily left the CDPAP program and chosen to receive homecare services through a different program.[35]

150.     As of March 24, 2025, DOH reported that 165,000 CDPAP Participants and 170,000  Personal Assistants "ha[d] either started or completed the registration process."[36]  DOH has not publicly announced how many of those individuals have completed the process.

---

[35] NY Department of Health, *CDPAP Update: State Department of Health Announces Plan to Protect Cdpap Consumers & Workers Who Register After April 1 Transition Deadline* (March 24, 2025) (https://www.health.ny.gov/press_releases/2025/2025-03-24_cdpap_update.htm. (Last visited March 26, 2025) (hereinafter "March 24, 2025 NYDOH Press Release)
[36] *Id*.

151.    Even assuming that these figures reflect those who are finished enrolling (which they do not), that still leaves tens of thousands of CDPAP Participants and Personal Assistants who have **two days** to enroll or register before losing their care or livelihoods.

*Defendant Ignores Red Flags and Calls to Delay Implementation*

152.    Despite these sobering figures, DOH's most recent press release reads: "The transition remains on track toward the April 1 deadline."

153.    Indeed, DOH's announcements with regard to the transition could not be more disingenuous or inept.

154.    For example, instead of addressing the problems reported about PPL, DOH has devoted its resources to "combat[ting] misinformation" and "lies" about CDPAP through press releases, fact sheets, and YouTube videos insisting that businesses are attempting to "scare" Participants "into thinking that [they] will lose access to home care" when that is not true.[37]  DOH has also released personal testimonials from CDAP Participants endorsing the transition process and efficiencies of PPL.  These testimonials do not acknowledge the barriers preventing thousands of New Yorkers from accessing the PPL platform.[38]

155.    DOH's own website even claims that PPL "actively engage[s] with consumers"— linking to a PPL Facebook post that encourages New Yorkers to start the transition, but is rife with angry comments from those who cannot complete their enrollment.  Ex. 3.[39]

---

[37] New York State Department of Health, Video on Consumer Directed Personal Assistance Program (CDPAP) https://www.youtube.com/watch?v=UOKgww5Kh_w; *NY Department of Health, New York State Department of Health Provides Update on Latest CDPAP Transition Progress, Including New Testimonials Demonstrating Positive Transition Experience,* (March 17, 2025)  https://www.health.ny.gov/press/releases/2025/2025-03-17_cdpap.htm (Last visited March 26, 2025) (hereinafter "March 17, 2025 Transition Experience Article").
[38] PPL -*NY CDPAP Implementation - Ramon and Regina Thoughts on Transitioning to PPL* , https://www.youtube.com/watch?v=Z6alnYryjU0; https://www.health.ny.gov/press/releases/2025/2025-03-02_cdpap.htm; https://www.health.ny.gov/press/releases/2025/2025-03-10_cdpap.htm (Last visited March 26, 2025).
[39] NY Department of Health - *New York State Department of Health Provides Update on Latest CDPAP Transition Progress.* (February 7, 2025)  https://www.health.ny.gov/press/releases/2025/2025-02-07_cdpap.htm (Last Visited March 26, 2025).

156.    Advocates, unions, legislators, the press, and members of the public have repeatedly called upon DOH and Governor Hochul to extend the deadline to protect the health and lives of CDPAP Participants—the tenor of these pleas growing more and more concerned as it nears.  (See Exs. 4-6).[40]

*Defendant Announces a "Late Registration" Plan that Leaves CDPAP Consumers In a Continued State of Uncertainty and Concern*

157.    On March 24, DOH announced a "Plan to Protect Cdpap Consumers & Workers Who Register After April 1 Transition Deadline" (the "March 24 Announcement" or "Announcement").[41]  Describing the plan as a "late registration window," DOH said Personal Assistants "who have not yet completed the transition," but who complete registration by April 30, can retroactively receive payments for hours worked in April upon completion of" their PPL registration. The plan amounts to an assurance that Personal Assistants will be paid retroactively at an unknown time *if* they complete PPL registration by April 30, but may still have to work for a month without receiving pay for wages earned.  The announcement is silent as to whether Personal Assistants will be covered by health, unemployment, and workers compensation insurance coverage during this time.

158.    On the same date, DOH also issued a "New York State Department of Health Memo" (the "March 24 Memo" or "Memo") announcing a policy entitled "Consumer Directed Personal Assistance Program (CDPAP) Statewide Fiscal Intermediary (SFI) Payment Policy for

---

[40] In addition to raising alarm bells for CDPAP Participants, these calls warn that Personal Assistants will be harmed by the transition because it will force them to lose their existing health insurance and require many of them to enroll in a plan with minimal coverage for basic services such as doctor's visits, hospitalization, surgery, chemotherapy, and maternity care.  *See* (Exs. 7, 6) Michael Kinnucan, *How the CDPAP Transition Could Leave Thousands of Home Care Workers Uninsured*  (March 17, 2025), https://fiscalpolicy.org/how-the-cdpap-transition-could-leave-thousands-of-home-care-workers-uninsured.  Personal Assistants, too, need additional time to make the transition, to weigh the options for themselves and their families.
[41] https://www.health.ny.gov/press/releases/2025/2025-03-24_cdpap_update.htm.

15624516v.1

Late Registrants" (the "Policy"). (Ex. 8).  According to the Memo, the Policy's purpose is to

"provide guidance on defining the process and acceptance criteria for handling payments for

Personal Assistants . . . for hours worked" during the "late registration window."  It also claims

that the Policy will "ensure[] that payments are handled consistently and in compliance with

employment and payment regulations."  Importantly, the Policy makes the "late registration

window" available only to "consumers . . . [with] prior authorizations with PPL" as of April 1 "but

who do not have a complete registration in PPL@Home."  Confusingly, this suggests that contrary

to the plan set forth in the Announcement, in order to be eligible, consumers must be "authorized"

by PPL as of April 1.  Furthermore, neither consumers nor their Personal Assistants have any

control over whether PPL will process their registrations by April 30.

159.    The Policy lists three tasks that must be completed before the April 30

"registration" deadline in order for payments to be processed:

> (a)    The consumer must have a valid prior authorization for PPL as their fiscal intermediary effective for all dates of service;

> (b)    The consumer must have completed registration with PPL, including having a signed and validated Memorandum of Understanding (MOU); and

> (c)    Each personal assistant requesting payment must have completed all registration processes with PPL, including submitting all required documentation for employment and passing required reviews (i.e. I-9 processing).

160.    The Policy further notes that Personal Assistants can submit timesheets either

electronically or on paper, with payments posted every two weeks if submitted electronically, but

potential delays if submitted on paper.  While the Policy explains that PPL will invoice DOH for

reimbursement after making these payments, it is still silent on the extent to which Personal

Assistants will be covered by health, unemployment, and workers compensation insurance during

the "late registration window."

34

161.    Rather than acknowledging the problems with the transition process, including its unreasonable timing, Defendant and Governor Hochul have continued pointing the finger at FIs and their purported "disinformation campaign."[42]

162.    Likewise, over and over, Defendant has declined to act on the calls of consumers, Personal Assistants, and so many others in the public to extend the deadline and allow the current system to continue operating in place during a longer transition, deflecting to the "progress" already made or his office's to efforts battle the ongoing spread of "misinformation" surrounding the upcoming change.

163.    Defendant himself has not provided accurate information about the extent of such "progress."  On March 13, 2025, DOH touted that "over 70 percent of current consumers in . . . CDPAP . . . in the North County ha[d] either started or completed" the transition.[43]  In fact, North County is one of the most sparsely populated regions in New York, with only approximately 300,000 residents in total.[44]  As a result, this "progress" represents only a fraction of the hundreds of thousands of Participants in the entire State, let alone their Personal Assistants.

164.    It is obvious that Defendant has no plan to give unenrolled CDPAP Participants notice of their impending loss of benefits or aid continuing before April 1.  In a particularly

---

[42] Kate Lisa,  *Questions loom as New York state gives 30-day grace period for Medicaid home care transition* Spectrum News 1 (March 24, 2025), https://spectrumlocalnews.com/nys/central-ny/politics/2025/03/24/questions-loom-as-n-y--gives-30-day-grace-period-for-medicaid-home-care-transition.

[43] NY Department of Health - *North Country Region Update: State Department of Health Announces Over 70 Percent of Consumers in North Country Have Started or Completed CDPAP Transition* (March 13, 2025) https://www.health.ny.gov/press/releases/2025/2025-03-13_cdpap_north_country_region.htm. (Last Visited March 26, 2025) (hereinafter "March 23, 2025 Press release)

[44] North Country Economic Indicators https://www.newyorkfed.org/medialibrary/media/research/regional_economy/charts/Regional_NorthCountry. (last visited March 26, 2025)

revealing exchange, when pressed on this issue during a March 14, 2025 radio interview on

Capitol Pressroom, Defendant stated, "The back up plan is – don't look for a back up plan."[45]

Plaintiffs' Outreach to Defendant

165.    Plaintiffs' counsel have repeatedly attempted to engage DOH directly to share their

concerns and work together to find a solution.

166.    On February 21, 2025, counsel sent DOH a six-page letter warning that absent more

robust outreach, thousands of CDPAP Participants will lose care, and that such Participants are

entitled to notice, Fair Hearings and aid continuing before that happens.  Counsel provided specific

examples of the problems their clients are encountering when attempting to enroll.  And they

requested a meeting to discuss DOH's "plans to ensure that the rights of [these] vulnerable

consumers are protected."  (Ex. 9).

167.    Plaintiffs' counsel spoke with DOH twice in March 2025, in an effort to jointly

identify a solution that would ensure that CDPAP consumers did not lose essential Medicaid-

funded services. However, these discussions did not lead to a tenable resolution.

168.    Plaintiffs' counsel sent DOH an email on March 25, 2025, informing them of their

continued serious concerns about the impending suspensions of CDPAP services without notice

and an opportunity to be heard, and of their intention to bring this lawsuit.

## CLASS ACTION ALLEGATIONS

169.    Named Plaintiffs Liza Engesser, Marisol Getchius, Geetanjali Seepersaud, Maria

Jaime, Y.P.S., and C.P. bring this action, pursuant to Rule 23(b)(2) of the Federal Rules of Civil

Procedure, on behalf of themselves and as representatives of a class of:

---

[45] Soundcloud, The Capitol Pressroom, *NY Health Commissioner talks access to care* (March 14, 2025)
https://soundcloud.com/user-18109193/03-14-25_cpseg4_web. (Last visited March 26, 2025) (hereinafter March 14, 2025 Pressroom Interview).

All individuals who receive Consumer Directed Personal
Assistance Program services, who have not completed enrollment,
or whose Personal Assistant(s) have not completed registration and
received confirmation from PPL that the Personal Assistant has
been approved to continue providing services.

170.    The class is so numerous that joinder of all class members in this action would be
impracticable. Approximately 280,000 Medicaid beneficiaries receive CDPAP services, and at
least 60,000 of those have not yet begun enrollment with PPL as of March 24. Still more Medicaid
beneficiaries have made some measure of progress on their own enrollment, but have encountered
roadblocks and delays in trying to register their Personal Assistants, leaving them anxious and
scared of losing their life-sustaining care in just a few days' time.

171.    Moreover, it would be impracticable for potential plaintiffs, who are, by definition,
disabled and low-income individuals, to obtain legal services on an individual basis for their
claims. Hence their rights under the law may well be meaningless without certification of a class
action seeking common redress.

172.    Questions of fact common to the class predominate over any individual  questions,
including whether Defendant has failed to create a transition plan to protect CDPAP participants
during the transition to a single Fiscal Intermediary; whether Defendant has sent timely and
adequate notice that includes information about how to request a Fair Hearing and the right to aid
continuing to all CDPAP Participants who will lose care on April 1, 2025; and whether Defendant
will provide aid continuing to CDPAP participants who will lose care on April 1 and who request a
Fair Hearing despite the lack of notice.

173.    There are questions of law common to the class, including the question of whether
the alleged acts of Defendant violate the rights of members of the proposed class under the

Medicaid Act, 42 U.S.C. § 1396 *et seq*., and its implementing regulations, as well as the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

174.    The claims of Named Plaintiffs Liza Engesser, Marisol Getchius, Geetanjali Seepersaud, Maria Jaime, Y.P.S., and C.P.are typical of the claims of the class in that all of them are CDPAP consumers who have been unable to enroll with PPL before the March 28 deadline, none of them have received timely and adequate notice that their services will be suspended on April 1, and none of them will be granted aid continuing if they request a fair hearing to challenge the suspension of their services.

175.    Named Plaintiffs will adequately represent the interests of the class.  Named Plaintiffs are members of the proposed class and there are no conflicts of interest between Named Plaintiffs and other proposed class members.

176.    Named Plaintiffs and all proposed class members would benefit from a declaration that Defendant has violated the Medicaid Act and the Due Process Clause of the Fourteenth Amendment by utilizing a transition plan that does not permit for timely and adequate notice and the opportunity to be heard, as well as aid continuing, before the suspension of services.

177.    Named Plaintiffs and all members of the proposed class would benefit from an injunction ensuring that they continue to receive their CDPAP services, until and unless they are able to enroll with PPL or receive timely and adequate notice and have an opportunity for a Fair Hearing to challenge any proposed suspension in care.

178.    Plaintiffs are represented by the New York Legal Assistance Group ("NYLAG"). NYLAG attorneys are experienced in class action litigation concerning Medicaid, including the Medicaid home health services program.

179.    Plaintiffs are also represented by attorneys from Patterson Belknap Webb & Tyler

LLP, a law firm with a robust litigation practice and extensive experience representing individuals

and organizations in connection with law reform class action litigation.

## CAUSE OF ACTION

180.    Under the Medicaid Act, "[a] state plan for medical assistance must ... provide for

granting an opportunity for a fair hearing before the State agency to any individual whose claim

for medical assistance under the plan is denied or is not acted upon with reasonable promptness[.]"

42 U.S.C. § 1396a(a)(3).

181.    The Medicaid Act's implementing regulations require that Medicaid recipients

receive timely and adequate notice as well as an opportunity to be heard and aid continuing, before

experiencing a reduction, suspension, or termination of benefits.  42 C.F.R. §§ 431.206(b)-(c),

431.210, 431.211, 438.210(c)-(d), 431.220, 438.402, 438.404.

182.    In addition, the Due Process Clause of the Fourteenth Amendment prohibits the

States from depriving any person of property without "due process of law."

183.    Due process protections require that an individual be given notice and an

opportunity to be heard before being deprived of any significant property interest.

184.    The receipt of Medicaid benefits constitutes a protectable property interest subject

to due process protection.

185.    Defendant's failure to ensure that, despite the Fiscal Intermediaries' closure,

Plaintiffs will have their CDPAP services continued at their current level, without a gap in care,

until and unless they either enroll with PPL or receive a timely and adequate notice of their right to

aid continuing and an opportunity for a Fair Hearing at which to challenge any proposed

termination or suspension, violates Plaintiffs' rights under the Medicaid Act, 42 U.S.C. §

1396a(a)(3), its implementing regulations, and the Due Process Clause of the Fourteenth

Amendment to the U.S. Constitution.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray that this Court enter judgment as follows:

1.    Certifying this case as a class action, pursuant to Rules 23(a) and (b)(2) of the

Federal Rules of Civil Procedure, with a class defined as:

> All individuals who receive Consumer Directed Personal
> Assistance Program services, who have not completed
> enrollment, or whose Personal Assistant(s) have not
> completed registration and received confirmation from PPL
> that the Personal Assistant has been approved to continue
> providing services.

2.    Declaring that:

a.    Defendant's failure to ensure that Plaintiffs will have their CDPAP benefits

continued at their current level until and unless they have timely and

adequate notice of their rights to aid continuing and an opportunity for a Fair

Hearing at which to challenge any proposed reduction, suspension or

termination violates Plaintiffs' rights under the Medicaid Act, 42 U.S.C. §

1396a(a)(3), its implementing regulations, and the Due Process Clause of

the Fourteenth Amendment to the U.S. Constitution.

3.    Preliminarily enjoining Defendant from implementing the CDPAP Amendment

until at least September 30, 2025.

4.    Requiring that Defendant:

a.    ensure that payments to CDPAP Personal Assistants continue uninterrupted

while CDPAP Consumers have a longer time to make the transition to PPL;

b.    provide a status update to Plaintiffs' counsel every thirty (30) days detailing

40

how many CDPAP Consumers and Personal Assistants have completed enrollment with PPL and confirming that payments to CDPAP Personal Assistants continue uninterrupted; and

c.   provide any CDPAP consumer who will have their CDPAP services suspended or terminated as a result of the effectiveness of the CDPAP Amendment on September 30, 2025, with timely and adequate notice—sent no later than September 10, 2025—and an opportunity for a fair hearing, as well as aid-continuing, as mandated by, and consistent with all of the requirements of the Medicaid Act, 42 U.S.C. § 1396a(a)(3), its implementing regulations, and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

5.    Permanently enjoining Defendant from allowing any member of the class to have their CDPAP services suspended or terminated without first providing timely and adequate notice and an opportunity for a Fair Hearing, as well as aid continuing, as mandated by, and consistent with all of the requirements of the Medicaid Act, 42 U.S.C. § 1396a(a)(3), its implementing regulations, and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

6.    Requiring Defendant to ensure local social services districts and Managed Care Organizations do not suspend, terminate or reduce CDPAP services received by any member of the class without first providing for timely and adequate notice and an opportunity for a Fair Hearing, as well as aid continuing, as mandated by, and consistent with all of the requirements of the Medicaid Act, 42 U.S.C. § 1396a(a)(3), its implementing regulations, and the Due Process Clause of the

Fourteenth Amendment to the U.S. Constitution.

7.     Awarding reasonable attorney's fees under 42 U.S.C. § 1988(b), 29 U.S.C. §

794a(b),  and 42 U.S.C. § 12205.

8.     Awarding costs and disbursements.

9.     Granting such other and further relief as the Court may deem just and proper.

15624516v.1

Dated:  New York, New York
            March 26, 2025

PATTERSON BELKNAP WEBB & TYLER LLP

*/s/ Lisa E. Cleary*
LISA E. CLEARY
CAITLIN A. ROSS
EMMA GUIDO BRILL
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222
lecleary@pbwt.com
kross@pbwt.com
ebrill@pbwt.com

LISA RIVERA, ESQ.
NEW YORK LEGAL ASSISTANCE GROUP
100 Pearl Street, 19th Floor
New York, New York 10004

*/s/ Elizabeth Jois*
ELIZABETH JOIS, Of Counsel
JULIA RUSSELL, Of Counsel
Attorneys for Petitioner
(212) 613-5093
ejois@nylag.org
jrussell@nylag.org

*Attorneys for Plaintiffs*

15624516v.1