# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIZA ENGESSER, MARISOL GETCHIUS, GEETANJALI SEEPERSAUD by her Next Friend SAVITRI SEEPERSAUD, and MARIA JAIME on her own behalf and as Next Friend to Y.P.S. AND C.P., individually and on behalf of all persons similarly situated, BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, and REGIONAL CENTER FOR INDEPENDENT LIVING,<br><br>          Plaintiffs,<br><br>      *v.*<br><br>JAMES V. MCDONALD, as Commissioner of the New York State Department of Health,<br><br>          Defendant. | CASE NO. 25-CV-01689 |

## SUPPLEMENTAL MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF PLAINTIFFS'
## <u>MOTION FOR A PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND & PROCEDURAL HISTORY .........................................................2

    A.  This Lawsuit and the March 31, 2025 Hearing.........................................2

    B.  The Court's TRO ......................................................................................3

    C.  Defendant's Misleading Reports on the Transition Status .....................5

    D.  DOH Has Failed to Take the Necessary Steps to Preserve a Continuation of Service ...............................................................................9

ARGUMENT ............................................................................................................10

  I.  Plaintiffs Meet the Standard for a Preliminary Injunction.................................10

    A.  Plaintiffs Face a Termination, Reduction, or Suspension of Medicaid Services Absent An Injunction .............................................11

    B.  Defendant Has Failed to Provide Adequate and Timely Notice of Plaintiffs' Fair Hearing and Aid Continuing Rights ...............................14

  II.  The Injunction Plaintiffs Seek is Appropriate ................................................19

CONCLUSION..........................................................................................................23

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudath Isr. of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020)...................................................................10

*Catanzano v. Dowling*,
847 F. Supp. 1070 (W.D.N.Y. 1994) ......................................................11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................................................................................18

*Davis v. Shah*,
821 F.3d 231 (2d Cir. 2016)....................................................................12

*Forschner Grp., Inc. v. Arrow Trading Co.*,
124 F.3d 402 (2d Cir. 1997)....................................................................20

*Goldberg v. Kelly*,
397 U.S. 254 (1970) .................................................................................16

*Guadagna v. Zucker*,
No. CV-173397 (SJF) (AKT), 2021 WL 11645538 (E.D.N.Y. Mar. 19, 2021)..........11, 14, 16

*Haymons v. Williams*,
795 F. Supp. 1511 (M.D. Fla. 1992) ......................................................11

*Henry v. Gross*,
803 F.2d 757 (2d Cir. 1986)....................................................................16

*Jeannot v. New York State*,
2025 WL 80689 (E.D.N.Y. Jan. 13, 2025) .............................................18

*Kelsey v. Rosa*,
No. 24-CV-05179 (PMH), 2025 U.S. Dist. LEXIS 29948 (S.D.N.Y. Feb. 19, 2025) ........................................................................10

*E.B. ex rel. M.B. v. Cuomo*,
2020 WL 3893928 (W.D.N.Y. July 11, 2020).........................................18

*Morel v. Giuliani*,
927 F.Supp. 622 (S.D.N.Y. 1995)...........................................................11

*Mullane v. Cent. Hanover Bank*,
339 U.S. 306 (1950) .................................................................................15

*N.Y. Statewide Senior Action Council v. Leavitt*,
409 F. Supp. 2d 325 (S.D.N.Y. 2005).....................................................18

**TABLE OF AUTHORITIES**
**(CONTINUED)**

Page(s)

*New York v. DHS*,
  408 F. Supp. 3d 334 (S.D.N.Y. 2019), aff'd, 969 F.3d 42 (2d Cir. 2020)..............................18

*Samele v. Zucker*,
  324 F. Supp. 3d 313 (E.D.N.Y. 2018) ........................................................................18

*Vitagliano v. Cnty. of Westchester*,
  71 F.4th 130 (2d Cir. 2023) ........................................................................................18

**Statutes**

42 U.S.C. § 1396a(a)(5)............................................................................................21

Medicaid Act.............................................................................................. *passim*

N.Y. Soc. Serv. Law § 363-a(1)................................................................................21

N.Y. Soc. Serv. Law § 365-f......................................................................................20

Part HH of Chapter 57 of the New York Session Laws of 2024 ..................................20

N.Y. Lab. Law § 191 ..................................................................................................8

**Other Authorities**

42 C.F.R. § 431.10(e)................................................................................................21

42 C.F.R. § 431.201.......................................................................................11, 12, 15

42 C.F.R. § 431.206....................................................................................................15

42 C.F.R. § 431.210....................................................................................................15

42 C.F.R. § 431.211.......................................................................................11, 12, 15

42 C.F.R. § 431.244(f)................................................................................................22

42 C.F.R. § 438.400(b)(1).....................................................................................11, 12

42 C.F.R. § 438.404....................................................................................................15

DOH Memorandum, Feb. 4, 2025 available at
  http://health.wnylc.com/health/afile/254/883/1/ (last accessed April 2, 2025) ......................22

U.S. Const. amend. XIV, § 1 .......................................................................3, 10, 14, 15

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*Fair Hearing # 7980874H*, Sept. 4, 2019, available at
    https://otda.ny.gov/fair%20hearing%20images/2019-9/Redacted_7980874H.pdf ...........................17

Plaintiffs Liza Engesser, Marisol Getchius, Geetanjali Seepersaud, Maria Jaime, Y.P.S. and C.P., on behalf of themselves and those similarly situated, Brooklyn Center for Independence of the Disabled, and Regional Center for Independent Living (collectively, "Plaintiffs"), respectfully submit this supplemental memorandum of law in further support of their motion for a preliminary injunction.

## PRELIMINARY STATEMENT

Through March 31, recipients of CDPAP services ("Consumers") received care from home care workers ("Personal Assistants") who were timely paid by, and received benefits from, hundreds of fiscal intermediaries ("Fiscal Intermediaries").  These Consumers lost their CDPAP services on April 1, when their Personal Assistants were no longer employed by a Fiscal Intermediary.  The Consumers did not receive a notice that explained that their services were terminating and the specific factual basis for that termination.  The Consumers were not given an opportunity to challenge the termination of their services in a fair hearing, and they were not provided with aid continuing pending a fair hearing.  This is a clear violation of the Medicaid Act and Due Process Clause.

Defendant and the New York State Department of Health (together, "DOH") created this mass health crisis. DOH should have created a transition plan that required minimal work by the Consumer – just the signing of a Memorandum of Understanding – such that 280,000 Consumers with disabilities would not have needed to proactively reach out to the new Statewide Fiscal Intermediary, Public Partnerships LLC ("PPL").  DOH should have started this transition earlier, so that Consumers had more than two to three months to navigate the complex process. Importantly, DOH should have created a period of overlap when both PPL and the other Fiscal Intermediaries operated, such that any Consumer who was not fully set up with PPL could still receive services.  DOH has displaced the old system, and replaced it with one in which only a

minority of Consumers have functional CDPAP services. The new PPL-exclusive system is not working. It cannot possibly work for the 20,000 Consumers who have no relationship to PPL at this time. It is also not working for many of the 200,000 Consumers who have begun enrollment with PPL but either have not themselves completed enrollment, or whose Personal Assistants are not fully registered with PPL.

Brazenly, DOH disclaims responsibility for the mess it has created. DOH has ascribed blame to all parties except itself for the enormous transition problems that have happened since April 1 – claiming alternatively that it is the fault of the former Fiscal Intermediaries, managed care organizations ("MCOs") and local districts of social services ("LDSS"), PPL, and even Plaintiffs' counsel. The Court should not countenance DOH's abdication of responsibility. The Court should enter a preliminary injunction that protects Plaintiffs' rights to continue receiving care without any service interruption and that requires DOH to take the necessary steps for the care to continue.

## BACKGROUND & PROCEDURAL HISTORY

### A.    This Lawsuit and the March 31, 2025 Hearing

This action seeks immediate injunctive relief under the Medicaid Act and Due Process Clause to protect Plaintiffs from ongoing, serious, and life-threatening harms resulting from Defendant's disastrous transition of CDPAP to PPL as the State's single fiscal intermediary, and failure to provide notice, an opportunity to be heard, and aid continuing to address suspensions in care during the transition period. The named individual plaintiffs, along with proposed class members (the "Proposed Class"), are CDPAP Consumers who are experiencing suspensions of authorized care services because they have not completed enrollment, or their Personal Assistants have not completed registration and received confirmation from PPL that the Personal Assistant has been approved to continue providing services. ECF No. 32 ¶ 169. Plaintiffs BCID

and RCIL are disability advocacy and direct services organizations that have diverted extensive resources to address these care suspensions, and whose members and constituents on CDPAP are experiencing these care suspensions as well.  ECF No. 32 ¶¶ 34-55.

After the filing of Plaintiff's complaint and motion for a temporary restraining order and preliminary injunction ("Motion for TRO"), ECF Nos. 32, 4-5, the Court scheduled an expedited hearing for March 31, 2025 (the "Hearing").  At the Hearing, Defendant claimed that Plaintiffs are not experiencing suspensions, reductions, or terminations in care within the meaning of the Medicaid Act or Due Process Clause, such that the notice, hearing, and aid continuing rights asserted in Plaintiffs' complaint are irrelevant.  Mar. 31, 2025 Hearing Tr., Dkt. 50 ("Tr.") 10:22–11:6.  As a result, Defendant claimed, his belated attempts to "inform" people of the upcoming transition were sufficient.  Id. 11:2–6.   And in any event, Defendant asserted, Plaintiffs are the ones at fault for (a) bringing this lawsuit at the last minute; and (b) asking the Court for an unworkable solution—namely, to maintain the status quo by requiring previously-existing Fiscal Intermediaries to serve those CDPAP Consumer who, or whose Personal Assistants, have not fully transitioned to PPL and therefore, cannot receive services.  Id. 20:20–23; 22:5–8.

### B.    The Court's TRO

After hearing oral argument, the Court advised the parties that it intended to grant a temporary restraining order pending an evidentiary hearing.  Id. 16:2–22.  The Court instructed the parties to attempt to negotiate appropriate language, but they were unsuccessful.  As Plaintiffs explained: "[W]e have not heard anything from [Defendant] guaranteeing that services will be continued starting tomorrow [or] that the employment relationship between [Personal Assistants and still-existing Fiscal Intermediaries will be maintained]."  Id. 19:5-8.

3

The Court therefore issued its own proposed TRO, which was docketed at the end of the Hearing.  ECF No. 37.  The Court's TRO was intended to ensure that all CDPAP recipients can continue to receive essential home care services during the pendency of the State's transition to a single fiscal intermediary—even those CDPAP recipients whose "registration is still pending." *See* ECF No. 50 at 21:14-22:2, 25:12-25:21 (noting that under TRO, DOH would "have the discretion to do what they think is appropriate to protect people").

Pursuant to the TRO, CDPAP consumers who have completed enrollment with PPL and whose Personal Assistants are fully registered with PPL and received confirmation that they can begin work, can use the PPL system and will be paid by PPL.

For all other CDPAP consumers — those who have not yet enrolled with PPL, those who are the in middle of the enrollment process, and those who have themselves enrolled, but whose Personal Assistants are not fully registered and confirmed to begin work with PPL — the TRO maintains the status quo.  All those consumers and Personal Assistants can continue to use their former FI's systems and the Personal Assistants will be paid by the FI.  The Court reiterated as much during today's teleconference, ordering:

> [T]he State has a responsibility to ensure that all CDPAP consumers and PAs who participated in CDPAP before April 1, 2025, regardless of their individual circumstances and present registration status, shall continue to receive care from their existing PA, who shall be timely paid for their services. Based on the papers and the hearing, and for good cause shown, it is hereby:
>
> ORDERED that Defendant must ensure and take whatever action necessary to ensure that all CDPAP consumers and PAs who received care and payment before April 1, 2025, regardless of their present registration status, shall continue to receive care from their existing PAs, who shall be timely paid for their services.

ECF No. 61.

4

### C.    Defendant's Misleading Reports on the Transition Status

DOH has and continues to issue statistics about the transition that obfuscate how many Consumers and Personal Assistants are actually set up to receive services from PPL today.  The issue is this:  PPL cannot, and is not, providing CDPAP benefits to Consumers who have started, but have not yet completed, registration with PPL.  Nevertheless, DOH consistently treats this population as if they are fully registered with and ready for their Personal Assistants to be paid through PPL.  For example, at the Hearing, defense counsel represented that there were "195,000 consumers or people who receive the CDPAP program who have registered *or are currently registering with PPL*" (emphasis added), and then characterized this entire population as individuals "who will receive the service, will receive it today, [and] . . . will receive it tomorrow."  Tr. at 4:8–10 (incorrectly attributing this last quote to Ms. Ross instead of Ms. Summers).   Likewise, in its April 1 press release, DOH touted how "260,000 Consumers Have Taken Action, Including Almost 200,000 Consumers *Who Have Started or Completed Registration with* PPL."[1]

DOH's use of the "started or completed registration" number misrepresents what is actually happening for CDPAP Consumers.  It does not capture who can receive benefits from PPL today, because to use PPL today, both the Consumer *and all of their Personal Assistants* must complete registration with PPL, as well as receive confirmation from PPL that the Personal Assistants are approved to work and access the PPL app on which they can record their time. *See* Declaration of Rachel Hotlzman, Dkt. 14 ("Holtzman Decl.") ¶ 13.

An explanation of how differently positioned Consumers are affected by DOH's mischaracterization is warranted.  Generally, there are three groups of Consumers.

---

[1] https://www.health.ny.gov/press/releases/2025/2025-04-01_cdpap.htm

*First*, there are Consumers who have not yet started enrollment with PPL.  Because Consumer enrollment is required to initiate Personal Assistant registration, by definition, the Personal Assistants for these Consumers have not begun registration.  *See* Holtzman Decl. ¶¶ 9–10 .  Although Plaintiffs' counsel is operating at an informational disadvantage, **Plaintiffs' counsel believes this population numbers around 20,000 Consumers.  PPL cannot provide benefits to these Consumers today.**  In order to receive continuing care, the Personal Assistants for these Consumers must be employed and timely paid by their existing Fiscal Intermediaries or some other system devised by DOH.

*Second*, there are Consumers who have begun—but not finished—registration with PPL. Registration may be incomplete for a number of reasons, including, *inter alia*, (a) the Consumer has not finished the enrollment process, (b) the Consumer has not received a PPL authorization number to enable their Personal Assistants to enroll, (c) the Consumer has received a PPL authorization but some or all of their Personal Assistants have not completed registration, (d) the Consumer and all of their Personal Assistants have completed the enrollment and registration process, but the status of one or more Personal Assistants remains "under review" in the PPL system, or (e) all of the Consumer's Personal Assistants have been confirmed in the PPL system, but they have not received instructions and access to PPL's time-keeping system.[2]  Holtzman Decl. ¶ 5–13.

**Plaintiffs' counsel believes this population includes over 160,000 Consumers.  PPL cannot provide benefits to these Consumers today.**  Nevertheless, DOH has taken the position

---

[2] Consumers and Personal Assistants alike have encountered a number of technical issues with PPL's registration system as well as long phone lines and disability-related impediments to completing registration.  *See* Holtzman Decl. ¶¶ 15–32; Supplemental Declaration of Joseph G. Rappaport, filed herewith ("Rappaport Supp. Decl.") ¶¶ 1–19; *see also, e.g.* Declaration of Maria Jaime, Dkt. 8 ("Jaime Decl.") ¶¶ 23–28.

that the TRO "does not apply" to these Consumers and, therefore, have not made arrangements for payment to these workers other than through the PPL system they presently cannot access.[3] As Plaintiffs stated in their April 1, 2025 letter, these people *are* losing services.  *See* Apr. 1, 2025 Ltr. from Lisa E. Cleary, Dkt. 38 ("Cleary Ltr.") at 2.  They are losing services because DOH is not treating them like Consumers who have not begun enrollment (which would allow their Personal Assistants to be paid through their prior Fiscal Intermediary), and, because their registration is still held up, the Personal Assistants also are not eligible to be paid through PPL. *Id.*

*Third*, there are Consumers who have "already registered with PPL."  Temporary Restraining Order ("TRO"), Dkt. 37, at 2.  These Consumers have (a) completed their own enrollment with PPL, (b) received the necessary authorization for their Personal Assistants to register with PPL, (c) their Personal Assistants have been able to complete the registration process with PPL, (d) PPL's systems reflect that the registration of all Personal Assistants has been approved, and (e) the Personal Assistant has received access to PPL's time keeping system and can use it to clock in.  DOH has never publicly released a figure of how many Consumers (or Personal Assistants) have achieved this status, but **Plaintiffs' counsel suspects it is fewer than 50,000 Consumers.  In theory, PPL can provide benefits to these Consumers today**.

However, Plaintiffs' Counsel is hearing otherwise.  For example, as described in Plaintiffs'' April 1 letter, these Consumers report that their Personal Assistants are unable to log in to PPL's system for a variety of reasons, including allegedly missing authorizations, missing documents, and the fact that previously approved Personal Assistants are labeled "returned" in the system.  *See* Rappaport Supp. Decl. ¶ 17.  Additionally, many Personal Assistants who

---

[3] https://www.health.ny.gov/press/releases/2025/2025-04-01_cdpap.htm.

believed they were fully confirmed and ready to begin work yesterday were unable to clock in without clicking an acknowledgement that they are not an employee of PPL and will only receive payment retroactively.  Cleary Ltr. at 3.  In this circumstance, the Personal Assistant is asked to—illegally—waive their rights under Section 191 of the New York Labor Law, or be precluded forever from receiving a day's pay for services provided to the CDPAP recipient.

Furthermore, DOH admitted yesterday that within the first 12 hours that the PPL's Time4Care app was in operation, only 65,000 workers were able to log hours.[4]  In the same public statement, DOH stated that almost 200,000 consumers had "started or completed registration with PPL."  This gross mismatch in numbers demonstrates that a majority of the 200,000 consumers did not receive CDPAP services on April 1.  Indeed, the Medicaid benefit provided through CDPAP is payment for the Consumer's Personal Assistants.  *See infra* Section I.A.  Therefore, CDPAP benefits stopped yesterday for the Consumers served by the Personal Assistants who could not clock in yesterday, which, by DOH's own estimate, is more than 125,000 Personal Assistants.

Plaintiffs' counsel is operating at an informational disadvantage.  We field as many calls and emails as we can from CDPAP participants, but we simply cannot understand what is happening for everyone.  To better understand where things stand, DOH must be compelled to present evidence of concrete figures illustrating how many Consumers fall into each of the three situations described above.

---

[4] https://www.health.ny.gov/press/releases/2025/2025-04-01_cdpap.htm.

### D.    DOH Has Failed to Take the Necessary Steps to Preserve a Continuation of Service

As Plaintiffs explained in their opening brief, until yesterday, the administrative, financial, and compliance responsibilities associated with receiving home care under CDPAP were performed by hundreds of Fiscal Intermediaries.  *See* Plaintiffs' Br. 8, ECF No. 5.  These Fiscal Intermediaries are, at least for now, the only entities with the infrastructure and the capacity to lawfully employ Personal Assistants not fully registered with PPL—including paying employees on time and offering required benefits, tasks critical for ensuring that CDPAP Consumers receive the care to which they are entitled.  Any remaining hope as to whether PPL might have the capacity to perform these tasks reliably for Personal Assistants has been dispelled by yesterday's experience: it cannot.  And DOH has not provided any workable third alternative.

But even though (as recounted above) tens of thousands of Personal Assistants cannot at this point be employed by PPL, and even though this Court's TRO told DOH to stay implementation of the amendment barring the non-PPL Fiscal Intermediaries from operating, DOH has not taken the necessary steps to preserve the ability of Fiscal Intermediaries to operate and thereby protect CDPAP Consumers' care.

In New York, a Medicaid recipient's benefits are administered by a managed care organization ("MCO") or a local department of social services ("LDSS").  Previously, MCOs and LDSSs contracted with Fiscal Intermediaries to deliver services to CDPAP Consumers.  *See* DOH Letter, ECF No. 39, at 2-3 (identifying MCOs and LDSSs as "the entities that authorize CDPAP services and held contracts with the FIs").  DOH's position, made clear in its letter yesterday and communicated to MCOs and LDSSs, is that these contracts have terminated as of March 31, and DOH has been unwilling to tell MCOs and LDSSs to reinstate the contracts.  *Id*. at 1-3.  Likewise, MCOs and LDSSs provided authorizations for Fiscal Intermediaries to provide

services to CDPAP Consumers, but given the uncertainty created by DOH's narrow interpretation of the TRO, many have not been willing to continue doing so after the effective date of the CDPAP Amendment.  As a result, and as recounted above, even many CDPAP Consumers who *DOH* agrees are subject to the TRO have effectively had their CDPAP benefits suspended.

## ARGUMENT

### I.    Plaintiffs Meet the Standard for a Preliminary Injunction

Courts preliminarily enjoin government action taken pursuant to a statute when, as here, the moving party establishes: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (internal quotations and alterations omitted).

Plaintiffs satisfy each of these elements.  Because the standard for entry of a temporary restraining order is the same, *Kelsey v. Rosa*, No. 24-CV-05179 (PMH), 2025 U.S. Dist. LEXIS 29948, at *3 (S.D.N.Y. Feb. 19, 2025), Plaintiffs respectfully refer the Court to the Argument section of their TRO Motion, which Plaintiffs incorporate by reference here.  ECF No. 5 at 23–48.

In further support of their Motion for a Preliminary Injunction, Plaintiffs correct two serious misrepresentations made by Defendant at the TRO Hearing regarding his legal obligations and compliance therewith under the Medicaid Act and its implementing regulations, as well as the Due Process Clause.  These misrepresentations are that the named individual Plaintiffs and the Proposed Class are ***not***: (a) facing a reduction, termination, or suspension in CDPAP Services; and (b) entitled to notice, an opportunity to be heard, and aid continuing.  (Tr. 11:2–6).

10

A.   **Plaintiffs Face a Termination, Reduction, or Suspension of Medicaid Services Absent An Injunction**

Defendant's assertion that Plaintiffs' care services are not being terminated, reduced, or suspended, is extremely disingenuous.  Defendant is well-aware that Plaintiffs are losing care as a result of the CDPAP Amendment, but is using semantics to avoid blame.  This is unacceptable and unlawful.

A "termination, reduction, or suspension" of Medicaid benefits triggering notice, hearing, and aid continuing rights occurs when these benefits are discontinued at the level previously authorized.  *See* 42 C.F.R. § 431.211; *id.* § 431.201; *id.* § 438.400(b)(1).  This can happen in a number of ways—when a Medicaid beneficiary's authorization is formally revoked or assessed at a lower level, or, as here, when "the practical effect of" the State's action "disqualifies" the beneficiary's continued "recei[pt]" of previously-authorized "home healthcare benefits." *Haymons v. Williams*, 795 F. Supp. 1511, 1522 (M.D. Fla. 1992).

In other words, the Medicaid Act and its implementing regulations need not "spell out every hypothetical scenario in which they could be implicated" in order to apply.  *Guadagna v. Zucker*, No. CV-173397 (SJF) (AKT), 2021 WL 11645538, at *14 (E.D.N.Y. Mar. 19, 2021). Indeed, courts have routinely found Medicaid beneficiaries entitled to these rights when—for whatever reason attributable to the State—they receive "less home health care than that level of care ordered by their treating physician." *Catanzano v. Dowling*, 847 F. Supp. 1070, 1074 (W.D.N.Y. 1994); *see, e.g.*, *Guadagna*, 2021 WL 11645538, at *12  (holding that State or Managed Long Term Care Plan's ("MLTCP") consideration of "application for enrollment" that results in an "assess[ment] . . . for lesser/different services than their current MLTCP" required notice, opportunity to be heard, and aid continuing); *Morel v. Giuliani*, 927 F.Supp. 622, 631, 636 (S.D.N.Y. 1995) (finding "a pattern of failure in providing timely benefits" triggering aid

11

continuing requirements where City of New York was "unable to provide enough staff to answer the phones to do the job in a way that provides adequate service" pursuant to City's attempt to "eliminate inefficiencies in current procedures").

Here, the State "cannot avoid an injunction demanding compliance with those requirements by assigning plaintiffs the burden of demonstrating why such procedural requirements—enacted in a direct exercise of Congress's legislative judgment—are worth respecting in any given instance." *Davis v. Shah*, 821 F.3d 231, 254 (2d Cir. 2016). Each CDPAP Consumer has already been determined eligible for CDPAP services in a specific amount or duration. Yet tens of thousands of these Consumers do not have a Personal Assistant employed by a Fiscal Intermediary to provide that service. This means that they are experiencing a "termination, suspension, or reduction" in care. *See* 42 C.F.R. § 431.211; *id.* § 431.201; *id.* § 438.400(b)(1).

Defendant seems to think that Plaintiffs' "services are continuing" simply because it has not taken formal action reducing those services under their respective care plans. Tr. 12:12-18. But such services are ***not*** continuing because there is nobody to pay and employ their Personal Assistants—so their Personal Assistants are not providing them. The CDPAP Amendment eliminates all fiscal intermediaries that previously would have employed Personal Assistants and processed payments, and replaces them with PPL. Yet CDPAP Consumers who have not started or completed enrollment in PPL; whose Personal Assistants have not started or completed registration or are unable to log hours; or whose service authorizations have not been updated, cannot receive their services because PPL cannot support them.

Defendant's assertion that the "Late Registration Window" resolves any lapse in services is belied by yesterday's chaos for CDPAP Consumers and Personal Assistants at all stages of the

12

enrollment and registration process.  Tr. 12:12-18.   The Court's TRO protects Consumers not fully transitioned to PPL—or whose Personal Assistants have not fully transitioned or cannot clock in—by allowing still-existing Fiscal Intermediaries to continue operating and paying for care if PPL cannot do so.  Tr. 23:6–9.  Yet Plaintiffs' counsel is inundated with complaints that many Consumers in this position cannot receive care because no entity—not PPL, nor their previous Fiscal Intermediaries—can employ their Personal Assistants.[5]  ECF Nos. 38, 38-1, 38-2, 38-3.

      Even many of the Consumers that Defendant claims are covered by the TRO—because they have not started the enrollment process at all—have been told that their previous Fiscal Intermediaries will not pay for additional care.  Declaration of Byron Rogers ("Rogers Decl.") ¶¶ 10-11, 14.  And in further defiance of the TRO, some FIs have been instructed that they will "NO[] [longer] be able to pay for dates of service" for Consumers mid-transition "to any FI besides PPL," even though these Consumers also cannot receive services through PPL.  ECF No. 38-2; *cf.* Supplemental Declaration of Joe Rappaport ("Supp. Rappaport Decl.") ¶¶ 7, 14-15.  As predicted, ECF No. 12 ¶ 38, Consumers in this position are preparing to go to the hospital in order to continue receiving care.  Declaration of Robert Cardillo ("Cardillo Decl.") ¶¶ 28-29; ECF No. 12 ¶ 38.

      Moreover, many Consumers who ostensibly would not even need the TRO's protections or "Late Registration Window" because they and their Personal Assistants have been ***expressly confirmed*** as fully enrolled, are ***still*** experiencing suspensions in services.  Declaration of Sarah

---

[5] Because tens of thousands of Personal Assistants across the State were not employed yesterday, they were not covered by employment protections such as unemployment insurance, workers compensation or short-term disability.  They were not covered by the waiver of liability that applies specifically to Personal Assistants in the CDPAP program who perform skilled tasks for their Participants.  They will not receive a paycheck on the legally required schedule.  CDPAP Participants have thus lost a Medicaid-funded service; the Defendant's Late Registration Window is window-dressing to obfuscate that fact.

Klein ("Klein Decl.") ¶¶ 12, 14-15, 18-19; Declaration of Nina Bakoyiannis ("Bakoyiannis Decl.") ¶¶ 10-11, 18-20.  Despite such confirmation, these Consumers' Personal Assistants cannot clock in at all or cannot do so without unlawfully agreeing to accept backpay and waiving other important employment rights.  Klein Decl. ¶¶ 12, 14-15, 18-19; Bakoyiannis Decl. ¶¶ 18-20; Supp. Rappaport Decl. ¶¶ 10-13; *see also* ECF No. 38-3; Berger Decl. ¶ 13.  These Personal Assistants literally cannot work or be paid in compliance with relevant law, and therefore, have told Consumers that they will not be able to continue providing care.  Klein Decl. ¶¶ 12, 14-15, 18-19; Supp. Rappaport Decl. ¶ 13; *see also* Bakoyiannis Decl. ¶¶ 18-20.  These Consumers will simply have to manage on their own or ultimately, go to the hospital even though they had no idea of this until yesterday.  Klein Decl. ¶¶ 12, 14-15, 18-19; Bakoyiannis Decl. ¶¶ 21-22; Supp. Rappaport Decl. ¶ 16.

If none of these situations constitute a termination, reduction, or suspension in care triggering Consumers' notice, hearing, and aid continuing rights as well as the Due Process Clause, it is hard to imagine what does.

**B.    Defendant Has Failed to Provide Adequate and Timely Notice of Plaintiffs' Fair Hearing and Aid Continuing Rights**

In light of the widespread interruptions in care that occurred yesterday and that are sure to continue, Defendant is incorrect that Plaintiffs "are not entitled to a fair hearing notice because there's no due process rights at stake here."  Tr. 11:1-5.  To the contrary, that is exactly what Defendant should have provided—which would have served as a stop-gap to prevent the rampant loss of services yesterday and the serious health conditions that will result.  *Guadagna*, 2021 WL 11645538, at *14.

Defendant all but concedes that he has not provided adequate notice under either the Medicaid Act or Due Process Clause.  It is undisputed that Defendant has not sent a uniform

notice to all Consumers explaining the mechanics and implications of the transition as well as their procedural rights. It is also undisputed some Consumers never received anything purporting to provide notice and learned about the transition through Plaintiffs' counsel or another advocacy organization. *See, e.g.*, ECF. 10 ¶ 8.

Nonetheless, Defendant insists that he has somehow met his obligations through his "weekly press releases" and other unspecified "steps" he has taken to "inform[] people of this change." Tr. 10:7-11:6. But at the same time, he acknowledges that these communications do not constitute "fair hearing notices"—those that:

- inform Medicaid recipients of an impending termination, suspension, or reduction of their benefits;

- explain the proposed action and its legal basis;

- explain recipients' rights to a fair hearing and to aid continuing pending the outcome thereof;

- are conveyed in writing; and

- are sent at least ten days before the intended action.

42 C.F.R. § 431.201, 431.206, 431.210, 431.211, 438.404; Tr. 11:2-5.

Defendant's press releases and other mailed communications do not contain any of this required information. See ECF No. 5 at 34-37. Nor were these communications "reasonably calculated, under all the circumstances, to apprise" CDPAP Consumers "of the pendency of the action" or to "afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank*, 339 U.S. 306, 314 (1950). Indeed, the press releases were posted on Defendant's website, rather than sent directly, when many CDPAP Consumers lack computer access, have limited language skills, or as lay persons, simply do not monitor government entities' webpages on a

routine basis.  Even if a Consumer came across one of the subject press releases, they would not understand what could happen absent any action vis-à-vis the transition, nor would they understand their rights to pose objections and receive aid continuing.  The press releases do not mention these rights at all, nor do they explain that those who fail to transition will lose their care.[6]  Nor do any of the mailed communications.  ECF No. 5 at 29-42; ECF 32-1; ECF 32-10.[7]

In addition, Defendant's failure to provide adequate notice renders Plaintiffs' fair hearing rights "fundamentally illusory."  *Guadagna*, 2021 WL 11645538, at *14 (cleaned up).  It is well-established that under *Goldberg v. Kelly*, public assistance recipients like Medicaid beneficiaries are entitled to "timely and adequate notice detailing the reasons for a proposed termination," as well as a pre-deprivation evidentiary hearing before any loss of services. 397 U.S. 254, 267–68 (1970).  Absent adequate notice, such individuals lack the " [required] information to put [them] in a position to defend the impending termination of benefits" at the hearing.  *Henry v. Gross*, 803 F.2d 757, 766 (2d Cir. 1986).

Plaintiffs' rights to be heard before they lose CDPAP services is not merely academic.  Plaintiffs are losing care – or, for most, have already lost care – as a result of individualized determinations that they did not enroll with PPL, or that their Personal Assistants did not register with PPL, or that the relevant entity did not provide PPL with a service authorization.  Before these individuals lose their care, they are entitled to timely notice that explains in what way they

---

[6] As but one example, Defendant's March 24, 2025 press release, issued shortly before this lawsuit and less than a week before April 1, encouraged Consumers to transition to PPL to maintain their services— but not once did it explicitly explain that they will lose care services if they fail to do so, or advise them of their fair hearing or aid continuing rights.  https://www.health.ny.gov/press/releases/2025/2025-03-24_cdpap_update.htm.

[7] Plaintiffs' counsel has confirmed that the consumer communications regarding the transition sent by MCOs are substantially similar to the template on the same topic that DOH provided to LDSS. Attachment to Declaration of Byron Rogers, filed herewith; *cf.* ECF Nos. 32 ¶ 140; ECF 5 at 11 n.6.

have failed to enroll with PPL, as well as the opportunity challenge the assertions in that notice in a fair hearing. And critically, for this opportunity to be meaningful, those who timely request hearings must be eligible to receive aid to continue pending the hearing.

For instance, such an opportunity would allow Named Plaintiff Marisol Getchius to explain that for weeks, she could not get her Personal Assistance registered because PPL's system had mis-identified her. It would allow Named Plaintiff Maria Jaime to adduce evidence that she was trying to enroll herself and her children, and have all of their Personal Assistants registered, but that her many calls to PPL and its facilitators have been fruitless. The administrative law judges who administer these hearings could then make credibility determinations and decide whether a given CDPAP Participant is being unlawfully deprived of services.[8] And all the while, these Named Plaintiffs would continue to receive the care they need, to facilitate their abilities to challenge the planned deprivation of care, and ensure that there is no gap in such care if the deprivation is found to be unwarranted.

To be clear, fair hearings such as these should be an absolute last resort. To obviate the need for notice and a fair hearing, Defendant should have created a transition plan that left sufficient time for the vast majority of CDPAP Consumers to be completely set up with PPL before the April 1 deadline. Then, before termination of services for any remaining CDPAP Consumers, Defendant should have timely notified them that their failure to enroll would result

---

[8] The Defendant, through his contract with the Office of Temporary and Disability Assistance ("OTDA") routinely adjudicates hearings to settle factual disputes about Medicaid recipients' compliance with administrative requirements. For example, Medicaid recipients must mail in an annual recertification form. Failure to do so results in a timely and adequate notice stating that the individual's Medicaid benefits will terminate as a result of failure to submit the form. The individual can then challenge that determination through a fair hearing at which they present evidence that they did, in fact, return the form or that they were never provided the form. *See, e.g.*, *Fair Hearing # 7980874H*, Sept. 4, 2019, *available at* https://otda.ny.gov/fair%20hearing%20images/2019-9/Redacted_7980874H.pdf .

in the loss of CDPAP services, and of their rights to challenge this determination at a fair hearing while receiving aid continuing.  While those hearings were pending, Defendant could have reached out to that group of Consumers to offer further assistance with PPL enrollment.  Instead, Defendant neither ensured that CDPAP Participants would keep their care during the transition process, nor notified them of their rights to challenge the factual basis for their loss of services in a fair hearing.

Defendant's seriatim failures, combined with well-accepted standards for standing and ripeness, is what compelled Plaintiffs' counsel to file this lawsuit last week, shortly before the April 1 transition deadline.  *Cf.* Tr. 20:8-19.  Indeed, to satisfy Article III's standing and ripeness requirements, a "threatened injury [must be] 'certainly impending,'" or there must be "a 'substantial risk' that the harm will occur."  *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)).  Courts dismiss lawsuits challenging losses of benefits that are not immediately impending as too speculative.[9]  As explained in Plaintiffs' complaint, ECF No. 32, Plaintiffs' counsel reached out to Defendant in mid-February 2025 to alert them to the impending crisis and the difficulties clients were having with the transition.  Plaintiffs' counsel met with Defendant twice and discussed these problems at great length.  During their early communications, Defendant

---

[9] *See, e.g., Jeannot v. New York State*, 2025 WL 80689, at *6 (E.D.N.Y. Jan. 13, 2025) (CDPAP recipients' concern that they would lose care in three months was too "speculative" to confer standing); *E.B. ex rel. M.B. v. Cuomo*, 2020 WL 3893928, at *6 (W.D.N.Y. July 11, 2020) (plaintiffs receiving home care failed to show that it was "certainly impending" that they would be institutionalized); *Samele v. Zucker*, 324 F. Supp. 3d 313, 324–25 (E.D.N.Y. 2018) (plaintiffs whose benefits were not "terminated, suspended or reduced" could not show "imminent prospect" of a "loss of medical care"); *N.Y. Statewide Senior Action Council v. Leavitt*, 409 F. Supp. 2d 325, 330 (S.D.N.Y. 2005) ("Plaintiffs cannot identify at this premature juncture the particular individuals who will fall between the cracks on the January 1, 2006 effective date [of a regulation changing Medicaid eligibility]."); *cf. New York v. DHS*, 408 F. Supp. 3d 334, 344 (S.D.N.Y. 2019) (finding sufficient standing in light of rule impacting immigration eligibility "scheduled to go into effect in a matter of days"), aff'd, 969 F.3d 42 (2d Cir. 2020).

expressed his desire to devise a solution that would ensure continuity of care for all CDPAP Consumers.  Meanwhile, Defendant's press releases reported "great progress on registration" and the Consumer population as "on track" to meet the April 1 deadline.[10]  However, on March 18, Defendant allowed MCOs and LDSSs to send letters to Consumers violating the requirements of due process in that they did not notify Consumers of the impending loss of services or advise them of their rights to a hearing.  Shortly thereafter, on March 24, Defendants announced their "Late Registration Window"[11]—which failed, by any stretch of the imagination, to ensure that Consumers would keep essential Medicaid services.  As a result, Plaintiffs' counsel had no choice but to bring an emergency action to protect Plaintiffs and the Proposed Class from injury.

**II.  The Injunction Plaintiffs Seek is Appropriate**

In light of DOH's approach to the TRO Plaintiff obtained on Monday, Plaintiffs seek injunctive relief that will clarify DOH's obligation to ensure that Consumers' CDPAP benefits are not suspended.  Plaintiffs seek a preliminary injunction to:

- consistent with the Court's order earlier today, require Defendant to ensure and take whatever action is necessary to ensure that all CDPAP Consumers who received care before April 1, 2025, regardless of their present registration status, shall continue to receive care from their existing PAs, who shall be timely paid for their services;

- enjoin Defendant from implementing those sections of Part HH of Chapter 57 of the New York Session Laws of 2024 that amend subdivision 4-a(ii-a) and 4-a-

---

[10] https://www.health.ny.gov/press/releases/2025/2025-03-17_cdpap.htm;
https://www.health.ny.gov/press/releases/2025/03-20-2025_cdpap_update.htm;
https://www.health.ny.gov/press/releases/2025/2025-03-10_cdpap.htm.

[11] https://www.health.ny.gov/press/releases/2025/2025-03-24_cdpap_update.htm.

1(a) (see section 3 of Part HH) of section 365-f of the social services law, as to

any CDPAP Consumers who are not fully enrolled in PPL ("Unenrolled

Consumers")—meaning that the Consumers themselves have completed

enrollment, and also that their Personal Assistants have fully registered and can

be employed without delay by PPL;

- require Defendant to take the necessary steps to restore the March 31 status quo

  as to Unenrolled Consumers, including by directing MCOs and LDSSs to

  reinstate their contracts with Fiscal Intermediaries and to restore authorizations

  for Fiscal Intermediaries to provide services.

As set forth in their moving papers, Plaintiffs ask that this injunction last until September 30, 2025.

"A district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct." *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) (citation omitted). Here, Defendant's wrongful conduct—the suspension of CDPAP benefits without the timely and adequate notice required by law—can only be prevented by requiring Defendant to take the necessary steps for CDPAP benefits to not be suspended absent such notice. Each element of Plaintiff's proposed injunction is tailored to that objective.

Many unenrolled Consumers cannot currently receive CDPAP services from PPL. *See supra* at 12-13. To avoid a suspension of service, Unenrolled Consumers need access to an alternative service provider, and as far as Plaintiffs are aware, the Fiscal Intermediaries are the only providers capable of properly and lawfully employing the Personal Assistants—a service they were already performing as of Monday, and that they are not providing now only because of

DOH's implementation of the CDPAP Amendment.  DOH must fix the mess it has made.  In the first instance, and as the Court has already recognized in its TRO, this means suspending implementation of the CDPAP Amendment as to Unenrolled Consumers.  In addition, however, to render this relief practically effective, DOH should also instruct the MCOs and LDSSs to reinstate contracts with the Fiscal Intermediaries and to restore authorizations for them to provide services to the extent necessary for servicing Unenrolled Consumers.

DOH is wrong that it lacks authority to direct these steps.  As required by federal law, DOH is the "single State agency" established or designated "to administer or to supervise the administration of" New York's Medicaid program.  *See* 42 U.S.C. § 1396a(a)(5); *see also* N.Y. Soc. Serv. Law § 363-a(1).  Federal regulations likewise require that "[t]he Medicaid agency may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters."  42 C.F.R. § 431.10(e).  Here, DOH is bound by federal law not to cause a suspension in care absent fair and adequate notice, and it can issue appropriate policies to ensure that this does not take place.

Lastly, Plaintiffs continue to believe that a six-month extension until September 30, 2025 is warranted.  As Plaintiffs have explained, federal law bars Defendant from suspending any CDPAP Consumer's benefits absent fair and adequate notice, which includes an opportunity for a hearing and aid continuing while that hearing is pending.  To the extent Defendant seeks to terminate benefits for a person who fails to enroll in PPL, it must provide aid continuing at least until resolution of the fair hearing, which requires the availability of a non-PPL service provider.  So far, however, no fair and adequate notice has taken place, and federal law affords ninety days for a final administrative action from when a Medicaid recipient requests a fair hearing.  42 C.F.R. § 431.244(f).  Moreover, as DOH has acknowledged, its Medicaid fair hearings are

backlogged, with over 10,000 cases still pending after the 90-day period. *See* DOH Memorandum, Feb. 4, 2025, available at http://health.wnylc.com/health/afile/254/883/1/ (last accessed April 2, 2025). The September 30 date is necessary both to ensure that as many Consumers as possible can fully enroll and that sufficient time is available for Consumers to receive the fair hearing they are entitled to.

The pre-existing Fiscal Intermediaries were competently running payroll and complying with other labor protections as of Monday, March 31. They are the only institutions Plaintiffs are aware of that have the information and the administrative capacity needed to effectuate employment of Personal Assistants and payment on the legally required weekly basis. In this rushed transition process, Defendant has not prioritized Consumers' continuity of care and has not complied with notice and hearing requirements. CDPAP Consumers are entitled to a process that comports with federal law.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction enjoining Defendant from implementing the CDPAP Amendment until at least September 30, 2025 and ordering the other relief requested herein.

Dated: April 2, 2025

Respectfully submitted,

By: */s/ Lisa E. Cleary*
    Lisa E. Cleary
    Caitlin Ross
    Emma G. Brill
    PATTERSON BELKNAP WEBB & TYLER LLP
    1133 Avenue of the Americas
    New York, New York 10036
    Telephone No.: (212) 336-2000
    Facsimile No.: (212) 336-2222

    LISA RIVERA, ESQ.
    NEW YORK LEGAL ASSISTANCE GROUP
    100 Pearl Street, 19th Floor
    New York, New York 10004

    */s/ Elizabeth Jois*
    ELIZABETH JOIS, Of Counsel
    JULIA RUSSELL, Of Counsel
    (212) 613-5093
    ejois@nylag.org
    jrussell@nylag.org

    *Attorneys for Plaintiffs*

15629718