SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

| HEATHER BURROUGHS, KIM E. GANDER, EILEEN BENTHAL, VALERIE BOERGESSON, and T.G. individually on their own behalf and respectively on behalf of all other similarly situated, | |
|---|---|
| *Plaintiffs*, | |
| v. | Index No.: 606596/2025 |
| NEW YORK STATE DEPARTMENT OF HEALTH, and JAMES V. MCDONALD, in his official capacity as Commissioner of the New York State Department of Health, | **AFFIRMATION OF AMIR BASSIRI** |
| *Defendants*. | |

**AMIR BASSIRI**, pursuant to New York CPLR § 2106, hereby affirms under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the following is true, and I understand that this document may be filed in a proceeding in a court of law:

1. I am the Deputy Commissioner of the Office of Health Insurance Programs ("OHIP") at the New York State Department of Health (the "Department" or "DOH") and I have been the New York State Medicaid Director since April 2022. In these roles, I am responsible for the policy direction, day-to-day strategy, operations, and management for all public health insurance programs, including the Medicaid and Child Health Plus programs, that cover nearly nine million New Yorkers, including individuals enrolled in the Consumer Directed Personal Assistance Program ("CDPAP"). I joined the Department in 2019 as Chief of Staff to the Medicaid Director, and immediately prior to becoming the Medicaid Director, I served as the Deputy Medicaid Director and Deputy Commissioner of OHIP. Prior to working with the Department, I worked as Senior Policy Advisor for Health in the Governor's Office under the Deputy Secretary of Health and Human Services.

1

2. I am familiar with the facts and circumstances of this case based on personal knowledge and expertise, and review of the Department's records. I am familiar with the subject matter of this litigation, which involves amendments to Social Services Law § 365-f directing that, as of April 1, 2025, fiscal intermediary ("FI") services, which are purely administrative services such as payroll, will be performed by a single, Statewide FI, instead of by the 600+ FIs that were formerly operating (the CDPAP Amendments"). I submit this affirmation in opposition to the Plaintiffs' motion for a preliminary injunction, which seeks an order requiring DOH to allow fiscal intermediaries ("FIs") in operation as of March 31, 2025. to continue providing fiscal intermediary services, for a period of time unspecified by Plaintiffs, notwithstanding the CDPAP Amendments.

3. As demonstrated below, the current CDPAP transition to the Statewide FI is well underway—213,000 consumers of CDPAP services have registered with the new Statewide FI, Public Partnerships, LLC ("PPL"), and 236,000 personal care assistants ("PAs") who provide homecare services to consumers have fully onboarded with PPL. In addition, it is important to note that pursuant to the preliminary injunction that was entered in the Eastern District of New York on April 10, 2025, in *Engesser, et al. v. McDonald* (Case No. 1:25-cv-01689), DOH is currently taking various steps to ensure that PAs receive adequate and timely compensation for their work, including steps that could allow outgoing FIs to continue to do payroll processing for PAs.

**THE MEDICAID PROGRAM**

4. The Medicaid program was established pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq*. Medicaid was designed as a joint state and federal program to provide medical care to those who would be otherwise unable to afford such care. Under the terms of the Medicaid program the federal government contributes a percentage of

the funding, referred to as federal financial participation. In New York State, responsibility for the remaining monies is divided between the State and local governments.

5. DOH is the single state agency in New York State ("New York" or the "State") that is responsible for the administration of the New York State Medicaid Program ("NYS Medicaid Program"). *See* Social Services Law ("SSL") § 363-a. The Program's primary purpose is to make medically necessary covered health and medical services available to eligible individuals. *See* SSL § 363; 42 U.S.C. § 1396. Per SSL § 363-A(2), the Department may promulgate all necessary regulations and guidelines for administration of the NYS Medicaid Program. To assist with the delivery of the Medicaid program, DOH: (a) contracts with Managed Care Organizations ("MCOs") for Medicaid enrollees who have managed care health benefit plans; and (b) works with the Local Departments of Social Services ("LDSS") for Medicaid enrollees in Fee-For-Service ("FFS"). *See* SSL § 364-j.

**NEW YORK CONSUMER DIRECTED PERSONAL ASSISTANCE PROGRAM**

6. CDPAP is a New York State Medicaid program intended "to permit chronically ill and/or physically disabled individuals [referred to as "consumers"] receiving home care services greater flexibility and freedom of choice in obtaining such services." SSL § 365-f(1); 18 NYCRR § 505.28(a). The CDPAP consumer is responsible for selecting and retaining their PA to assist with their home care needs.

7. Individuals are eligible to participate in CDPAP if they are: eligible for long term care and services; eligible for medical assistance; have a stable medical condition, are determined by either the MCO or LDSS to be in need of home care services or private duty nursing; and meet criteria established by the Commissioner of Health. *See* SSL § 365-F(2).

8. To receive CDPAP services a consumer must make a request for services to their

LDSS; or, if enrolled in an MCO, to their MCO. If a consumer is determined appropriate for CDPAP, the LDSS or MCO will work with the consumer to develop a plan of care and authorize the amount of care that is medically necessary.

9. Because the CDPAP program is "consumer directed," CDPAP consumers are required to assume numerous responsibilities, including, but not limited to, recruiting, hiring, training, scheduling, and supervising their PAs. *See* SSL § 365-f(3). Consumers who cannot self-direct or otherwise choose, may delegate their responsibilities to a designated representative who is an adult that is willing and capable of assuming and performing a consumer's responsibilities. To fulfill the responsibilities, the consumer works with a Fiscal Intermediary ("FI") that performs administrative functions such as wage and benefit processing for PAs, processing all income tax, and other required wage withholdings, and maintaining employment records on behalf of the consumer. *See* SSL § 365f(4-a)(a)(i)-(ii); 18 NYCRR § 505.28(b)(8), (j).

10. Prior to the transition to PPL, DOH did not contract with FIs. Instead, MCOs or LDSS contracted directly with the FI(s) to provide FI services to consumers for whom the MCO or LDSS had authorized CDPAP services. DOH was not a party to those contracts.

11. Based on the most recent information available to the Department, prior to the transition to a single statewide FI, CDPAP was estimated to serve more than 280,000 consumers, whose homecare needs ranged between as much as 24 hours per day to as few as 4 hours per week. More than 70,000 consumers, to date have opted to, instead of transitioning to PPL, modify their plan of care and move to homecare through a different delivery model. Approximately 213,000 consumers have transitioned to PPL.

A. **CDPAP Fiscal Intermediaries**

*i. Enrollment Process with FIs*

12.     Prior to April 1, 2025, after consumers were determined to be eligible to participate in CDPAP, consumers would select an FI contracted with their MCO or LDSS. Pursuant to the CDPAP Amendment, however, consumers should register with the state contracted statewide FI vendor, PPL.

13.     Pursuant to New York State law, consumers are required to enter into a Memorandum of Understanding ("MOU") with the FI to detail the obligations of each party. *See* SSL § 365-f (4-a)(a)(ii)(I). Neither the PA, MCO, LDSS, or DOH can enter into this agreement on behalf of the consumer. These MOUs affirmatively acknowledge the responsibilities of the consumer and FI and confirm that the consumer (or their designated representative) has the capacity to self-direct care. In the context of registration with PPL, consumers may enter into the MOU in-person, online, or by assenting over the phone.

14.     Consumers also need to ensure their PAs sign up with the FI so that they can be paid. This includes completing legally mandated federal wage, benefit tax and employment forms (e.g. I-9, W-4), and submitting legally required health information, such as proof of vaccination status.

*ii. Transfer Process for Consumers switching from their FI*

15.     Prior to April 1, 2025, CDPAP consumers were permitted to transition from one FI to another at any time. When consumers transitioned from an FI–either because a consumer moved, wanted to use a different FI, or if their FI ceased operations in CDPAP–the FI and consumer each had responsibilities to ensure the consumer retained services and the PA continued receiving wages.

16.     Notably, a change in FI does not affect the consumer's eligibility for homecare services or authorization for CDPAP.

17.     Where an FI is ceasing operation or will no longer serve a consumer's area, the outgoing FI has to "deliver written notice forty-five calendar days in advance to the affected

5

consumers, consumer representatives, personal assistants, the department, and any local social services district or managed care plans with which the fiscal intermediary contracts." *See* SSL § 365-f (4-d)(i).

*iii. FI Landscape in New York prior to CDPAP Amendments*

18. New York's FI model, with more than 600 FIs in operation (prior to April 1, 2025), was an extreme outlier compared with the rest of the nation. Most states that offer CDPAP have fewer than three FIs statewide, and many states have just one FI.

19. The large number of FIs operating in New York State did not create efficient competition. Instead, it hindered program monitoring and program integrity efforts. With more FIs than the rest of the country combined, New York paid an excessively high administrative rate to FIs, resulting in CDPAP becoming prohibitively expensive. The State's administrative rate was more than double the average rate paid by other state Medicaid agencies in states with similar programs and costs of living, such as Massachusetts. Historically, the rates have been calculated based on MCO and FI cost reporting. In the current inefficient system, the Medicaid program is paying for the overhead costs of hundreds of FIs, rather than the overhead of one contracted FI and its subcontractors.

20. There were also significant disparities among the hundreds of operating FIs, such as different wage and benefit packages for PAs, inconsistent messaging and application of overtime policies, and inconsistent compliance with requirements for maintaining accurate records. Finally, consumers were limited by their region in their choices of FIs with cultural or linguistic experience.

21. In addition, prior to the CDPAP Amendments, FIs did not contract with DOH, nor were they licensed or registered with DOH. As a result, DOH had and continues to have no ability to effectively regulate FIs, other than the Statewide FI, through customary governmental mechanisms, such as the levying of penalties and sanctions, pulling registration or licenses, or

6

otherwise removing bad actors from the marketplace. The decentralized approach also has negative fiscal consequences for CDPAP because DOH cannot control the number of FIs in the market and cannot anticipate rising CDPAP costs.

## THE CDPAP AMENDMENTS

22. In response to the challenges posed by New York's CDPAP model, and to maintain the fiscal viability of this important program, there have been several legislative attempts since 2017 to bring the FI market into some format that is amenable to regulation.

23. Earlier amendments to SSL § 365-f included attempts to regulate CDPAP by promulgating various Requests for Proposals aimed at consolidating the FIs providing services and reducing administrative service costs. *See, e.g.,* L2017, ch. 57, pt. E § 1; L2018, ch. 41 § 1; L2019, ch. 57, pt. G; L2021, ch. 57, pt. LL; L2022, ch. 57, pt. PP. Such prior attempts at improving CDPAP by consolidating or reducing the number of FIs either were met with resistance or failed to fix the problems described above. CDPAP has been the subject of much legislative debate.

24. Then, on April 20, 2024, the New York State Legislature passed, and the Governor signed into law, an amendment to CDPAP's governing statute (hereinafter "the CDPAP Amendment" or "Part HH"), SSL § 365-f, to address the above concerns, amongst others.

25. The CDPAP Amendment borrows and builds on existing CDPAP models in other states, wherein a state's Medicaid program contracts with a single statewide FI ("Statewide FI"), which performs the requisite administrative functions for the entire CDPAP, thereby reducing administrative cost growth and strengthening oversight over the services provided and overall program integrity.

**A. Cost Savings**

7

26.     Expenditures for CDPAP last year was $9 billion, with spending in the current state fiscal year projected to exceed $11 billion. Instead of those billions of taxpayer dollars paying for health services delivered to chronically ill and physically disabled New Yorkers, a substantial portion of CDPAP funding under the old model was used to pay the excessive administrative fees of an inefficient, outdated, and oversized FI system. Prior to April 1, 2025, the structure of CDPAP administration required that Medicaid program dollars desperately needed elsewhere, be funneled to cover the overhead costs of more than 600 FIs.

27.     Funds directed toward unnecessary administrative costs diverts crucial resources away from actual healthcare services like personal care services, safety net hospitals, physician salaries, and group homes that care for people with intellectual and developmental disabilities. For example, funding for FI services exceeds the entirety of Medicaid payments to nursing facilities, which, unlike FIs, are subject to rigorous licensure, regulation, and other standards to promote consumer protections and quality of care.

**B.  Improve Efficiency and Program Integrity for Consumers**

28.     Following discussions with over a dozen other states' Medicaid agencies, it became unequivocally clear that New York is an extreme outlier when compared with other states. With at least 600 FIs operating in CDPAP, the State was relying on an inefficient system of CDPAP administration. A single Statewide FI that directly contracts with the State will provide efficient mechanisms to allow oversight of compliance with State and federal rules, marketing, and potential waste. It will also streamline and equalize access to care statewide so consumers can access administrative services that fit their needs regardless of where they live.

29.     Under the CDPAP Amendments, DOH will have a greater ability to track Medicaid payments through one Statewide FI to PAs and analyze data to ensure compliance with all State and federal requirements. This change will also allow the Office of the Medicaid

8

Inspector General to conduct auditing and oversight of the Statewide FI more quickly and comprehensively.

30. A single Statewide FI with a limited number of subcontractors will also simplify the CDPAP process for consumers. Consumers will no longer have to hunt around for an FI willing to work with them, or for an FI who has the linguistic and cultural competency that meets their needs.

31. Pursuant to the CDPAP Amendments, as of April 1, 2025, consumers who are approved for CDPAP through their LDSS or MCO and selects their preferred PA(s) will immediately be able to enroll with the Statewide FI, PPL, to obtain CDPAP services. PPL and its subcontractors have the ability to meet the individual linguistic and cultural needs of every consumer in the State and assist them with all the necessary administrative requirements. In doing so, PPL will help the consumer to obtain care from their chosen PA(s) through CDPAP. The shift to a Statewide FI will enable consumers to quickly retain the FI to begin providing administrative services.

32. Additionally, because PPL and its subcontractors will be required to ensure the provision of CDPAP services in a culturally and linguistically competent manner, consumers throughout the state will not be limited regionally in their access to care and administrative services.

## THE AWARDED FI: PUBLIC PARTNERSHIPS LLC ("PPL")

**A. Review of PPL's Bid**

33. Following a competitive bidding process including the evaluation of bids for cost, technical expertise, and compliance with applicable rules, DOH determined that Public

9

Partnerships LLC ("PPL") offered the best value under the terms of the RFP and received the total highest bid score.

34. After the determination was made that PPL was the successful bidder a review of PPL's Vendor Responsibility Questionnaire ("VRQ") was conducted to determine whether PPL was a responsible vendor. The VRQ asks bidders to disclose all issues, including whether the bidder has been the subject of any investigation by "any government entity for a civil or criminal violation for any business-related conduct." DOH carefully examined PPL's disclosures within the VRQ and also addressed any issues that had been revealed during DOH's own investigation. This information was then compiled into the Vendor Responsibility Profile ("VRP"), which contains, among other things, an "issue description" for each issue identified by PPL or DOH, as well as the "State Contracting Entity Resolution" response. The Resolution narrative illustrates DOH's determinations as to whether each issue will affect or otherwise compromise PPL's ability to fulfill the contractual requirements. In the completed VRP, DOH represented that an affirmative review was completed and that DOH had reasonable assurance that PPL is responsible.

35. On September 27, 2024, after completion of the review process set forth above, DOH informed PPL by telephone that it had been selected as the Statewide FI.

36. The Statewide FI contract between PPL and DOH was signed on December 20, 2024. DOH approved the contract on December 24, 2024.

B. PPL's Experience

37. PPL has established its headquarters in New York City and set up large locations in both New York City and Albany. To ensure that PPL has a robust local presence and

10

appropriate staff levels, PPL has also opened regional offices across the State that have created about 2,500 jobs for New Yorkers.

38. In order to fully realize PPL's unique capabilities, DOH has worked closely with PPL to refine and implement the transition plan and timeline to ensure a seamless transition.

39. The transition process began on January 6, 2025, and continued throughout February and March to ease the flow of consumers and PAs to PPL. On March 1, 2025, consumers that were new to CDPAP, along with their PAs, began to be enrolled with PPL as their FI. Throughout the month of March 2025, current consumers that were switching from one MCO to another may have received a recommendation from their new MCO that the consumer and their PA register with and transfer their FI services to PPL at that time. Lastly, throughout March 2025, consumers and their PAs were able to register with PPL and request that their MCO or LDSS transfer their FI services to PPL.

### CONSUMER AND PA TRANSITION

40. As stated above, Per SSL § 365-f(4-d)(a)(i), when FIs are ceasing operation, the FI "shall deliver written notice forty-five calendar days in advance to the affected consumers, consumer representatives, personal assistants, the department, and any local social services districts or managed care plans with which the fiscal intermediary contracts." Moreover, SSL § 365-f(4-d) requires that FIs ceasing operations must "not take any action that would prevent a personal assistant from moving to a new fiscal intermediary."

41. Because FIs were statutorily mandated to cease operations as of April 1, 2025 at the latest, FIs were required to provide written notice to consumers and PAs, informing them of the upcoming closure, by February 14, 2025.

42. On December 6, 2024, the Department notified FIs of their duties under SSL § 365-f to provide this notice to consumers and PAs. Attached as **Exhibit A** is a copy of the December 6, 2024 Memorandum (hereinafter "December 6 Memo"). The December 6 Memo

11

also reminded FIs that they are required by statute to cooperate in the sharing of information when a consumer transfers to a new FI. Accordingly, the Department requested that FIs share basic consumer and PA contact information to allow the Department to assist with the transition. The Department's request for consumer and PA data was met with pushback, noncompliance, and lawsuits.

43. On January 29, 2025, DOH provided another update to the FIs to remind them of the notification requirements under SSL § 365-f(4-d)(a)(i). *See* Notification to Current Fiscal Intermediaries Regarding Upcoming Notification Dates, annexed hereto as **Exhibit B**. The letter stressed that FIs that are ceasing operations on March 31, 2025 had to deliver written notice to their consumers and PAs by February 14, 2025. DOH linked several options of template notices that contained the required statutory notice and factual information regarding the date the current FIs planned to cease providing FI services, and the SFI contact information. Although the provisions of SSL § 365-f (4-d)(a)(ii) clearly require FIs to cooperate in a consumer's transition from one FI to another, many FIs have not cooperated in the transition to a statewide FI. Many have flatly refused to give DOH and the MCOs even the most basic contact information for consumers and PAs, in an effort to prevent DOH from effectuating the smooth transfer to consumers and PAs to PPL. Because of this widespread lack of cooperation on the part of the outgoing FIs, MCOs and PPL have had to go to the consumer as the first point of contact to gather PA contact data.

<u>Auto Enrollment not an option</u>

44. There are several restrictions that prevented the Department from auto-enrolling consumers and PAs. As discussed above, consumers sign an MOU with their FI. The Department cannot sign on behalf of, nor could it auto-enroll a consumer until that consumer signs an MOU. It would add more confusion and delay if the Department had to establish a process to track execution of MOUs. Further, the Department cannot assume that consumers

12

will choose to transfer to PPL. As mentioned, approximately 70,000 consumers have chosen not to transition to PPL and have instead elected to receive personal care services through a licensed home care services agency. Similarly, the Department cannot assume that PAs will transfer to PPL and continue providing services. Like any employment agreement, the employee must agree to the employment, which makes auto-enrollment of a PA simply not feasible.

45. As discussed above, the consumer is authorized for care through the LDSS or MCO. The consumer hires their PA and then provides the FI with the PA's information so the FI can administer payroll and benefits. The Department is not involved in this hiring or payroll processing for PAs and has no reason to collect the PA's Personally Identifiable Information (PII). Accordingly, because of the decentralized nature of the pre-April 2025 FI framework, FIs were the only entities in the system that housed PA contact and wage and payment information and therefore were in the best position to provide this information. In addition, because PPL is serving as a joint employer, PAs must complete new paperwork, such as I-9s, to comply with state and federal labor and employment laws.

46. Rather than comply with the Department's request for consumer and PA information, many FIs mounted a concerted legal attack to thwart the Department's ability to receive this necessary information. This forced the Department to utilize less effective and more cumbersome ways to obtain consumer and PA information. The Department utilized all available means to front-load as much consumer and PA data as possible into PPL's systems.

47. DOH closely monitored the registration process. Because some consumers and PAs did not enroll with PPL by the March 28, 2025 deadline, DOH implemented a 30-day late registration window to permit additional time for consumers and PAs to transition to PPL. Notice of this 30-day window, to protect CDPAP consumers and their PAs, was published in DOH's March 24, 2025 press release. **Exhibit C**. This grace period allows consumers and PAs who

13

have not started or are experiencing delays in their registration to continue that process beyond the April 1 deadline, while also ensuring that PAs can continue to provide services and receive payment so long as registration is completed by April 30, 2025. This was implemented to further support a seamless transition process, to prevent CDPAP consumers from losing health care and to ensure PAs could get paid for all time worked.

### *Engesser, et al. v. McDonald*

49. On March 26, 2025, two days after the late registration window was announced, four CDPAP consumers and their advocates commenced an action in the Eastern District of New York, seeking, among other things, an order enjoining defendant Commissioner of Health from implementing the CDPAP Amendment until at least September 30, 2025. At a court conference held on April 4, 2025, Judge Block directed the parties in *Engesser, et al. v. McDonald*, to negotiate and prepare a draft preliminary injunction ("PI"). Over the course of the next several days, counsels for DOH and the plaintiffs in *Engesser* carefully negotiated the draft language for the PI. On April 8, 2025, DOH counsels and representatives met with counsels for the *Engesser* plaintiffs and stipulated to the draft PI, which was signed and issued by the court on April 10, 2025, and which will expire on June 6, 2025. A copy of the signed PI is annexed hereto as **Exhibit D**.

50. To date, DOH has been fully compliant with the entirety of the PI, which allows consumers to continue receiving services and PAs to continue to be paid while consumers and PAs transition to PPL. DOH has taken the following steps in compliance with the PI:

a) pursuant to Section II(b) of the PI, DOH, on April 14, 2025, issued instructions to managed care organizations ("MCOs") and LDSS on the options and process for employment and payment of PAs until the expiration of the preliminary injunction. In addition to directing the MCOs and LDSS to contact all consumers not fully registered with PPL by April 15 to confirm whether each consumer wishes to complete their

registration with PPL, each guidance provides clarity on (i) when a consumer or their representative may request that a prior FI provide payment for their PA, and (ii) the required actions needed on the part of the MCO or the LDSS to confirm appropriate payment is distributed to PAs for their work in CDPAP, including the requirement to resolve authorization issues as quickly as possible. *See* 25 OHIP/ADM-02, annexed hereto as **Exhibit E**, available at

https://www.health.ny.gov/health_care/medicaid/redesign/mrt90/2025/docs/25_ohip_adm-02a.pdf; *see* Employment and Payment of Personal Assistants (PAs) through Pendency of Preliminary Injunction, annexed hereto as **Exhibit F**, available at

https://www.health.ny.gov/health_care/medicaid/redesign/mrt90/2025/docs/2025-04-14_sfi_pa_emplymt_pymnt_policy.pdf.

b) pursuant to Sections II(d)(iii)(2) and III(e)(iii)(3) of the PI, DOH created publicly-available guidance for consumers to follow when requesting that their PAs be paid by their prior FI. *See* Guidance for Consumers Seeking Assistance with PPL Registration, annexed hereto as **Exhibit G**, available at

https://www.health.ny.gov/health_care/medicaid/program/longterm/cdpap/docs/guidance_consumer_cdpap_reg_mco_ldss.pdf.

c) in accordance with Section II(h) of the PI, DOH has been implementing an expedited onboarding process, which includes establishing (1) a dedicated phone line, (833)947-8666, that is open five days a week for consumers and PAs to contact DOH directly and (2) a dedicated email address, statewideFI@health.ny.gov.

d) Pursuant to Section VI(c) and (d), DOH and plaintiffs' counsel commenced weekly meetings on April 17, 2025, with the next meeting scheduled for May 15, 2025.

51.     DOH has been holding regular meetings with MCOs and LDSS that address the transition to PPL and continued compliance with the PI. DOH has also been in regular contact

with PPL regarding the transition and the PI requirements. Based on these discussions, PPL launched a comprehensive webpage addressing timesheets and payroll questions, available at https://pplfirst.com/cdpap-resources/.

52. DOH continues to work diligently with MCOs, LDSS, and PPL to (1) prioritize the transition of consumers and PAs in Category A, then Category B, then Category C in the PI; (2) within each Category, prioritize Consumers with the highest acuity and their PAs; (3) promptly address Consumer authorizations issues when a consumer elects to remain with their prior FI temporarily and (4) ensure that Consumers are Fully Onboarded and their PAs are fully registered with PPL.

53. Because the current CDPAP transition is near completion, and DOH is fully in compliance with the PI's requirements, including coordinating with PPL, the MCOs, and the LDSS to successfully implement the transition, it is clear that plaintiffs have already received the relief that they seek in this current case.

**WHEREFORE**, it is respectfully requested that the Court deny Plaintiff's motion for a preliminary injunction.

I affirm this  9th day of May 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law

Dated: May 9, 2025

_____
**AMIR BASSIRI**