# Exhibit A

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X
                          :

ENGESSER, ET AL.,           :  25-CV-01689(FB)
                          :

        Plaintiffs,    :
                          :  United States Courthouse

    -against-        :  Brooklyn, New York
                          :

MCDONALD,               :
                          :  May 20, 2025

        Defendant.    :  4:00 p.m.
                          :

- - - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR PREMOTION CONFERENCE
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Plaintiff:      NEW YORK LEGAL ASSISTANCE GROUP
                        100 Pearl Street, 19th Floor
                        New York, New York 10004
                        BY:  ELIZABETH JOIS, ESQ.

                        PATTERSON BELKNAP WEBB & TYLER LLP
                        1133 Avenue of the Americas
                        New York, New York 10036
                        BY:  LISA E. CLEARY, ESQ.
                             CAITLIN ROSS, ESQ.
                             JACQUELINE BRANDON, ESQ.

For the Defendant:      NYS OFFICE OF THE ATTORNEY GENERAL
                        28 Liberty Street
                        New York, NY 10005
                        BY:  RACHEL PAM SUMMER, ESQ.
                             SAMANTHA LEIGH BUCHALTER, ESQ.

Court Reporter:         JAMIE ANN STANTON, RMR, CRR, RPR
                        Official Court Reporter
                        Telephone: (718) 613-2274
                        E-mail:  JamieStanton.edny@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.
               *     *     *     *     *

(In open court.)

THE COURTROOM DEPUTY:  You can all be seated.

THE COURT:  I thought I said don't stand up and I should hold you all in contempt because you didn't obey my ruling.

THE COURTROOM DEPUTY:  Civil cause for a pre-motion conference, Engesser versus McDonald.

I ask the parties if you could please state your appearances.

MS. JOIS:  Good afternoon, Your Honor.  My name is Elizabeth Jois from the New York Legal Assistance Group on behalf of the plaintiffs.

MS. CLEARY:  Lisa Cleary, Patterson Belknap Webb & Tyler, on behalf of plaintiffs.

MS. ROSS:  Caitlin Ross, also from Patterson Belknap Webb & Tyler, on behalf of the plaintiffs.

MS. BRANDON:  Jacqueline Brandon, also from Patterson Belknap Webb & Tyler, on behalf of the plaintiffs.

THE COURT:  Everybody has spoken so far?

Next?

MS. BUCHALTER:  Samantha Buchalter, from New York State Attorney General's Office, on behalf of defendant.

MS. SUMMER:  And Rachel Summer, also from the New York State Attorney General's Office.

MS. LAWLESS:  I am here from DOH.  Susan Lawless.

*Proceedings*                                                    3

THE COURT:  You are the most important.

MS. LAWLESS:  I feel that way about you.

THE COURT:  It's good to see you all again and, in the large perspective, it looks like you all are really trying to make this happen and you are making progress.  So all I can try do is to facilitate that.  And it's good to have you come to court periodically like this.  I think it's great that we proceed this way, it seems to be a mature sensible way of going about our collective responsibilities.

And when I initially saw that you had a deadline of June, my initial reaction was that it seemed to be that maybe it would be a bit of a challenge, that may be too short a period of time.  And it doesn't surprise me that, you know, you just need some additional time to, you know, make this all happen.  So I sort of anticipated that we would be dealing with that type of situation and I am inclined to extend the time.  It makes perfect sense.

I mean, I really don't know what the staffing issues are, I'm not really privy to them, but obviously it's always good to get more help if you can get it.  Obviously there are budgetary problems and there are practical problems in doing that, but the bottom line, it just seems like we can't get the personnel to get this thing done as expeditiously as we all would like.

So it makes sense to me to extend the time to keep

*Proceedings*                                                                    4

going and keep doing exactly what you have been doing and try to get all these people as best as you can and as quickly as you can.

The proposed date of August is okay except that if I have to see you again, I am going to have to probably do it from Greece because that's where I am going to be August unless you want to come to Greece to do it.

So we can try to do it that way, which may be a little bit awkward, we would have to have a hearing and all of this instead of being in court.  I am thinking of doing it in September, the first or second week in September.  I don't see any harm in giving you a little additional time, to accommodate my vacation plans and everybody else's summer plans.

Does that make any sense?

MS. BUCHALTER:  Your Honor, if I may?

The PI which was negotiated by the parties, it was negotiated to allow for an extension of time --

THE COURT:  Right.

MS. BUCHALTER:  -- if PPL, a nonparty, was unable to accept newly registered consumers in PA's timing.  That is not the case.

THE COURT:  Are you telling me we should not extend the time?

MS. BUCHALTER:  Yes, Your Honor.

THE COURT:  I get a sense that you are not really that opposed to it, but I am getting mixed messages here.

MS. BUCHALTER:  Your Honor, we are opposed to an extension.

THE COURT:  What would happen if we don't extend the time?

MS. BUCHALTER:  There's no reason to extend the time.  It will not be helpful.  We have registered many, many people under the PI.  It has worked.  We are down to a number of consumers.  We all agree they should be reached.  But to extend the deadline would be to create more chaos for the individuals who have gone back to their former FI under the PI.  They will stay there and not -- it's not reasonable to think they will stay there until the deadline.

THE COURT:  The argument here is that there's an underserved population, I don't know how many people, 70,000, whatever, that just don't have the capacity to register.

MS. BUCHALTER:  Your Honor, I respectfully --

THE COURT:  I am getting a difference of opinion here.

MS. BUCHALTER:  The numbers are Attorneys' Eyes Only designated, but it is much less than 70,000.  I agree, these are consumers that have been reached out to many, many times.  They are nonresponsive.

*Proceedings*                                                      6

THE COURT:  I don't know if I can agree with that. They're getting up and they can't wait to talk.

MS. BUCHALTER:  These are consumers who have a DOH local district.  Their managed care plans have been reached out to weekly, many times weekly, by methods of communication that the consumers themselves have been required to abide by law.  They have been nonresponsive. There is no reason why extending the deadline will help those people.

THE COURT:  I think what they are going to say is that they've been nonresponsive for a reason, they are really not cognizant or aware of how to go about, you know, registering or helping themselves.  I guess that's what they're going to say.  They're not questioning whether they've been responsive or not.  They wanted me to try to reach out to these people to see whether they can make the best efforts to get them to be responsive.

MS. BUCHALTER:  Your Honor, respectfully, they have been reached out to.  We all agree that they should be reached out to.  Under the pendency of the PI, the PI provided for those reach-outs.  That has been happening. There is no indication that extending the time will help reach the same people that we have been trying to reach.

THE COURT:  So we have a little bit of a difference of agreement here, a different factual pattern,

and I have to make some sort of a resolution of the differences.

What are you saying?

MS. BUCHALTER:  Your Honor.

THE COURT:  You are not on the same page all of a sudden.  I was really hoping that you would be.

MS. JOIS:  Your Honor, we are not on the same page at the moment.  I want to explain two different groups.

Counsel is talking about the number of people, consumers, who are not enrolled with PPL and I am going to be very careful not to name that number, but I am going to call it a very large number.  And Counsel's explaining that those people have received some sort of communications.  They gave a number.  The average number is not that impressive.

THE COURT:  That are not responding?

MS. JOIS:  Well, here's my problem, Your Honor.  These people haven't received their Medicaid-funded service since April 1st.  That's the last time their PAs were paid to provide them with care.  So we at the moment do not know, did their personal assistant stop coming to work?  Are they able to answer their telephone?  Are they in the hospital?  We don't know.  Right?  Nobody knows because there is a very large group of people, suddenly lost purposes, and they're not currently responding to communications and the

*Proceedings*                                                                    8

Department of Health does not know why.

But that's only one group.

Another group that is actually larger are people where the PA has not been able to finish registering with PPL.  And for those people, there has not been individualized outreach on this weekly basis.  Those people are just being asked to identify themselves, to just keep getting themselves through this process that they've become lost in.

So what our amendments to the PI were asking for is that all of those people be identified, be assigned to a facilitator, and just have that facilitator reach out to them so that they can find out what the problem is.

THE COURT:  So the initial agreement which you folks entered into, you know, after painstakingly negotiating, could have contemplated that, but it did not.

MS. BUCHALTER:  Your Honor, if I may.

The people in that category are also subject to outreach.

We are also here on a pre-motion conference.  I would ask that Your Honor give us the chance to brief.  This is obviously --

THE COURT:  Wait a second.  Forget about that. Don't worry about giving you chances to do what you want to do.  We are just trying to make a sensible resolution.  I am

*Jamie Ann Stanton, RMR, CRR, RPR*
*Official Court Reporter*

*Proceedings*                                                      9

trying to get, you know, a sensible sense of where we're at and what is the fair thing to do under all the circumstances.  That's all I am trying to do.

MS. BUCHALTER:  Your Honor, because this involves a lot of Attorneys' Eyes Only information, a lot of numbers, I would ask that the Court seal the courtroom as contemplated by the protective order that the parties entered into to discuss the actual numbers of people.

THE COURT:  I think we are getting ahead of our skis.

Conceptually, whether the numbers are this or that, it makes a certain amount of logic to me, unless I'm missing something initially, these people have not been given any services for a period of time.  They may be dead. They may not be dead.  They -- we don't know who they are, we don't know why they haven't responded.  Don't you think as a matter of fairness and common sense we should at least make an effort to find out whether they're alive or dead, what's the reason, are they disabled, are they not able to speak, talk, hear?  Right?

MS. BUCHALTER:  Your Honor, in that case, some individuals, you know, if they aren't able to consumer direct, you know, they are not eligible.  I agree, it is very fact-intensive.  I would just ask that we have the right to just file their motion.  We have the right to

oppose.  And that would be able --

THE COURT:  That's the legal stuff, I get.  You make motions.  But come talk to me again.  What is wrong with trying to find out why these people have not responded?  What is wrong with that?

MS. BUCHALTER:  Your Honor, we are -- DOH has been reaching out, managed care organizations, local districts have been reaching out to these individuals during the pendency of the PI.

THE COURT:  That's exactly what we want you to do.

MS. BUCHALTER:  But there's no indication that after six weeks that's going to change.  There are over two weeks left.

THE COURT:  If you had the facilitators taking an active role in trying to contact these people, find out why it is, we haven't heard from you, wouldn't we get answers?

MS. BUCHALTER:  There is no indication that the facilitators would be better able to get answers than the Department --

THE COURT:  The only way to find out is to try.

MS. BUCHALTER:  Your Honor, the PI does not contemplate that.  That's new relief.  That is a complete change.  That is an injunction.  That's not a preliminary injunction.

THE COURT:  It's new, but I think I have the power

to do what I think is fair and just under the circumstances. I can make the preliminary injunction motion, it is what I was going to do to begin with and you folks did a great job of doing a lot of the work which spared me a lot of time to have to sort it out myself.

I am talking common sense. If I, for example, hypothetically, were in need of services, but I don't have -- only one ear that's bothering me, but both ears, I can't hear anymore, you know, I would hope that somebody would reach out to me to find out, you know, how I'm doing.

MS. BUCHALTER: Yes, Your Honor.

THE COURT: Whether, you know, I have issues that really, you know, have something to do with my inability to reach out.

Does that make sense as a human being?

MS. BUCHALTER: Your Honor, there have been many, many -- the number is in the sealed documents. There have been many reach-outs to individuals, we agree.

THE COURT: Okay. So I can look at numbers, you know, I can look at these numbers, but conceptually, why not give the facilitators an opportunity to be proactive? You didn't agree to that, but I think I have the power to do what I think is fair and just.

MS. BUCHALTER: In the interim, because the preliminary injunction ends on June 6th, we have a little

*Proceedings*                                                      12

over two weeks, can we please brief plaintiff's motion?

THE COURT:  You can brief all you want to, but I have to make a decision, so you are not helping me right now.

So you are taking a position that you don't want the facilitators to be activated to really reach out to these people.

MS. BUCHALTER:  No, Your Honor.

THE COURT:  It seems to me, I don't know what the harm would be to do that, I just don't understand that.

MS. BUCHALTER:  Your Honor, if we take your guidance, if we were given the opportunity to speak with plaintiffs, you know, we had two days, we can --

THE COURT:  I want to continue the dialogue.  I am trying to talk as best as I can whatever common sense I have left in me, I'm just trying to do that.

So those are the people who have not been heard from for a long period of time and we want to try to get closure on that group, I guess.

And the other issue you have is people who have applied but they haven't completed their applications?

MS. JOIS:  Yes, Your Honor.

It was specifically where the worker has not completed their enrollment with PPL, so they can't get paid. In other words, they may have started an application, but

then never submitted their document to show that they are employable in the United States.  So they're not getting paid for this time because they, for whatever reason, have reached a roadblock.

THE COURT:  What reasons would there be?  Isn't it within their control to complete the application, to give you the information that's needed?

MS. JOIS:  For instance, I was speaking with a consumer, Your Honor, whose worker has tried uploading their Social Security card multiple times and the PPL system just keeps rejecting it.  They just need help uploading this one document.  They are trying.  It's true for many of these people.  They need a small amount of help.  We are speaking to so many individuals who don't have smart phones or don't have an e-mail account, for whom English is not their native language.

THE COURT:  What kind of help do they need?

MS. JOIS:  Well, I think what we are proposing is that they be assigned to a facilitator.  Our understanding -- and the State can correct me if I am wrong -- is that the facilitators were chosen by PPL and the Department of Health.

THE COURT:  The Department of Health has control over that.  We understand that.

MS. JOIS:  So they have physical offices

throughout the state.  They have staff who can be making these calls.  I believe there are by and large organizations that have been operating in this sphere for a long time so I think they understand the employability issues or issues about timesheets and would know how to help.

THE COURT:  So what I am hearing is that you've spent days reaching, it may require us a little bit of fine tuning because of the reality on the ground that has transpired since this was signed?

MS. JOIS:  Yes, Your Honor.

THE COURT:  Can't you talk to each other a little bit about this?

MS. BUCHALTER:  Your Honor, may my client speak?

THE COURT:  Yes.

MS. LAWLESS:  Your Honor, we had attempted to discuss these issues with NYLAG and they informed us we are just going to file our papers.  They haven't been open to that.

But, Your Honor, may I say --

MS. JOIS:  Your Honor --

THE COURT:  What's going on here?  They're going to have a heart attack.

MS. LAWLESS:  I know, but Judge, they told us they were going to file this PI.  We said we didn't agree.  We didn't think it was workable.  They said we're going to file

it anyway.  So here we are.

MS. BUCHALTER:  There are two-and-a-half weeks left.  We are willing to talk with plaintiffs.

THE COURT:  I get it.  This is why I'm here.  This is why I foolishly agreed 30 years or so ago to become a judge.  I should have taken that decision back, I knew that.

So you've got to talk to each other now, okay?

MS. LAWLESS:  Your Honor, can I explain things from DOH's perspective?

THE COURT:  Sure.

MS. LAWLESS:  From DOH's perspective, there is no operational reason why someone who wants to enroll with PPL can't do it in a 24-hour period.  Where we are today, from where we were on March 31st, is a different world.  People can get through on phones to PPL.  PPL has the capacity, if they have the completed paperwork, they can finalize a worker's registration within 24 hours.  So there's no operational reason why this small subset of people -- and Your Honor, in the grand scheme of things, it is a small subset, in category C -- cannot complete the process.  And there's no reason why if all of them today said, you know what, we changed our minds, we realize June 6th is a real deadline, they can complete the process in this timeframe. PPL's ability to process all of these thousands of people is very high because this is a program with roughly 300 people.

THE COURT:  It puts a big burden upon the State to search these people out when they can't help themselves.

MS. LAWLESS:  Your Honor, we have made tens of thousands of outreach attempts.  I would say at least five per person has been made already.  There's no operational reason why these people haven't switched.  Maybe they are waiting for the deadline.  Maybe they moved out of state. Maybe they moved in with a relative.  Maybe they're dead. Maybe they're in the hospital.  Maybe they're in a nursing home.  But it's not because they can't call PPL and get through on the phone line and complete the registration process.

MS. JOIS:  Your Honor --

MS. LAWLESS:  Your Honor, one more thing.

THE COURT:  Let her finish.

MS. LAWLESS:  Sorry.  Thank you.

Of the middle category of people, the workers who have, like, one piece of paper to finish, we are having in-person events to help those people, we have another one scheduled for this weekend -- I think it's this weekend.  We have another one scheduled for this week.  We are perfectly -- we want to get those people through the process.  And the number that's in that category now, we are confident that we can process all those people by June 6th. We have no -- you know, the executives at the agency who

have expertise in Medicaid operations are confident about this. I understand NYLAG doesn't feel confident about it, but with respect, Your Honor, the executives at the agency are the people who have the expertise to make this transition happen and NYLAG, if any one of those people ran for office, I would vote for them, but they are not currently in the New York State Legislature, Your Honor. And it's not for them to say how the DOH should be operating and what the DOH should be instructing its vendors to do under this -- in this whole process.

What they are suggesting with these facilitators is such a micromanagement we don't even have control over -- like they're subcontractors of our vendor, it's outrageous.

THE COURT: Here's my sense.

First of all, I really do believe the State is making herculean efforts to try to make this happen and I do believe there is a rational reason for this whole process to be upgraded, updated, get control over it. Because, you know, there is a potential -- I'm not saying this is what's happened -- for, you know, mistakes, call it fraud, call it mistakes, call it innocent mistakes, whatever. And I think to be able to organize it as you are doing now makes somewhat sense to me. And I think it could minimize, you know, error or incorrect things happening that should not happen.

Having said that, I really think that why don't we try to do this to sort of give it a little bit of tweak and maybe just extend the time a little bit beyond June and come back to court.  In the meantime you folks talk to each other.  I am a little bit hesitant to open up the door to all the facilitators and putting all that in motion.  I think it's administratively burdensome.  And I am more comfortable with just extending the time for a brief period of time and coming back and seeing how you folks are doing.  That's my instinct.  It doesn't foreclose anything and it really would maybe motivate you folks to sit down and continue your chats and your deliberations.  You have the numbers.  You have the knowledge.  You have the sense of what is happening.  What can happen.  What should happen.  I really rely upon your collective professionalism to do this for me because otherwise, if I feel into it all, it's a Fanuel, and I don't think that's really a practical way for this to be resolved.  You've come a long way, 80 percent, 90 percent, you're dealing with maybe a ten percent factor to wrap this up.  20 percent?  50 percent?  What do you think?  I don't agree with that.  I don't think it's extensive.

MS. LAWLESS:  Your Honor, DOH calculates that it's two-and-a-half percent in category C.

THE COURT:  You are going to disagree about

things.

MS. JOIS:  Your Honor, if I could just address for one moment, we all just heard the Department of Health sort of allege that those last, that last category C group, well, maybe they're waiting for the deadline, who knows.  Our concern is that the PI isn't working for that group and they want us to take their word for it that it's going to work by June 6th, but this same Department of Health put out public statements saying the transition was on track for April 1st and it absolutely was not and we all know that.

THE COURT:  Now, wait a second.

MS. JOIS:  We don't have that same faith.

THE COURT:  You negotiated to this.  You agreed to this.  You knew about all of this in advance, right?

MS. JOIS:  Yes, Your Honor, we did.  We did not foresee how difficult it would be for people to return to a prior FI.  And the result has been that there are a lot of people left in the cold right now.

THE COURT:  I don't know.  And I don't know.  There are a lot of uncertain things here.  But I am hesitant to put in motion the facilitators and the administration of oversight here and open the doors to all of this.

MS. JOIS:  I want to clarify.  We are not asking for additional oversight of the facilitators; we are just asking that they be assigned to the cases to do the job they

are already contracted to do.  They already have contracts to provide services to these people.

THE COURT:  I know that, right.

But you don't think we should do that?

MS. BUCHALTER:  They have been not been contracted to do this specific new job.

MS. LAWLESS:  Your Honor, this group of people has been unresponsive to managed care plans, to DOH, to the local districts, to PPL.  There's no reason to think that they're going to be responsive to a facilitator who is assigned to them who is another stranger they don't know calling them.

THE COURT:  Let me ask you this.  It's easy to find that out since you have control over the facilitators, we can find out if they will be responsive.  They can go ahead and try to be more assertive and reach out to these people.

What's wrong with that?

MS. BUCHALTER:  Your Honor, I would ask, again, that we be able to brief or be given to time speak with plaintiffs.

THE COURT:  The deadline is June 6th, right?

MS. BUCHALTER:  Yes, Your Honor.

THE COURT:  I will extend it for, I don't know, maybe two weeks and you talk to each other in the meantime

and we will put this down for another conference in June and we will see where we are at and hope for the best.  I think that for present purposes, that's the best I am comfortable in doing.

If you want to submit papers, submit papers all you want.  I mean, really, if I have to really decide the preliminary injunction application de novo, you know, I don't know what I will do, but in any event, you can submit whatever papers you want.  I don't care.

MS. BUCHALTER:  Thank you, Your Honor.

THE COURT:  But how about just putting it over two more weeks, okay?

MS. JOIS:  Your Honor, we are happy to have that extension and have more time to talk, but we would also like to submit our brief because if those talks aren't fruitful, we will be back coming up on a deadline.

THE COURT:  You may well be.  So submit your briefs and I will have to make a decision by June, one way or the other, up or down, that's what I have to do, that's why I get the big bucks.

But in the meantime, the micromanaging this, we are taking baby steps.  Sometimes it's not so bad to take baby steps, right?  And this way it will give me an opportunity to see all your smiling faces again before I go to Greece on June 30th.

Now, you like to talk and you have a lot to say.

MS. CLEARY:  I do, Your Honor.

We have been working in good faith with the Department of Health since we filed our original complaint and motion for preliminary injunction.  We have always taken the position that on behalf of the consumers we represent, we want to facilitate and work with DOH to ensure that there can be a transition to PPL.  Having been involved in the transition since Your Honor signed a stipulation and order granting the preliminary injunction, we have been working diligently with Counsel for DOH.

THE COURT:  But they say the same thing.

MS. CLEARY:  And what we are saying, Your Honor, is we have identified that there is an impasse that is precluding the smooth transition to PPL and we have a solution that involves facilitators that have already been provided for and selected by PPL.  Let them do their jobs so that we can complete the transition and not have to be involved in briefing on --

THE COURT:  It makes a certain amount of common sense.

We are going to extend the period for two weeks and you are going to be now hopefully talking to each other and maybe by being here today in court we will be able to really reach some further accommodation.  I think we've got

to try to do that.  And you know your positions.  You can make your legal arguments.  If I have to decide it, I will decide it.  But in the meantime, I would rather not have to decide it, because I don't have the same institutional knowledge that you have.  I don't have the same factual feelings that you folks have.  I haven't lived with this like you folks have.  So you are the best people who can bring this to an ultimate final resolution.  If I have to do it, I'll do it, but I would really like to see you continue your discussions now that you have been in court here today again and you have another two weeks, a little bit of flexibility.  I don't think it will hurt anybody.

And if you want to put down for another court appearance in June, you can do that.  You can submit your papers to me in the meantime, work out your own briefing schedule.  Obviously, we are on a short string here.

And I don't know what else to say.  I mean, I may have to take all these papers to Greece with me and spend two months just sorting it all out.  I don't think we want to do that.

MS. CLEARY:  Thank you, Your Honor.

MS. BUCHALTER:  Thank you, Your Honor.

THE COURT:  So I guess what I am trying to do is be a little bit of a diplomat here.  And it's, I think, important to come to court together to air out our

differences before the judge as sort of like the facilitator, you might say, right? And having heard all of this, having listened to each other's complaints, and I think you all are really trying to do the right job, I don't see anybody acting in bad faith here. It's just there's this disconnect. Sometimes communication gets a little bit, you know, entangled, right, but that's why it's good to have you in court today. All right?

So hopefully this will help facilitate so that you don't need facilitators or we do need facilitators, but you are the initial facilitators right now. See what you can do.

Do we have a new date in June?

THE COURTROOM DEPUTY: How about Wednesday, June the 18th, at 4:30?

THE COURT: And that's going to be extension of time, I guess, right?

THE COURTROOM DEPUTY: Two weeks would be the 20th, Friday, June 20th, is two weeks from the 6th.

THE COURT: So to that extent, I, either on my own initiative or with your complicit consent, extended the deadline to that date.

MS. BUCHALTER: Thank you, Your Honor.

THE COURT: Try to see whether you can knock some heads together here.

*Proceedings*                                                        25

MS. CLEARY:  Did you say June 20th?

THE COURT:  You can use the courtroom now while you are here if you want to talk to each other.

MS. JOIS:  For clarification, Your Honor, are you saying that you are extending the current PI until June 20th?

THE COURT:  Right.

MS. JOIS:  And then are you also scheduling an additional conference now?

THE COURT:  That's what Mike did.

Should I do that or not?  You may not need it.

MS. RUSSELL:  It's fine to have it scheduled.  I'm just wanted to know if it's on the 20th or the 18th.

THE COURT:  Let me know if you need to come back. And maybe you won't need to do that.

MS. BUCHALTER:  Thank you, Your Honor.

THE COURT:  Hopefully this was helpful and I don't know what else we can say today, all right?

MS. BUCHALTER:  Thank you.

THE COURT:  Keep up the good work.  Hopefully we will be able to bring this to the finish line.  It seems like we are rounding third base maybe if you want to use a baseball analogy.

And just to try to invoke a little bit of humor, it's important to do that in our wonderful world that we

have to manage, right?

So I was told by a philosopher, such as he was, that he viewed life as a sporting event.  He was not like Bertrand Russell, he was not the most profound person that I have spoken to, but I thought his analogy was interesting and I thought this would be the appropriate time to share on the record, give a little levity, and I think there was some wisdom to it.

He said life is as simple as this, Judge.  You start off you go from home plate to first base during your first 20 years.  And then from 20 to 40, you go from first base to second base.  And then from 40 to 60, you go from second base to third base.  And from 60 to 80, you go from third base to home.

I said, well, you know, I have a problem because I don't fit into any of those categories.  What about me?  He says, extra innings.

So maybe we are all at the extra innings stage here hopefully.  Let's keep up the good work.  Hopefully this is somewhat helpful to you all.  It's good to see you again.

MS. BUCHALTER:  Thank you, Your Honor.

MS. JOIS:  Thank you, Your Honor.

THE COURT:  If you want to use the courtroom, we have some rooms here.  Why don't you spend some time here

now.  It's 4:30.  I've got to leave, but I don't think you need me.  So we have the jury room.  We have other rooms. Mr. Inelli will help try to accommodate you.

Good to see you all again.

(Matter concluded.)

\*    \*    \*    \*    \*

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Jamie Ann Stanton          May 20, 2025
_____          _____
   JAMIE ANN STANTON                     DATE

# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

LIZA ENGESSER, MARISOL GETCHIUS,
GEETANJALI SEEPERSAUD by her Next Friend
SAVITRI SEEPERSAUD, and MARIA JAIME
on her own behalf and as Next Friend to Y.P.S.
and C.P., individually and on behalf of all persons
similarly situated; BROOKLYN CENTER FOR
INDEPENDENCE OF THE DISABLED, and
REGIONAL CENTER FOR INDEPENDENT
LIVING,

                                 Plaintiffs,



                    -against-



JAMES V. MCDONALD, as Commissioner of the
New York State Department of Health,

                               Defendant.

---

**Case No.:** 1:25-cv-01689


**[PROPOSED] AMENDED
PRELIMINARY INJUNCTION**

---

      **WHEREAS** the Consumer Directed Personal Assistance Program ("CDPAP") is a New York State Medicaid Program intended "to permit chronically ill and/or physically disabled individuals [referred to as 'consumers'] receiving home care services greater flexibility and freedom of choice in obtaining such services," N.Y. Social Services Law ("SSL") § 365-f(1); 18 New York Codes, Rules, and Regulations ("NYCRR") 505.28(a);

      **WHEREAS** under CDPAP, the consumer may select and retain personal care aides (referred to as a "personal assistant" or "PA") to assist with their home care needs;

      **WHEREAS** to participate in CDPAP, each consumer is required to assume responsibilities, including, but not limited to, recruiting, hiring, training, scheduling, and supervising their PAs, *see* SSL § 365-f(3);

      **WHEREAS** in the fulfillment of their responsibilities, the consumer works with a Fiscal Intermediary ("FI") that performs administrative functions such as wage and benefit processing for PAs, processing all income tax and other required wage withholdings, and maintaining

1

employment records on behalf of the consumer, *see* SSL § 365-f(4-a)(a)(i)-(ii); 18 NYCRR 505.28(b)(6) and (i);

**WHEREAS** on April 20, 2024, the New York State Legislature passed an amendment to CDPAP's governing statute (hereinafter "the CDPAP Amendment"), SSL § 365-f to address certain financial, administrative, and compliance concerns;

**WHEREAS** the CDPAP Amendment required the Department to issue a Request for Proposals ("RFP") to contract with a single statewide FI to perform the FI role for CDPAP ("Statewide FI"), *see* SSL § 365-f(4-a);

**WHEREAS** on September 27, 2024, Public Partnerships, LLC ("PPL") was selected as the Statewide FI;

**WHEREAS** the CDPAP Amendment provides that "[e]xcept for the [contracted] statewide fiscal intermediary and its subcontractors, as of April first, two thousand twenty-five, no entity shall provide, directly or through contract, fiscal intermediary services," *see* SSL § 365-f(4-a-1)(a);

**WHEREAS** as of March 31, 2025, there were CDPAP consumers who had not fully transitioned to PPL;

**WHEREAS** on or about March 24, 2025, DOH announced that Consumers and PAs would be permitted an additional 30 days to register with PPL, by April 30, 2025, such that those PAs will receive payment from PPL for all days worked in April 2025 upon registration;

**WHEREAS** Plaintiffs filed this action on March 26, 2025, and moved for entry of a temporary restraining order and preliminary injunction on March 27, 2025;

**WHEREAS** the Court granted a temporary restraining order on March 31, 2025, and entered a further Order clarifying the temporary restraining order on April 2, 2025;

**WHEREAS** no plaintiff class has been certified to date, Plaintiffs reserve the right to make any motion for class certification, and Defendant reserves the right to oppose any motion for class certification;

**WHEREAS** Plaintiffs and Defendant James V. McDonald, sued in his official capacity as Commissioner of the New York State Department of Health ("DOH" or the "Department") (together, the "Parties"), desired to resolve Plaintiffs' motion for a temporary restraining order and preliminary injunction without further litigation and without admission that a motion for such relief is appropriately granted;

2

**WHEREAS** the Parties proposed a Preliminary Injunction on April 9, 2025, which was so-ordered by the Court on April 10, 2025;

**WHEREAS** many Consumers continue to experience severe disruptions in care; and

**WHEREAS** this Amended Order will allow Consumers to receive services and PAs to be paid while Consumers and PAs fully transition to a single Statewide FI by better utilizing the services of Facilitators.

**IT IS HEREBY AGREED AND ORDERED AS FOLLOWS**:

I.    Definitions

    a.  "Amended Order" or "Amended Preliminary Injunction" means this Proposed Amended Preliminary Injunction submitted for the Court's approval on May 15, 2025.

    b.  "Fully Registered Consumer" means a consumer who has themselves or through a Designated Representative:

        i.  Completed the necessary steps for registration with PPL; and

        ii.  Signed the required memorandum of understanding with PPL.

    c.  "Fully Onboarded Personal Assistant" means a Personal Assistant who has completed all legal requirements to become a PPL employee, including employment eligibility verification, and has been notified that the PA is Fully Onboarded.

    d.  "MCO" shall have the same meaning as a Managed Care Provider pursuant to SSL § 364-j.

    e.  "LDSS" means Local Departments of Social Services established pursuant to Article 2 of the Social Services Law.

    f.  "Authorization" means the authorization for services by an MCO or LDSS pursuant to 18 NYCRR 505.28(d)(3)(i).

    g.  "Facilitators" means entities subcontracted with PPL to perform services on behalf of the consumer to facilitate the consumer's role as the employer pursuant to SSL § 365-f.

    h.  "Prior FI" means the FI with which the Consumer was enrolled on March 31, 2025.

    i.  "Expiration Date" means September 15, 2025, or any later date set by the Court.

j.  "CDPAP Amendment" means Part HH of Chapter 57 of the New York Session Laws of 2024 that amended subdivision 4-a(ii-a) and added subdivision 4a-1(a) (*see* Section 3 of Part HH) to SSL § 365-f.

k.  "New Consumer" means a consumer who seeks CDPAP services after March 31, 2025 or who continues CDPAP services while voluntarily changing MCOs.

l.  "Stipulation and Order" means the Stipulation and Proposed Preliminary Injunction submitted for the Court's approval on April 9, 2025 and so-ordered by the Court on April 10, 2025.

m.  "Designated Representative" shall have the same meaning as Designated Representative pursuant to 18 NYCRR 505.28(b)(5).

n.  "Underserved Consumer" shall mean any Consumer whose full Authorization was not utilized in the two weeks prior to the entry of this Amended Order.

II.  Employment and Payment of PAs through Pendency of Preliminary Injunction

a.  DOH shall take the following actions to ensure that the PAs working with Consumers who were receiving care as of March 31, 2025 shall continue to be timely paid, or to be paid retroactively as quickly as possible, for their services performed since March 31, 2025 and receive statutory benefits consistent with applicable labor and employment laws, as set forth in this Section, while Consumers who received care as of March 31, 2025 complete registration, and their PAs are fully onboarded, with PPL.

b.  DOH shall issue sufficient instructions to PPL, MCOs, LDSS, and Facilitators to ensure that they can comply with this Amended Order.

c.  DOH shall provide copies of such instructions to Plaintiffs' counsel and consider any feedback.  Plaintiffs' counsel shall be permitted to post the instructions publicly on their website as agreed upon with DOH.

d.  Underserved Consumers

   i.  DOH shall identify every Underserved Consumer within 5 business days of the entry of this Amended Preliminary Injunction.

   ii.  DOH will assign each Underserved Consumer to a Facilitator.  The assignment to a Facilitator shall take into consideration each Underserved Consumer's area of residence and Facilitators' physical locations.  Any Consumer who wishes to

4

change their assigned Facilitator may do so by contacting the DOH Transition Hotline or their MCO or LDSS.

iii. DOH shall direct each Facilitator to contact all of its Underserved Consumers as soon as possible to determine what issues have prevented the utilization of their full authorizations and to begin addressing those issues.

iv. DOH shall require that each Facilitator provide to DOH a list of Consumers that have not been reached within two weeks of their assignment to that Facilitator, and within one week of receiving this list, DOH shall develop a plan with the Facilitators, MCOs and LDSS to reach any such Consumers.

v. DOH shall ensure that Facilitators, on behalf of PPL, can:

1. Access PPL systems in order to complete registration and onboarding of both Consumers and PAs;

2. View and edit real-time information on Consumer registration and PA onboarding, including specific information regarding any missing or improperly recorded documentation;

3. Review PA paperwork and documentation and complete all employment verifications on behalf of PPL;

4. Create and follow-up on "work tickets" in PPL's system;

5. View Consumers' authorizations for services, communicate with MCOs and LDSS regarding missing or incomplete authorizations, and contact Consumers to discuss any discrepancies between services authorized and services utilized;

6. View and verify PA time logged on the PA's profile as well as information regarding whether (a) a PA's shift was denied (and if so, why); (b) PPL has edited a PA's time entry (and if so, why); and (c) paper timesheets were received for a PA.

7. View and verify payroll information for each PA of every assigned Consumer, including the date and method of payment and the number of hours worked accounted for in a paycheck.

8. Assist Consumers and PAs with manual entry of time, accept paper timesheets and enter information from those paper timesheets into PPL's system, and assist with Consumer approval of time entered as needed;

5

9. Escalate payment issues to PPL for resolution within 24 hours; and

10. Provide trainings to Consumers and PAs regarding PPL's time-keeping systems.

vi. DOH shall ensure that PPL provides each Facilitator with:

1. A specific point of contact at PPL with a designated phone number and email address to resolve issues identified by that Facilitator that cannot be entirely resolved by the Facilitator;

2. Training materials regarding use of PPL's time-keeping systems; and

3. Materials sufficient to explain:

(a) PPL's employment policies and employee benefits;

(b) the process by which Consumers can terminate employment of a PA;

(c) the process by which PAs can resign from employment; and

(d) how the designations of "terminated" or "resigned" should be captured in PPL's system.

vii. DOH shall provide materials to the Office of Mental Health and the Office for People With Developmental Disabilities for those agencies to distribute to their constituents explaining the transition to a single statewide fiscal intermediary and containing contact information for the DOH CDPAP Transition Hotline, PPL, and the Facilitators.

e. Paper Timesheets

i. DOH shall instruct PPL that it must accept paper timesheets from any PA, without the Consumer or PA requesting an individual exception, until the Expiration Date.

f. Consumers and PAs Utilizing Services of Prior FIs

i. Any Consumer being served by a Prior FI who is not Fully Registered with PPL by June 20, or whose PAs have not been Fully Onboarded to PPL by June 20 pursuant to Sections II.d.iii-v or II.e.v of the Preliminary Injunction and this Court's order dated May 20, 2025, ECF No. 86, may continue to be served by their Prior FI until the Expiration Date.

ii. DOH, the MCOs, the LDSS, and PPL shall not take any steps to transition these Consumers and PAs to PPL until July 14, 2025, unless the Consumer affirmatively seeks registration with PPL.

    iii. Beginning on July 14, 2025, these Consumers and PAs shall be assigned to Facilitators who will assist them in fully registering and onboarding with PPL.

    iv. After June 20, 2025, no additional Consumers can have their authorizations for care returned to a Prior FI.

g. Notification of Employment by PPL

    i. DOH will direct PPL that, at the point when any PA who was previously not Fully Onboarded with PPL becomes Fully Onboarded with PPL, PPL must:

        1. Inform the Consumer, the Consumer's Designated Representative, if any, and the PA via email and phone that the PA is employed and will be paid by PPL, and the date when payment will begin;

        2. Provide the PA, the Consumer's Designated Representative, if any, and Consumer with instructions for submitting and approving time; and

        3. Fully and timely pay the PA back to the later of (a) April 1, 2025, or (b) the last date for which the PA was paid by the Prior FI, whichever date is the more recent, consistent with applicable law.

III. Expedited Authorizations

a. For any Consumer who is Fully Registered with PPL but whose Authorization has not been transferred to PPL, DOH will continue to prioritize the transfer of those Authorizations.

b. Expedited PPL Onboarding Mechanism:

    i. DOH will continue to utilize a process for urgent onboarding of PAs who are not Fully Onboarded with PPL.  This process will include:

        1. Assignment of each Consumer to a Facilitator;

        2. Intensive and direct outreach by DOH;

        3. Expansion of DOH's dedicated CDPAP transition team;

        4. Continued staffing of a dedicated DOH CDPAP Transition phone line (at 1-833-947-8666) and email address (statewidefi@health.ny.gov) which shall remain publicly available;

        5. Provision of real-time access to PPL's technology systems for MCOs and Facilitators;

        6. Consumer in-home visits by Facilitators and/or MCOs;

       7.   Availability of in-person community office visits; and

       8.   PPL staff to be placed in in-person community offices.

c.  Registration and Onboarding of Consumers and PAs who receive services through LDSS:

    i.   DOH shall establish and direct PPL to establish a dedicated registration and onboarding process for Consumers who are not Fully Registered, and/or Consumers whose PAs are not Fully Onboarded, who receive services through LDSS.

IV.   Nothing in this Amended Order applies to New Consumers.

V.   This Amended Order does not prevent DOH or PPL from continuing to transition Consumers and their PAs to PPL, except as set forth in Section II(f).

VI.   This Amended Order vacates and supersedes the April 10, 2025 Preliminary Injunction.

VII.   Timeline

a.  Defendant's time to answer, move, or otherwise respond to the Corrected Class Action Complaint, ECF No. 32, is hereby extended to the Expiration Date or any date further ordered by the Court.

b.  Nothing in this Amended Order limits Plaintiffs' rights to seek an extension of the Expiration Date.

c.  DOH will not oppose any request for a reasonable extension of the Expiration Date that is based on PPL's administrative capacity to timely register Consumers who wish to become Fully Registered Consumers and onboard PAs who wish to become Fully Onboarded PAs.

d.  This Amended Order shall remain in effect until the later of the Expiration Date or any date further ordered by the Court.

VIII.   Reservation of Rights

a.  Nothing in this Amended Order waives or compromises the rights of any Consumer under the Medicaid Act or other provision of law, including but not limited to, Consumers' rights to notice, an opportunity to be heard, and aid-continuing before any reduction, suspension or termination of services, as set forth in Plaintiffs' Corrected Class Action Complaint.

8

    b. Nothing in this Amended Order compromises or waives any Party's claims or defenses as to the merits of this Action.

    c. Nothing in this Amended Order diminishes the rights of PAs under federal or state labor or employment laws.

IX.   Continued Communication Between the Parties During the Pendency of this Amended Order

    a. With consent of the Consumer, Plaintiffs' counsel may provide DOH with the appropriate personal identifying information of any Consumer not Fully Registered with PPL or whose PAs are not Fully Onboarded with PPL.  DOH will use, and will instruct PPL to use, best efforts to address the situation expeditiously and update Plaintiffs' counsel.

    b. Plaintiffs' counsel may provide DOH with a description of ongoing technical, practical and logistical problems with respect to PPL, and DOH shall direct PPL to address those problems where appropriate.

    c. DOH will provide Plaintiffs' counsel with weekly data, subject to the Confidentiality Agreement and Protective Order so-ordered by the Court on May 5, 2025, *see* ECF No. 75. At a minimum, this data shall include:

        i. Underserved Consumers by county, insurance type (MCO or LDSS), and acuity tier;

        ii. The number of Consumers who are Fully Registered with PPL;

            A. Of those Consumers Fully Registered with PPL, the number that have no PA associated with their PPL profile;

            B. Of those Consumers Fully Registered with PPL, the number that have had no PA log time in PPL's systems during the prior week;

            C. Of those Consumers Fully Registered with PPL, the number whose authorization for services was not fully utilized during the prior week;

        i. The number of Consumers who have started but not completed registration with PPL;

        ii. The number of Consumers who have not started registration with PPL;

        iii. The number of PAs who are Fully Onboarded with PPL;

        iv. The number of PAs who have started but not completed onboarding with PPL; and

9

          v.     The number of Consumers who are receiving services from a Prior FI.

    d.  DOH will meet with Plaintiffs' counsel weekly.

X.    Reporting

    a.  On the first and third Monday of each month, starting on June 2, 2025 and ending on the Monday following the Expiration Date, DOH shall file publicly a report to the Court containing, at a minimum: (1) the number of Consumers who have left the CDPAP program since January 1, 2025; (2) the number of Fully Registered Consumers; (3) the number of Fully Onboarded PAs; (4) the number of PAs who have started but not completed the onboarding process; and (5) the number of PAs that were paid by PPL in the preceding pay period.

XI.    Neither Plaintiffs nor Defendant shall be deemed a "prevailing party" for any purpose including, but not limited to, any statutory or contractual claim based upon "prevailing party" status by virtue of this Amended Order.

XII.    Defendant expressly denies any wrongful conduct or liability, or violation of any federal, state, or local statute, ordinance, or law in this Action whatsoever. Any actions taken pursuant to this Amended Order are made solely to avoid the burdens and expenses associated with the Motion for Preliminary Injunction, and this Amended Order and the actions taken pursuant hereto are not to be deemed an admission by Defendant of liability or wrongdoing or that Defendant has violated any of Plaintiffs' rights as contained in the statutes, regulations, Constitutions or other applicable law of the United States or the State of New York, and will not independently give rise to a claim against Defendant or the State of New York.

XIII.    This Amended Order shall not in any manner be construed as determinative of the issues or claims raised in this Action or any other proceeding, and shall have no precedential value. In addition, notwithstanding the provisions of any paragraph herein, this Amended Order shall not bind or collaterally estop Defendant or the State of New York (including, but not limited to, any and all present and former agencies, departments, divisions, subdivisions, subsidiaries, administrators, principals, officers, employees, directors, members, agents, attorneys, insurers, and assigns, whether in an individual or official capacity) in any pending or future actions or proceedings in which the same or similar

10

issues are raised, from defending any and all issues raised in said actions or proceedings, or from advancing any and all available defenses.

XIV.  The Parties can amend this Amended Order in writing, subject to approval by the Court.

XV.   DOH is immediately and preliminarily enjoined from implementing any sections of the CDPAP Amendment to the extent that they are inconsistent with this Amended Order.

XVI.  The headings contained in this Amended Order are for ease of reference only and are not a material part of this Amended Order.

XVII. Notwithstanding the provisions of this Amended Order, DOH reserves the right to implement, change, or otherwise alter or amend the procedures and requirements of this Amended Order if required by intervening changes in federal or state statutes or regulations that are inconsistent with the terms herein.

UNITED STATES DISTRICT JUDGE

_____

Issued: _____, 2025

11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIZA ENGESSER, MARISOL GETCHIUS, GEETANJALI SEEPERSAUD by her Next Friend SAVITRI SEEPERSAUD, and MARIA JAIME on her own behalf and as Next Friend to Y.P.S. and C.P., individually and on behalf of all persons similarly situated; BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, and REGIONAL CENTER FOR INDEPENDENT LIVING,<br><br>                  Plaintiffs,<br><br><br>        -against-<br><br><br>JAMES V. MCDONALD, as Commissioner of the New York State Department of Health,<br><br>                  Defendant. | **Case No.:** 1:25-cv-01689<br><br><br>**[PROPOSED] AMENDED PRELIMINARY INJUNCTION** |

**WHEREAS** the Consumer Directed Personal Assistance Program ("CDPAP") is a New York State Medicaid Program intended "to permit chronically ill and/or physically disabled individuals [referred to as 'consumers'] receiving home care services greater flexibility and freedom of choice in obtaining such services," N.Y. Social Services Law ("SSL") § 365-f(1); 18 New York Codes, Rules, and Regulations ("NYCRR") 505.28(a);

**WHEREAS** under CDPAP, the consumer may select and retain personal care aides (referred to as a "personal assistant" or "PA") to assist with their home care needs;

**WHEREAS** to participate in CDPAP, each consumer is required to assume responsibilities, including, but not limited to, recruiting, hiring, training, scheduling, and supervising their PAs, *see* SSL § 365-f(3);

**WHEREAS** in the fulfillment of their responsibilities, the consumer works with a Fiscal Intermediary ("FI") that performs administrative functions such as wage and benefit processing

for PAs, processing all income tax and other required wage withholdings, and maintaining employment records on behalf of the consumer, *see* SSL § 365-f(4-a)(a)(i)-(ii); 18 NYCRR 505.28(b)(6) and (i);

**WHEREAS** on April 20, 2024, the New York State Legislature passed an amendment to CDPAP's governing statute (hereinafter "the CDPAP Amendment"), SSL § 365-f to address certain financial, administrative, and compliance concerns;

**WHEREAS** the CDPAP Amendment required the Department to issue a Request for Proposals ("RFP") to contract with a single statewide FI to perform the FI role for CDPAP ("Statewide FI"), *see* SSL § 365-f(4-a);

**WHEREAS** on September 27, 2024, Public Partnerships, LLC ("PPL") was selected as the Statewide FI;

**WHEREAS** the CDPAP Amendment provides that "[e]xcept for the [contracted] statewide fiscal intermediary and its subcontractors, as of April first, two thousand twenty-five, no entity shall provide, directly or through contract, fiscal intermediary services," *see* SSL § 365-f(4-a-1)(a);

**WHEREAS** as of March 31, 2025, there were CDPAP consumers who had not fully transitioned to PPL;

**WHEREAS** on or about March 24, 2025, DOH announced that Consumers and PAs would be permitted an additional 30 days to register with PPL, by April 30, 2025, such that those PAs will receive payment from PPL for all days worked in April 2025 upon registration;

**WHEREAS** Plaintiffs filed this action on March 26, 2025, and moved for entry of a temporary restraining order and preliminary injunction on March 27, 2025;

**WHEREAS** the Court granted a temporary restraining order on March 31, 2025, and entered a further Order clarifying the temporary restraining order on April 2, 2025;

**WHEREAS** no plaintiff class has been certified to date, Plaintiffs reserve the right to make any motion for class certification, and Defendant reserves the right to oppose any motion for class certification;

**WHEREAS** Plaintiffs and Defendant James V. McDonald, sued in his official capacity as Commissioner of the New York State Department of Health ("DOH" or the "Department") (together, the "Parties"), ~~desire~~desired to resolve Plaintiffs' motion for a temporary restraining order and preliminary injunction without further litigation and without admission that a motion for such relief is appropriately granted;~~and~~

2

**WHEREAS** the Parties proposed a Preliminary Injunction on April 9, 2025, which was so-ordered by the Court on April 10, 2025;

**WHEREAS** many Consumers continue to experience severe disruptions in care; and

**WHEREAS** this ~~Stipulation and~~Amended Order will allow ~~for~~ Consumers to ~~continue receiving~~receive services and PAs to ~~continue to~~ be paid while Consumers and PAs fully transition to a single Statewide FI by better utilizing the services of Facilitators.

**IT IS HEREBY AGREED AND ORDERED AS FOLLOWS**:

I.  Definitions

   a. "Amended Order" or "Amended Preliminary Injunction" means this Proposed Amended Preliminary Injunction submitted for the Court's approval on May 15, 2025.

   b. ~~a.~~ "Fully Registered Consumer" means a consumer who has themselves or through a Designated Representative:

      i.  Completed the necessary steps for registration with PPL; and

      ii. Signed the required memorandum of understanding with PPL.

   c. ~~b.~~ "Fully Onboarded Personal Assistant" means a Personal Assistant who has completed all legal requirements to become a PPL employee, including employment eligibility verification, and has been notified that the PA is Fully Onboarded.

   d. ~~c.~~ "MCO" shall have the same meaning as a Managed Care Provider pursuant to SSL § 364-j.

   e. ~~d.~~ "LDSS" means Local Departments of Social Services established pursuant to Article 2 of the Social Services Law.

   f. ~~e.~~ "Authorization" means the authorization for services by an MCO or LDSS pursuant to 18 NYCRR 505.28(d)(3)(i).

   g. ~~f.~~ "Facilitators" means entities subcontracted with PPL to perform services on behalf of the consumer to facilitate the consumer's role as the employer pursuant to SSL § 365- f.

   h. ~~g.~~ "Prior FI" means the FI with which the Consumer was enrolled on March 31, 2025.

   i. ~~h.~~ "Expiration Date" means ~~June 6~~September 15, 2025, or any later date set by the Court.

   j. ~~i.~~ "CDPAP Amendment" means Part HH of Chapter 57 of the New York Session Laws of 2024 that amended subdivision 4-a(ii-a) and added subdivision 4a-1(a) (*see* Section 3 of Part HH) to SSL § 365-f.

3

k. ~~j.~~ "New Consumer" means a consumer who seeks CDPAP services after March 31, 2025 or who continues CDPAP services while voluntarily changing MCOs.

~~k. "Registration Deadline" means May 15, 2025.~~

l. "Stipulation and Order" means ~~this~~the Stipulation and Proposed Preliminary Injunction submitted for the Court's approval on April 9, 2025 and so-ordered by the Court on April 10, 2025.

m. "Designated Representative" shall have the same meaning as Designated Representative pursuant to 18 NYCRR 505.28(b)(5).

n. "Underserved Consumer" shall mean any Consumer whose full Authorization was not utilized in the two weeks prior to the entry of this Amended Order.

II. Employment and Payment of PAs through Pendency of Preliminary Injunction

a. DOH shall take the following actions to ensure that the PAs working with Consumers who were receiving care as of March 31, 2025 shall continue to be timely paid, or to be paid retroactively as quickly as possible, for their services performed since March 31, 2025 and receive statutory benefits consistent with applicable labor and employment laws, as set forth in this Section, while Consumers who received care as of March 31, 2025 complete registration, and their PAs are fully onboarded, with PPL.

b. DOH shall issue sufficient instructions to PPL, MCOs, ~~and~~ LDSS, and Facilitators to ensure that they can comply with this ~~Stipulation and~~Amended Order.

c. ~~i.~~ DOH shall provide copies of such instructions to Plaintiffs' counsel and consider any feedback. Plaintiffs' counsel shall be permitted to post the instructions publicly on their website as agreed upon with DOH.

~~c. Category A: "Fully Registered Consumer, Fully Onboarded PA" Group~~

~~i. This Category covers employment and payment of PAs who are Fully Onboarded with PPL, and whose Consumers are Fully Registered with PPL.~~

~~ii. PAs who are Fully Onboarded with PPL shall be employed and fully and timely paid by PPL back to the later of (a) April 1, 2025, or (b) the last date for which the PA was paid by their Prior FI.~~

~~iii. Fully Onboarded PAs in this group may submit time records to PPL via PPL's program application; via telephone call to PPL; and via paper time sheets to PPL. PPL shall not require prior approval to submit paper time sheets for any time~~

4

sheets submitted on or before April 26, 2025.

d. Category B: "Fully Registered Consumer, Not Fully Onboarded PA" Group

    i. This Category covers employment and payment of any PAs who are not Fully Onboarded with PPL, and whose Consumers are Fully Registered with PPL.

    ii. PAs who are not Fully Onboarded with PPL shall either be employed and paid by the Prior FI while they complete the onboarding process with PPL, or be directed to the Expedited PPL Onboarding Mechanism, *see infra*, as set forth in this Section.

d. iii. Consumer Election Underserved Consumers

    1. At the Consumer's election, the PA will be employed and paid by the Prior FI, provided that the Requirements set forth below are satisfied.

    2. The Consumer may express this election personally or through the Consumer's Designated Representative, through any reasonable means, including but not limited to, via telephone call or email to the Consumer's MCO or LDSS. MCOs and LDSS shall be instructed to accept elections submitted by these methods. DOH shall make publicly available guidance that a Consumer can reference when communicating with the MCO or LDSS regarding this election.

i. DOH shall identify every Underserved Consumer within 5 business days of the entry of this Amended Preliminary Injunction.

ii. DOH will assign each Underserved Consumer to a Facilitator. The assignment to a Facilitator shall take into consideration each Underserved Consumer's area of residence and Facilitators' physical locations. Any Consumer who wishes to change their assigned Facilitator may do so by contacting the DOH Transition Hotline or their MCO or LDSS.

iii. DOH shall direct each Facilitator to contact all of its Underserved Consumers as soon as possible to determine what issues have prevented the utilization of their full authorizations and to begin addressing those issues.

iv. DOH will direct any MCO or LDSS that receives an election by a Consumer or their Designated Representative under this Section, and where the Requirements below are satisfied, to make arrangements to immediately reinstate the Consumer's Authorization with the Prior FI shall require that each Facilitator

provide to DOH a list of Consumers that have not been reached within two weeks of their assignment to that Facilitator, and within one week of receiving this list, DOH shall develop a plan with the Facilitators, MCOs and LDSS to reach any such Consumers.

v. Requirements: A Consumer or their Designated Representative may request that any PA who is not yet fully onboarded receive payment from the Prior FI, provided that:

1. The Consumer's MCO or LDSS is capable of updating the Consumer's authorization to the Prior FI in sufficient time for the worker to be paid within seven (7) days;

2. The Prior FI exists, is operational, has no other legal impediments to employing or paying PAs, made timely payments through March 31, 2025, and agrees to employ and make timely payments to the PA until such time as the PA becomes a Fully Onboarded PA;

3. The Prior FI agrees to an economic arrangement with the applicable MCO or LDSS that is not significantly different from the arrangement that existed immediately prior to April 1, 2025, including without limitation the payment for such services; and

4. The Prior FI agrees not to make misrepresentations to any Consumer or PA regarding the CDPAP Transition.

vi. If any of the above Requirements are not met, then the Consumer and the Consumer's PAs will be directed by the MCO or LDSS to the Expedited PPL Onboarding Mechanism, *see infra*, as set forth in this Section.

e. Category C: "Not Fully Registered Consumers" Group

i. This Category covers employment and payment of all PAs whose Consumers are *not* Fully Registered with PPL.

ii. PAs whose Consumers are not Fully Registered with PPL shall either be employed and paid by the Prior FI or shall be directed by the MCO or LDSS to the Expedited PPL Onboarding Mechanism, *see infra,* as set forth in this Section.

iii. Consumer Election:

1. At the Consumer's election, the PA will be paid by the Prior FI provided that the Requirements set forth in Section II.d.v are satisfied.

2. DOH shall direct MCOs and LDSS to contact all Consumers who are not Fully Registered with PPL by direct contact to the Consumer through the Consumer's preferred means within five days from the date that the Court enters this Order. By the next business day after the five day period, DOH will update Plaintiffs' Counsel on the status of this outreach.

3. In addition to this outreach, the Consumer may express this election personally or through the Consumer's Designated Representative, through other means, including via telephone call or email to the Consumer's MCO or LDSS. MCOs and LDSS shall be instructed to accept elections submitted by these methods. DOH shall make publicly available guidance that a Consumer can reference when communicating with the MCO or LDSS regarding this election.

iv. DOH will direct any MCO or LDSS that receives an election by a Consumer under this Section, and where the Requirements set forth in Section II.d.v are satisfied, to make arrangements to immediately reinstate the Consumer's Authorization with the Prior FI.

v. A Consumer or their Designated Representative may request that any PA who is not yet fully onboarded receive payment from the Prior FI, provided that the Requirements set forth in Section II.d.v are satisfied.

vi. If any of the Requirements set forth in Section II.d.v are not met, then the Consumer and the Consumer's PAs will be directed by the MCO or LDSS to the Expedited PPL Onboarding Mechanism, *see infra*, as set forth in this Section. All Consumers in Category C should become Fully Registered Consumers with PPL as soon as possible but in no event later than the Registration Deadline to allow their PAs to be Fully Onboarded PAs by the Expiration Date.

v. DOH shall ensure that Facilitators, on behalf of PPL, can:

1. Access PPL systems in order to complete registration and onboarding of both Consumers and PAs;

2. View and edit real-time information on Consumer registration and PA onboarding, including specific information regarding any missing or improperly recorded documentation;

3. Review PA paperwork and documentation and complete all employment verifications on behalf of PPL;

4. Create and follow-up on "work tickets" in PPL's system;

5. View Consumers' authorizations for services, communicate with MCOs and LDSS regarding missing or incomplete authorizations, and contact Consumers to discuss any discrepancies between services authorized and services utilized;

6. View and verify PA time logged on the PA's profile as well as information regarding whether (a) a PA's shift was denied (and if so, why); (b) PPL has edited a PA's time entry (and if so, why); and (c) paper timesheets were received for a PA.

7. View and verify payroll information for each PA of every assigned Consumer, including the date and method of payment and the number of hours worked accounted for in a paycheck.

8. Assist Consumers and PAs with manual entry of time, accept paper timesheets and enter information from those paper timesheets into PPL's system, and assist with Consumer approval of time entered as needed;

9. Escalate payment issues to PPL for resolution within 24 hours; and

10. Provide trainings to Consumers and PAs regarding PPL's time-keeping systems.

vi. DOH shall ensure that PPL provides each Facilitator with:

8

1. A specific point of contact at PPL with a designated phone number and email address to resolve issues identified by that Facilitator that cannot be entirely resolved by the Facilitator;

2. Training materials regarding use of PPL's time-keeping systems; and

3. Materials sufficient to explain:

   (a) PPL's employment policies and employee benefits;

   (b) the process by which Consumers can terminate employment of a PA;

   (c) the process by which PAs can resign from employment; and

   (d) how the designations of "terminated" or "resigned" should be captured in PPL's system.

vii. DOH shall provide materials to the Office of Mental Health and the Office for People With Developmental Disabilities for those agencies to distribute to their constituents explaining the transition to a single statewide fiscal intermediary and containing contact information for the DOH CDPAP Transition Hotline, PPL, and the Facilitators.

e. Paper Timesheets

i. DOH shall instruct PPL that it must accept paper timesheets from any PA, without the Consumer or PA requesting an individual exception, until the Expiration Date.

f. ~~Moving from Category B or C to Category A~~Consumers and PAs Utilizing Services of Prior FIs

i. Any Consumer being served by a Prior FI who is not Fully Registered with PPL by June 20, or whose PAs have not been Fully Onboarded to PPL by June 20 pursuant to Sections II.d.iii-v or II.e.v of the Preliminary Injunction and this Court's order dated May 20, 2025, ECF No. 86, may continue to be served by their Prior FI until the Expiration Date.

ii. DOH, the MCOs, the LDSS, and PPL shall not take any steps to transition these Consumers and PAs to PPL until July 14, 2025, unless the Consumer affirmatively seeks registration with PPL.

iii. Beginning on July 14, 2025, these Consumers and PAs shall be assigned to Facilitators who will assist them in fully registering and onboarding with PPL.

iv. After June 20, 2025, no additional Consumers can have their authorizations for care returned to a Prior FI.

g. Notification of Employment by PPL

9

    i.   DOH will direct PPL that, at the point <u>when</u> any PA who was previously not Fully Onboarded with PPL becomes Fully Onboarded with PPL, PPL must:

    1.   Inform the Consumer, the Consumer's Designated Representative, if any, and the PA via email and phone that the PA is employed and will be paid by PPL, and the date <u>when</u> payment ~~begins~~<u>will begin</u>;

    2.   Provide the PA, the Consumer's Designated Representative, if any, and Consumer with instructions for submitting and approving time; and

    3.   Fully and timely pay the PA back to the later of (a) April 1, 2025, or (b) the last date for which the PA was paid by the Prior FI, whichever date is the more recent<u>, consistent with applicable law</u>.

<u>III.</u>    ~~g.~~ Expedited ~~Authorization:~~<u>Authorizations</u>

<u>a.</u>  ~~i.~~ For any Consumer who is Fully Registered with PPL but whose Authorization has not been transferred to PPL, DOH will continue to prioritize the transfer of those Authorizations.

<u>b.</u>  ~~h.~~ Expedited PPL Onboarding Mechanism:

    i.   DOH will ~~put in place~~<u>continue to utilize</u> a process for urgent onboarding of PAs who are not Fully Onboarded with PPL. ~~(*See* Sections II.d.ii and II.e.ii above.).~~ This process will include:

    <u>1.</u>  <u>Assignment of each Consumer to a Facilitator;</u>

    <u>2.</u>  ~~1.~~ Intensive and direct outreach by DOH;

    <u>3.</u>  ~~2.~~ Expansion of DOH's dedicated CDPAP transition team;

    <u>4.</u>  ~~3. Establishment~~<u>Continued staffing</u> of a dedicated DOH ~~phone line, which shall be made~~ <u>CDPAP Transition phone line (at 1- 833-947-8666) and email address (statewidefi@health.ny.gov) which shall remain</u> publicly available;

    <u>5.</u>  ~~4.~~ Provision of <u>real-time</u> access to PPL's technology systems ~~by~~<u>for</u> MCOs<u> and Facilitators</u>;

    <u>6.</u>  ~~5.~~ Consumer in-home visits by Facilitators and/or MCOs;

7. ~~6.~~ Availability of in-person community office visits; and

8. ~~7.~~ PPL staff to be placed in in-person community offices.

c. Registration and Onboarding of Consumers and PAs who receive services through LDSS:

~~i. Prioritization:~~

~~i. DOH shall, and shall direct MCOs, LDSS, and PPL to prioritize their resources to address the Consumers and PAs in Category A first, then Category B, then Category C.~~

~~ii. Within each Category, DOH shall, and shall direct MCOs, LDSS, and PPL to prioritize Consumers with highest acuity and their PAs.~~

i. ~~iii.~~ DOH shall establish and ~~shall~~ direct PPL to establish a dedicated registration and onboarding process for Consumers who are not Fully Registered, and/or Consumers whose PAs are not Fully Onboarded, who receive services through LDSS.

IV. ~~j.~~ Nothing in this ~~Stipulation and~~ Amended Order applies to New Consumers.

V. ~~k.~~ This ~~Stipulation and~~ Amended Order does not prevent DOH or PPL from continuing to transition Consumers and their PAs to PPL, except as set forth in Section II(f).

VI. ~~III.~~ This ~~Stipulation and~~ Amended Order vacates and supersedes the ~~March 31~~ April 10, 2025 ~~TRO as amended by the Court's April 2, 2025 Order~~ Preliminary Injunction.

VII. ~~IV.~~ Timeline

a. Defendant's time to answer, move, or otherwise respond to the Corrected Class Action Complaint, ECF No. 32, is hereby extended to the Expiration Date or any date further ordered by the Court.

b. Nothing in this ~~Stipulation and~~ Amended Order limits Plaintiffs' rights to seek an extension of the Expiration Date.

c. DOH will not oppose any request for a reasonable extension of the Expiration Date that is based on PPL's administrative capacity to timely register Consumers who wish to become Fully Registered Consumers and onboard PAs who wish to become Fully Onboarded PAs.

d. This ~~Stipulation and~~ Amended Order shall remain in effect until the later of the Expiration Date or any date further ordered by the Court.

11

VIII. ~~V.~~ Reservation of Rights

    a. Nothing in this ~~Stipulation and~~Amended Order waives or compromises the rights of any Consumer under the Medicaid Act or other provision of law, including but not limited to, ~~to,~~ Consumers' rights to notice, an opportunity to be heard, and aid-continuing before any reduction, suspension or termination of services, as set forth in Plaintiffs' Corrected Class Action Complaint.

    b. Nothing in this ~~Stipulation and~~Amended Order compromises or waives any Party's claims or defenses as to the merits of this Action.

    c. Nothing in this ~~Stipulation and~~Amended Order diminishes the rights of PAs under federal or state labor or employment laws.

IX. ~~VI.~~ Continued Communication Between the Parties During the Pendency of this ~~Stipulation and~~Amended Order

    a. With consent of the Consumer, Plaintiffs' counsel may provide DOH with the appropriate personal identifying information of any Consumer not Fully Registered with PPL or whose PAs are not Fully Onboarded with PPL. DOH will use, and will instruct PPL to use, best efforts to address the situation expeditiously and update ~~a.~~ Plaintiffs' counsel.

    b. Plaintiffs' counsel may provide DOH with a description of ongoing technical, practical and logistical problems with respect to PPL, and DOH shall direct PPL to address those problems where appropriate.

    c. DOH will provide Plaintiffs' counsel with weekly data ~~to be negotiated.~~, subject to the Confidentiality Agreement and Protective Order so-ordered by the Court on May 5, 2025, *see* ECF No. 75. At a minimum, this data shall include:

        i. Underserved Consumers by county, insurance type (MCO or LDSS), and acuity tier;

        ii. The number of Consumers who are Fully Registered with PPL;

            A. Of those Consumers Fully Registered with PPL, the number that have no PA associated with their PPL profile;

            B. Of those Consumers Fully Registered with PPL, the number that have had no PA log time in PPL's systems during the prior week;

            C. Of those Consumers Fully Registered with PPL, the number whose authorization for services was not fully utilized during the prior week;

        i. The number of Consumers who have started but not completed registration

        with PPL;

    ii.    The number of Consumers who have not started registration with PPL;

    iii.    The number of PAs who are Fully Onboarded with PPL;

    iv.    The number of PAs who have started but not completed onboarding with PPL; and

    v.    The number of Consumers who are receiving services from a Prior FI.

d. DOH will meet with Plaintiffs' counsel weekly.

e. The Parties agree to enter into a confidentiality agreement or order to cover the exchange of information pursuant to this Section, to be negotiated at a later date.

X.    Reporting

    a.    On the first and third Monday of each month, starting on June 2, 2025 and ending on the Monday following the Expiration Date, DOH shall file publicly a report to the Court containing, at a minimum: (1) the number of Consumers who have left the CDPAP program since January 1, 2025; (2) the number of Fully Registered Consumers; (3) the number of Fully Onboarded PAs; (4) the number of PAs who have started but not completed the onboarding process; and (5) the number of PAs that were paid by PPL in the preceding pay period.

XI.    VII. Neither Plaintiffs nor Defendant shall be deemed a "prevailing party" for any purpose including, but not limited to, any statutory or contractual claim based upon "prevailing party" status by virtue of this Stipulation and Amended Order.

XII.    VIII. Defendant expressly denies any wrongful conduct or liability, or violation of any federal, state, or local statute, ordinance, or law in this Action whatsoever.  Any actions taken pursuant to this Stipulation and Amended Order are made solely to avoid the burdens and expenses associated with the Motion for Preliminary Injunction, and this Stipulation and Amended Order and the actions taken pursuant hereto are not to be deemed an admission by Defendant of liability or wrongdoing or that Defendant has violated any of Plaintiffs' rights as contained in the statutes, regulations, Constitutions or other applicable law of the United

13

States or the State of New York, and will not independently give rise to a claim against Defendant or the State of New York.

XIII.   IX. This ~~Stipulation and~~Amended Order shall not in any manner be construed as determinative of the issues or claims raised in this Action or any other proceeding, and shall have no precedential value.  In addition, notwithstanding the provisions of any paragraph herein, this ~~Stipulation and~~Amended Order shall not bind or collaterally estop Defendant or the State of New York (including, but not limited to, any and all present and former agencies, departments, divisions, subdivisions, subsidiaries, administrators, principals, officers, employees, directors, members, agents, attorneys, insurers, and assigns, whether in an individual or official capacity) in any pending or future actions or proceedings in which the same or similar

issues are raised, from defending any and all issues raised in said actions or proceedings, or from advancing any and all available defenses.

XIV.   X. The Parties can amend this ~~Stipulation and~~Amended Order in writing, subject to approval by the Court.

XV.   XI. DOH is immediately and preliminarily enjoined from implementing any sections of the CDPAP Amendment to the extent that they are inconsistent with this ~~Stipulation and~~Amended Order.

XVI.   XII. The headings contained in this ~~Stipulation and~~Amended Order are for ease of reference only and are not a material part of this ~~Stipulation and~~Amended Order.

XVII.   XIII. Notwithstanding the provisions of this ~~Stipulation and~~Amended Order, DOH reserves the right to implement, change, or otherwise alter or amend the procedures and requirements of this ~~Stipulation and~~Amended Order if required by intervening changes in federal or state statutes or regulations that are inconsistent with the terms herein.

UNITED STATES DISTRICT JUDGE

_____

~~/S/ Frederic Block~~

14

Issued: ~~April~~ ~~10~~ ____, 2025

# Exhibit C

The Honorable Kathy Hochul
Governor of New York State
NYS State Capitol Building
Albany, NY 12224

Gabrielle Broder
148 Bank St. GA
New York, NY 10014
917-301-0683

April 25, 2025

Dear Honorable Governor Hochul:

I am writing to express my dismay over the PPL transition that was forced on myself and hundreds of thousands of other disabled New Yorkers this month. Calling it a disaster would be an understatement.

First, allow me to introduce myself. I am a 48 year-old former special education teacher and administrator and a resident of Manhattan. Nine years ago, I was in a car accident that left me quadriplegic and dependent on home care 24/7 in 12-hour split shifts. I wouldn't be able to survive one day on my own without this assistance. My medical needs are too complex to be handled by traditional home care. I do not have any family with the capacity to care for me, so I have had to recruit my staff of 8 personal assistants (PA's) and 3 back ups.

I consider my staff and I to be among the lucky ones, because I am pretty tech-savvy, highly literate, possess excellent organizational and clerical skills, and had the time to spend the approximately100 hours that were required over the past 10 weeks to help my PA's register, do their trainings, and manage their payrolls. Unfortunately, even that kind of time investment and my level of skill were insufficient to overcome the bungled morass of a system that PPL created.

And so as of a week ago, only 1 of my 8 PA's had received their complete pay.

The registration process had numerous pitfalls and headaches, but let's just fast forward to the payroll issues.

I would estimate that at least 40% of shifts have had trouble getting processed.

While some of these were admittedly due to errors made by the PA's who are are new to PPL and learning how to clock in and out, I would argue that none of these errors would have been made if it were not for the unnecessarily complicated design that is decidedly user unfriendly.

For example, before they even get started, PA's have to complete their electronic visit verification (EVV) training—but they need a training on how to take the training!—not only because their eyes glaze over when confronted with a couple dozen pages of detail, but because sometimes you have to swipe right to go to the next page, sometimes you have to scroll down, and sometimes both before clicking "next", or "I've read and understood". Upon completion, most of them did not appear to me to have understood or absorbed the presentation, and frankly, any system that requires this level training just to clock in, is way too convoluted for a minimum wage job. It shows a total disregard for the workers, or any understanding that many of them are immigrants with limited English proficiency and limited formal education. In addition, the very heavy emphasis on staying "in compliance", the description of the schedule with which they will be given a compliance report, and the consequences of low compliance scores were intimidating and patronizing in tone, though I do understand the need for compliance and reducing fraud.

So once they made it through the training they attempted to start interfacing with the system.

On the Time4Care app, PA's have to select the program called "15 minutes", which confuses people since they are working for much more than 15 minutes. To clock out, they press "end time", but then have to proceed to also hit "submit". They may think they are done and close the app, but no—they must then proceed to click "confirm". Good, right? Wrong! If they don't go to the next screen and also click "ok", their entry doesn't go through.

So how about the Telephony option? After all, not all my PAs have or know how to use a smart phone.

The issue is similar but even worse. First of all, the computer voice speaks quickly and you have to keep up so it's best to do this on speakerphone or you miss the next instruction while you're keying in your response. After entering your birthdate and last four digits of your social (that's 12 digits with no opportunity to confirm), you enter who you are providing care to, and if you are clocking out, you press one to end your shift. Now you are told your end time. But don't hang up! Press one if correct. But hang on! You still have to confirm two more times after being asked about the 15 minutes again. Even my native English speakers found this daunting. But I have 5 who are not, and 2 of those speak Spanish only. There is no option to call in Spanish.

To make matters worse, the call often drops or hangs up on you before ending. PA's have had to call three times and spend six minutes clocking in or out, causing themselves or the PA waiting to clock in to lose out on time. And sometimes when they clock out, the system tells them they are clocking in again! This requires them to do a manual entry, which very few of them understand how to do without my assistance (and manual entries are not "in compliance").

This brings us to the system glitches and errors, because even when my PAs follow all the steps perfectly, some of their shifts still disappear!

-On the EVV training, PAs are told they do not have to clock out and clock back in again at midnight and sometimes this works. But other times it will randomly register only after midnight, cutting off four hours.

-Sometimes whole shifts disappear from the dashboard, or say "good to pay" on the dashboard but payment is not received the following week when it should be.

-Sometimes a shift will appear only on the PA's Time4Care app or on my dashboard, but not both, or it will appear a day later. Or it will appear and then disappear.

-On at least two occasions, I saw denied shifts on my dashboard that indicated a PA clocked in at midnight on a day that she never worked and clocked out at 11:59 PM the following day when she also wasn't working. No such clock ins or clock outs were ever attempted.

-The one time a PA entered a manual entry on Telephony, it did not register and they had to do it again on Time4Care.

-When PA's do a manual entry on Time4Care, it is sometimes processed right away and other times later or not at all. Many times, it says "in review", and the PA has to click on that and repeat the steps of pressing "submit", "confirm" and "ok" multiple times in order for it to show up on my (the consumer's) dashboard. When entries don't show up, PA's are unsure whether to redo another entry or just wait to see if they get paid.

I would prefer to make this simpler and just have them do paper timesheets, but I've heard from other consumers that this causes even more delays. Paperwork gets lost, takes time to process, etc. I also couldn't even get a straight answer about how or where to send it in as what I was told by a PPL rep over the phone contradicted what is written on the actual timesheet. Plus, it wouldn't be "in compliance" if I don't qualify for an exception, so according to the training that means all my PA's could be fired in six months.

As you can imagine, all of this is an overwhelming and unreasonable burden for me, the disabled consumer, to keep track of and manage. Picture this. I have 14 shifts per week, which PPL counts as 21 since they split up the overnight into two. If I don't remember to manually approve each one, at some point between the 8 PM end of the Saturday dayshift and 11:59 PM every Saturday night, people don't get paid. So I have to set an alarm. On the dashboard, shifts are not listed chronologically nor by name. They are scrambled. They are divided between pending and past but the pending list seems to include over a weeks' worth of shifts (including ones I have already approved and ones I have yet to approve) that don't even fit on one page. The past list doesn't show the date of service unless you click on "view". Initially, I couldn't figure out how to approve shifts because the approve button is not visible unless you swipe to the right and I thought I was viewing the whole chart on my phone. Unfortunately I can't use a computer because my fingers don't work and it's much more difficult for me to hit those keys. Doing everything on the cell phone is extra challenging because the font is very tiny. And as previously stated, some shifts don't appear at all, or don't align with the PAs' Time4Care app, which by the way is difficult to view shifts on because you have to click all around to piece them together and

figure out the dates. In order to track all this, and figure out which shifts I had to help PAs enter manual entries for, and when they were getting paid and when they weren't, I had to create an Excel spreadsheet and re-enter all data there.

Isn't this the job of a timekeeper? Where is my timekeeper? With my prior fiscal intermediary (FI), I never had to worry about anything like this, and my timekeeper, Jessie, was paid to do this. Requiring me to do her job without compensation is disrespectful and immoral, especially given that many in my community are not capable of doing it and our very lives depend on the services we are talking about here.

In contrast, with my previous FI, there was never a late payment. Anytime there was a mistake made with EVV calls, Jessie would let me know, she would give me the opportunity to explain how the error happened, and would send me a paper for my PA and I to sign. It was simple, quick and effective. She had a personal relationship with me and my PAs, so I could always reach out directly to her with any questions or concerns and she would get back to me within a couple hours.

When I call PPL, I am lucky if I get a live person. Out of about 60 calls, I have only gotten through 3 times. And unfortunately, though I spent 30 to 60 minutes on the phone each time, the representative typically either cannot answer my questions, leaves me on hold while while they ask a supervisor and still doesn't give me a sufficient answer, or they give me misinformation that conflicts with PPL's own written materials and trainings or with what other representatives have said.

This is all feeling very DOGE-esque, although I know Mr. Musk had nothing to do with it. It is beyond headaches and stress. These are people's livelihoods and ability to care for their families. I could lose workers over this, putting my independence, my health, and my life in jeopardy. Please feel free to reach out to me with any questions.


Yours Truly,


Gabrielle Broder

# Exhibit D



Select Language ⌄

Start Here    Programs    Resources ⌄    Services ⌄    About ⌄    New York CDPAP

🔍    Contact    Login

Home / CDPAP Resources

# CDPAP Resources

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

Browse videos, guides, and other materials on navigating consumer direction with PPL.

## Important Payroll Reminders

- All time entries, including paper timesheets, must be submitted for approval by 11:59 p.m. ET on Saturday.
- Consumers/DRs must approve PA hours by 12 p.m. (noon) ET every Sunday. Timesheets will not be paid until the consumer or DR approves through approved systems. Learn how to approve PA timesheets through any of PPL's timekeeping systems on the **Payroll & Payment** section of this page. For help, call PPL at 1-833-247-5346.
- CDPAP personal assistants (PAs) are paid weekly, on Thursdays, via direct deposit or paper check, based on their chosen method

Understanding PPL's Systems

**Consumers/DRs must approve PA hours by 12 p.m. (noon) ET every Sunday.** Timesheets will not be paid until the consumer or DR approves through approved systems. Learn how to approve PA timesheets through any of PPL's timekeeping systems on the **Payroll & Payment** section of this page. For help, call PPL at 1-833-247-5346.

- CDPAP personal assistants (PAs) are paid weekly, on Thursdays, via direct deposit or paper check, based on their chosen method.
- A copy of the PPL pay schedule for New York can be found **here**.
- If your payroll processing status says "Pending" in PPL@Home, see the **Payroll & Payment** section of this page for common errors and how to resolve them.

**Understanding PPL's Systems**

Timekeeping

Payroll & Payment

Benefits & HR

# Understanding PPL's CDPAP Systems

## PPL@Home

PPL@Home is the online system personal assistants (PAs) and consumers use to register with PPL, manage their information and authorizations, and view the status of timesheets.

### PPL@Home Self-Registration for Consumers

### PPL@Home Self-Registration for Personal Assistants

| Understanding PPL's Systems |
| Timekeeping |
| Payroll & Payment |
| Benefits & HR |

## PPL@Home Self-Registration for Consumers



## PPL@Home Mobile Registration for Consumers





## PPL@Home Self-Registration for Personal Assistants



## How to Complete the USCIS Form I-9 in PPL@Home





### PPL@Home Transition Guide for Consumers

**English** →

**Chinese – Simplified** →

**Korean** →

**Russian** →

**Spanish** →

**Yiddish** →

### PPL@Home Transition Guide for Personal Assistants

**English** →

**Chinese – Simplified** →

**Korean** →

**Russian** →

**Spanish** →

**Yiddish** →

| Understanding PPL's Systems |
| Timekeeping |
| Payroll & Payment |
| Benefits & HR |

## Time4Care™

Time4Care is PPL's highly rated mobile app for PAs and consumers to manage their time and pay. Time4Care can be downloaded from the **Apple App Store** or **Google Play Store** depending on your device. More information on Time4Care is available in the Timekeeping section below.

# Timekeeping

# Timekeeping

PPL offers multiple timekeeping options to accommodate the different needs of CDPAP consumers and personal assistants while maintaining electronic visit verification (EVV) compliance. A full guide to entering and approving time is available **here in English** and **here in Spanish**.

- Understanding PPL's Systems

- Timekeeping

- Payroll & Payment

- Benefits & HR

**How to Manage Time with PPL**

**Approving Time with PPL**

## Time4Care™

Time4Care is PPL's electronic visit verification (EVV) mobile app that personal assistants use to clock in and out of their shifts, view pay information, and manage their time. Consumers use Time4Care to approve time for their PAs.

**Download Time4Care on Apple App Store**

**Download Time4Care on Google Play**






| Understanding PPL's Systems |
| --- |
| Timekeeping |
| Payroll & Payment |
| Benefits & HR |

## Time4Care Guide

[English](#) →

[Bengali](#) →

[Chinese – Simplified](#) →

[Chinese – Traditional](#) →

[Spanish](#) →

## Approving Timesheets in Time4Care for Consumers

[English](#) →

## Time4Care App Setup



## Time4Care PA Dashboard Tour



## Time4Care Online Clock

## Time4Care Offline Clock



## Time4Care Online Clock In and Clock Out

## Time4Care Offline Clock In and Clock Out



Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR





## Time4Care Adding Past Entries

## Time4Care Editing Time Entries





## Understanding Overnight Time Entries





Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR



## EVV and Time4Care Reference Guide for Personal Assistants

English →                      Korean →

Arabic →                      Polish →

Bengali →                     Russian →

Chinese – Simplified →        Spanish →

Chinese – Traditional →       Urdu →

French →                      Yiddish →

Italian →

## Telephony

Calling in to PPL's telephony system is the other EVV-compliant way for PAs to clock in and out of shifts. Entries must be submitted and approved via the

# Telephony

Calling in to PPL's telephony system is the other EVV-compliant way for PAs to clock in and out of shifts. Entries must be submitted and approved via the phone number the consumer registered with in PPL@Home.

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR



## Telephony System for Personal Assistants

**Telephony Guide for PAs**

**Spanish Telephony Guide for PAs**

1. Dial 1-833-278-3959.

2. Select option one to indicate you are the caregiver.

## Telephony System for Consumers

**Telephony Guide for Consumers** →

**Spanish Telephony Guide for Consumers**

1. Dial 1-833-278-3959.

2. Select option 2 to indicate you are the consumer calling to

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

1. Dial 1-833-278-3959.

2. Select option one to indicate you are the <u>caregiver</u>.

3. Enter your 8-digit date of birth.

4. Enter the last 4digits of your Social Security Number (SSN).

5. Select your consumer from the list.

6. Follow the prompts to start a new shift or end your shift.

7. If needed, follow the prompts to correct and resubmit entries.

1. Dial 1-833-278-3959.

2. Select option 2 to indicate you are the <u>consumer</u> calling to review submitted time.

3. Enter your 8-digit date of birth. For example, if you were born on July 1, 1998, you would enter 07011998.

4. Enter just the numbers from your PPL ID (do not include the letters "PRC-NY").

5. Listen to the details of the PAs you are associated to.

6. Select the number that corresponds to the PA you are calling to approve time for. For example, "Press 1 for Jane Doe." "Press 2 for John Smith."

7. Listen to the details of each shift submitted for your review.

8. Select the shift for approval.

9. To approve a shift, select 1. To

select the shift for approval.

9. To approve a shift, select 1. To reject, select 2. To hear the details again, select 3.

10. If shifts are approved, the call will end. If rejected, you will be prompted to select one of the following reasons for the rejection:

     ◦ 1 if hours worked are inaccurate.

     ◦ 2 if days worked are inaccurate.

     ◦ 3 for other.

11. Select 1 to confirm the reason you selected is correct, or 2 to reselect the reason.

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

# Paper Timesheets

In certain cases, consumers and personal assistants may request an exception to use paper timesheets. Whenever possible, an EVV compliant timesheet submission is required. Exceptions to this can be requested through completing PPL's **exception form**.

to use paper timesheets. Whenever possible, an EVV compliant timesheet submission is required. Exceptions to this can be requested through completing PPL's **exception form**.

This option is available for those who meet the below criteria and their case manager verifies:

- Consumers and/or personal assistants are unable to use electronic timekeeping due to sincerely held religious beliefs.

- The consumer does not have access to the internet and does not have a landline telephone in their residence.

- There is another exceptional circumstance that prevents a consumer/DR or PA from using an electronic method of timekeeping.

Paper timesheets can be requested by calling 1-833-247-5346 or submitting an **exception form** via fax, mail, or email.

- Mail: PO Box 310, Binghamton, NY 13902

- Fax: 1-844-244-4384

- Email: **NYCDPAP_TS@pplfirst.com**

## PPL@Home

Consumers and designated representatives can approve time entered in either Time4Care or PPL@Home through their PPL@Home dashboard. PPL@Home is

---

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

Case 1:25-cv-01689-FB-LKE    Document 96-1    Filed 06/16/25    Page 74 of 176 PageID #: 1491

Consumers and designated representatives can approve time entered in either Time4Care or PPL@Home through their PPL@Home dashboard. PPL@Home is not an EVV-compliant method for PAs to enter their time.

## Approving Shifts in PPL@Home – Consumers

| Understanding PPL's Systems |
| Timekeeping |
| Payroll & Payment |
| Benefits & HR |



**Guide: Approving Time in PPL@Home for Consumers**

- In your PPL@Home dashboard, go to the Timesheet tab

- Click or tap View to see the shifts that were entered and submitted by the PA

- If everything is correct, hit the approve button; if anything is incorrect, hit the reject button

- If everything is correct, hit the approve button; if anything is incorrect, hit the reject button

- Rejecting the timesheet will prompt the PA to correct and resubmit the timesheet for approval



Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR



## Approving Shifts in PPL@Home – Designated Representatives



**Guide: Approving Time in PPL@Home for Designated Representatives** →

### [Guide: Approving Time in PPL@Home for Designated Representatives](#) →

| Understanding PPL's Systems |
| --- |
| Timekeeping |
| Payroll & Payment |
| Benefits & HR |

- In your PPL@Home dashboard, go to the Associated Consumers tab

- Click or tap Manage Consumer — this will take you to the consumer's dashboard

- Go to the Timesheet tab

- Click or tap View to see the shifts that were entered and submitted by the PA

- If everything is correct, hit the approve button; if anything is incorrect, hit the reject button

- Rejecting the timesheet will prompt the PA to correct and resubmit the timesheet for approval





Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR



# Best Practices for Timekeeping

## Save Your Time Entries

When clocking out of a shift, be sure to save your time before exiting the timekeeping system. If you are clocking in and out through the Time4Care app, tap "End Time," then "Submit," then "Ok" to save and submit your time. If using telephony, listen to the system when it asks if the current end date and time is accurate. If the date and time are correct, you must press 1 to save the entry.

tap "End Time," then "Submit," then "Ok" to save and submit your time. If using telephony, listen to the system when it asks if the current end date and time is accurate. If the date and time are correct, you must press 1 to save the entry.

## Closely Track Your Time — Especially for Manual Entries

When using a manual timekeeping option such as telephony or paper timesheet, it is important that you carefully track each shift. Information that should be tracked each day includes:

- The date
- Clock in and clock out times
- Total hours worked
- Name of the consumer/personal assistant
- Type of service provided

Recording this information will help make sure you are using your authorized hours correctly and that you are paid the right amount. It will also reduce the need for corrections.

## Stick with the Same Device

**Device-Specific Clocking:** PAs should consistently use the same device to clock in and out. The clock operates on the device itself, not the system, which explains any display or shift issues experienced when using multiple devices.

**Timesheet Approval Limitations:** Consumers can only approve or deny timesheets submitted through the same medium. For example, timesheets entered via IVR Telephony are not accessible in Time4Care (T4C), meaning IVR-entered timesheets cannot be approved through T4C.

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

**Timesheet Approval Limitations:** Consumers can only approve or deny timesheets submitted through the same medium. For example, timesheets entered via IVR Telephony are not accessible in Time4Care (T4C), meaning IVR-entered timesheets cannot be approved through T4C.

- Time shifts entered via PPL@Home or IVR telephony will not be displayed in the Time4Care mobile app. However, PAs should not submit duplicate shifts in the mobile app, as consumers can approve telephony-submitted timesheets directly through PPL@Home and telephony platforms.

## Need to Edit an Overnight Shift?

Time4Care automatically splits overnight shifts that go past midnight into two time entries. To edit an overnight shift in Time4Care, please delete both parts of the overnight shift and complete a new manual entry with the correct times for your shift. If your new manual entry crosses midnight, Time4Care will split your shift for you between days.

## Avoid Overlapping Shifts

If multiple PAs are working for a consumer, only one can be on the clock at a time. When one PA finishes their shift and another PA takes over, the first PA must clock out before the next PA clocks in. This prevents overlapping time, which can lead to pended (delayed) timesheets.

## Payroll & Payment

---

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

# Payroll & Payment

| |
|---|
| Understanding PPL's Systems |
| Timekeeping |
| Payroll & Payment |
| Benefits & HR |

PAs are paid weekly, on Thursdays, via direct deposit or paper check, based on their chosen method. For time submitted by the payroll deadline of Saturday at 11:59 p.m. ET, PAs will be paid on Thursday of the following week. A copy of the PPL pay schedule can be found [here](#).

If you requested direct deposit, please be aware that your first paycheck **may** be a paper check. As a standard practice, PPL verifies that your banking information is accurate prior to payroll. If you submitted a direct deposit form at least 5 days before the payroll date and your banking information was confirmed to be correct, you will receive an electronic deposit. If you submitted your direct deposit form within less than 5 days of the payroll or we could not confirm the information with your bank, you will receive a paper check until your banking information is confirmed.

**Guide: Understanding PPL Payroll**

## Pended Payments

If you do not receive payment via direct deposit or a paper check on Thursday, the chart below lists some of the reasons why this may have happened. You can also see the status of in-process and processed payrolls by logging in to PPL@Home and navigating to the Timesheet tab.

| Summary | Basic Information | To Do List | Associated Consumers | Required Documents | Signature | Forms | Checklist | Timesheet | Additional Attributes |
|---|---|---|---|---|---|---|---|---|---|

Timesheet Summary

can also see the status of in-process and processed payrolls by logging in to PPL@Home and navigating to the Timesheet tab.



**Understanding PPL's Systems**

**Timekeeping**

**Payroll & Payment**

**Benefits & HR**

Under Actions, click View to view your time entries and the status. If the Status is "Good to Pay," and Processing Status is "Ready for payment," your payment will be processed in the next payroll. If the processing status says, "Sent to Payroll," that means payroll is in process with our payroll provider and you will be receiving payment on the next pay date.

If your processing status says "Pended," that means something is preventing your payroll from processing and needs to be resolved. Click the hyperlinked text to find out why the payment is pending.

See the chart below for the different error codes associated with pended payments and how to resolve them.

# Reasons a Payment May be Pended (Delayed)

| Error Message | What It Means | What to Do |
|---|---|---|
| Consumer is deceased on Date of Service. | Our records show that your consumer was | Please check your time entries and try again. |

| Error Message | What It Means | What to Do |
|---|---|---|
| Consumer is deceased on Date of Service. | Our records show that your consumer was deceased on at least one of your service dates. | Please check your time entries and try again. |
| Consumer is missing CIN/Medicaid ID/Member ID. | Your time record is missing your consumer's CIN, Medicaid ID, or Member ID. | Please check your time record and try again. |
| Consumer is not enrolled during Time Entry's Date of Service. | Our records show that your consumer was not enrolled in CDPAP or not registered with PPL on at least one of your service dates. | Please ensure your consumer completes all necessary steps in PPL@Home to complete registration. Consumers must sign the Memorandum of Understanding (MOU) and have a valid service authorization to be fully |

- Understanding PPL's Systems
- Timekeeping
- Payroll & Payment
- Benefits & HR

Memorandum of Understanding (MOU) and have a valid service authorization to be fully registered with PPL.

| Understanding PPL's Systems | | | |
| --- | --- | --- | --- |
| Timekeeping | No Rate found. | The Service Code you entered does not exist. | Please check your time entries and try again. |
| Payroll & Payment | | | |
| Benefits & HR | Provider has already submitted a time entry for this time, under a different Service Code. | You have already submitted a time entry for at least one of these time entries, under a different Service Code. Only one Service Code can be used for a time entry. | Please check your time entries and try again. |
| | Provider is not PA for Consumer. | Our records show that you are not a registered PA for this consumer. | Please contact PPL Customer Service at 1-833-247-5346 to associate your account |

| | | |
|---|---|---|
| Provider is not PA for Consumer. | Our records show that you are not a registered PA for this consumer. | Please contact PPL Customer Service at 1-833-247-5346 to associate your account to your consumer. |

**Understanding PPL's Systems**

**Timekeeping**

**Payroll & Payment**

**Benefits & HR**

| | | |
|---|---|---|
| Provider is not Paperwork Complete. | Our records show that you have not finished registering with PPL. You cannot be paid until your registration paperwork is complete. | Please log in to PPL@Home or call PPL customer service at 1-833-247-5346 to complete all outstanding forms and paperwork. |
| Provider must have SSN. | Your SSN is missing. PPL cannot pay you without a valid SSN on file. | Please log in to PPL@Home to provide your social security number. |
| There is no authorization for the Consumer's Plan they | We do not have a valid authorization on file for your consumer for this | PPL receives and processes service authorizations from |

| Understanding PPL's Systems |
| --- |
| Timekeeping |
| Payroll & Payment |
| Benefits & HR |

There is no authorization for the Consumer's Plan they are currently enrolled under.

We do not have a valid authorization on file for your consumer for this health plan. Please call PPL Customer Service for assistance.

PPL receives and processes service authorizations from consumers' health plans (MCOs, MLTCs, PACE) and Local Department of Social Services offices daily. They are processed by PPL on the same day. Consumers can check if they have a service authorization with PPL and view the details by logging into PPL@Home and navigating to the "Authorizations" tab. If after checking PPL@Home you do not see a service authorization, please check back as service authorization updates occur regularly. Once resolved, we will be able to process any time

occur regularly. Once resolved, we will be able to process any time submitted in the next payroll.

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

| | | |
|---|---|---|
| There is no authorization for Time Entry's service code. | We do not have a valid authorization for your consumer for this Service Code. | Please revise the service code to align with the service(s) your consumer is authorized for. |
| Time Entry overlaps with a previously submitted time entry for the same Service Date. | You have already submitted a time entry that is the same as at least one of these time entries. | Please check your time entries and try again. |
| Time Entry overlaps with another Provider's time entry for the same | Another PA has already submitted a time entry that is the same as at | Please check your time entries and try again. |

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

| Time Entry overlaps with another Provider's time entry for the same Service Date and Service Code. 2-1 Service isn't allowed for this service. | Another PA has already submitted a time entry that is the same as at least one of these time entries.  Please check your time entries and try again.  If you need assistance, please call PPL Customer Service. | Please check your time entries and try again. |
|---|---|---|
| Time Entry overlaps with another Provider's time entry for the same Service Date. | Another PA has already submitted a time entry that is the same as at least one of these time entries.  Please check your time entries and try again.  If you need assistance, please call PPL Customer Service. | Please check your time entries and try again. |
| Time Entry overlaps with another time entry for different Consumer. | You have already submitted a time entry that is the same as at | Please check your time entries and try again. |

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

| | | |
|---|---|---|
| Time Entry overlaps with another time entry for different Consumer. Group Service is not allowed for this Service Code. | You have already submitted a time entry that is the same as at least one of these time entries, for another consumer. Group Service is not allowed for this Service Code. | Please check your time entries and try again. |
| Time Entry's Date of Service is during a gap in Consumer's enrollment or eligibility. | Our records show that your consumer was not enrolled in CDPAP on at least one of your Service Dates. | Please check your time entries and try again. |
| Time Entry's Date of Service is not within Authorization From/To Date. | We do not have a valid authorization on file for your consumer for these Service Dates. | Please call PPL Customer Service at 1-833-247-5346 for assistance. |
| Time Entry's Service | Under this Service | Please call PPL |

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

| | | |
|---|---|---|
| Time Entry's Service Code is a Group service (1-Provider 2-Consumer). It must list two Consumers. | Under this Service Code, you must list at least two consumers. | Please call PPL Customer Service at 1-833-247-5346 for assistance. |
| Time Entry's Units exceed remaining on Authorization. | At least one of your time entries exceeds the number of units left on your consumer's authorization. | Please call PPL Customer Service at 1-833-247-5346 for assistance. |
| Units cannot be zero. | You must submit at least one time entry; you cannot submit a blank timesheet. | Please check your time entries and try again. |

# Consumer Approvals

Approving PA timesheets is an important part of consumer direction. This verifies that the time the PA submitted is accurate. **In CDPAP, consumers must approve their PAs' timesheets no later than 12 p.m. (noon) ET every Sunday. PA timesheets must be submitted for approval by Saturdays at 11:59 p.m. ET.**

PPL offers four ways to approve timesheets. It is recommended for Consumers to use the same method to approve time as the PA used to submit time.

## Approving Time in Time4Care™

1. Download the Time4Care app from the **Apple App Store** or **Google Play Store**.

2. Log in using your PPL@Home credentials.

3. Go to your dashboard in the Time4Care app.

4. On your dashboard, you will see all time entries from your PAs that are waiting for your approval. You can either tap the individual entries or "View All" to see all of the entries.

5. You will be brought to the list view where you can view all entries awaiting your approval. To select multiple entries, tap the radio buttons to the right of each entry you would like to approve or reject, or tap "Select All" to

**Understanding PPL's Systems**

**Timekeeping**

**Payroll & Payment**

**Benefits & HR**

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

5. You will be brought to the list view, where you can view all entries awaiting your approval. To select multiple entries, tap the radio buttons to the right of each entry you would like to approve or reject, or tap "Select All" to select all entries.

6. If you select multiple entries, you will be able to approve or reject the batch directly from the list view.

7. If you tap a single entry, you will be brought to a new screen where you can confirm that the shift entered by your PA is accurate.

8. If the entry looks correct, you can tap "Approve." You will then see a pop-up confirming the entry has been approved.

9. If the entry looks incorrect for any reason, you can tap "Reject." This will bring you to a new screen where you can select the reason(s) why the entry was rejected.

10. After you have tapped on the reason(s) you are rejecting the time entry, tap the "Reject" button. You will see a pop-up confirming the entry has been successfully rejected.

11. Your PA will see any approved or rejected entries in their own Time4Care dashboard. If an entry has been rejected, your PA can edit the rejected entry and resubmit it for your approval.

# Approving Time in PPL@Home

## Consumers

1. Log in to PPL@Home with your **email address** or **mobile number**

# Approving Time in PPL@Home

## Consumers

1. Log in to PPL@Home with your **email address** or **mobile number**.

2. In your PPL@Home dashboard, go to the "Timesheet" tab.

3. Click or tap "View" to see the shifts that were entered and submitted by the PA.

4. If everything is correct, hit the approve button; if anything is incorrect, hit the reject button.

5. Rejecting the timesheet will prompt the PA to correct and resubmit the timesheet for approval.

## Designated Representatives

1. Log in to PPL@Home with your **email address** or **mobile number**.

2. In your PPL@Home dashboard, go to the "Associated Consumers" tab.

3. Click or tap "Manage Consumer" — this will take you to the consumer's dashboard.

4. Go to the Timesheet tab.

5. Click or tap "View" to see the shifts that were entered and submitted by the PA

6. If everything is correct, hit the "Approve" button; if anything is incorrect, hit the "Reject" button.

---

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

6. If everything is correct, hit the "Approve" button; if anything is incorrect, hit the "Reject" button.

7. Rejecting the timesheet will prompt the PA to correct and resubmit the timesheet for approval.

## Approving Time in Telephony

1. Dial 1-833-278-3959.

2. Select option 2 to indicate you are the consumer calling to review submitted time.

3. Enter your 8-digit date of birth. For example, if you were born on July 1, 1998, you would enter 07011998.

4. Enter just the numbers from your PPL ID (do not include the letters "PRC-NY").

5. Listen to the details of the PAs you are associated with.

6. Select the number that corresponds to the PA you are calling to approve time for. For example, "Press 1 for Jane Doe." "Press 2 for John Smith."

7. Listen to the details of each shift submitted for your review.

8. Select the shift for approval.

9. To approve a shift, select 1. To reject, select 2. To hear the details again, select 3.

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

8. Select the shift for approval.

9. To approve a shift, select 1. To reject, select 2. To hear the details again, select 3.

10. If shifts are approved, the call will end. If rejected, you will be prompted to select one of the following reasons for the rejection:

- 1 if hours worked are inaccurate.

- 2 if days worked are inaccurate.

- 3 for other.

11. Select 1 to confirm the reason you selected is correct, or two to reselect the reason.

## Approving Time Using Paper Timesheets

1. Fill out one paper timesheet per PA

2. Sign and date the timesheet using blue or black ink

3. Submit completed timesheets via fax, email, or physical mail:

- Mail: PO Box 310, Binghamton, NY 13902

- Fax: 1-844-244-4384

- Email: NYCDPAP_TS@pplfirst.com

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

# Benefits & Human Resources

- Understanding PPL's Systems
- Timekeeping
- Payroll & Payment
- **Benefits & HR**

CDPAP personal assistants have several health benefit options through PPL.

## Benefits for Full-time Workers

PAs working more than 130 hours per month have the choice of enrolling in PPL's SecureHealth Plan, which provides comprehensive coverage.

Personal assistants in the downstate regions — Nassau, Suffolk, New York, Kings, Queens, Richmond, Bronx, and Westchester counties — are automatically enrolled in the PPL BasicWellness Plan, which covers basic preventive care, and the PPL Flex Benefit Plan (also called Flex Card), which helps cover various healthcare-related expenses. The PPL Flex Benefit Plan allows your employer to contribute to eligible medical expenses in a set amount for each hour you work. This plan also allows you to elect other optional benefits, such as transit and dependent care.

There are no monthly premium costs to the personal assistant to be enrolled in the BasicWellness Plan.

## Benefits for Part-Time Workers

PAs working less than 130 hours per month can explore health insurance options through NY State of Health by calling 1-855-355-5777 or visiting

# Benefits for Part-Time Workers

PAs working less than 130 hours per month can explore health insurance options through NY State of Health by calling 1-855-355-5777 or visiting https://nystateofhealth.ny.gov.

| Understanding PPL's Systems |
| :-- |
| Timekeeping |
| Payroll & Payment |
| Benefits & HR |

## Benefits Resources

- PPL HR Hotline: 1-833-746-8283

- Frequently Asked Questions: **CDPAP Caregiver Healthcare Benefit Options Offered by PPL**

## Benefit FAQs

**Question:  What healthcare coverage will I receive when I join PPL?**

Answer: If you work more than 130 hours a month, you will have the option to enroll in **PPL's SecureHealth Plan**.

If you work within the boroughs of NYC or the counties of Nassau, Suffolk, or Westchester, you will automatically receive **PPL's BasicWellness Plan**, which covers preventive care, and the PPL Flex Benefit card, which helps pay for healthcare expenses. The BasicWellness plan will not affect your eligibility for any other health insurance.

**Question: How do I get health insurance coverage if I work less than 130 hours a month?**

Answer: Call NY State of Health at 1-855-355-5777 or visit **NY State of Health** to find out your options.

Answer: Call NY State of Health at 1-855-355-5777 or visit [NY State of Health](#) to find out your options.

## PPL BasicWellness + Flex Benefit Plan

**Question: What is the PPL BasicWellness Plan?**

Answer: This is a wellness plan that covers basic preventive care such as vaccinations and screenings and offers financial relief for critical Illness diagnosis and off-the-job accidents. This plan is not intended to replace other insurance coverage you may have, but it can work in addition to it by helping with certain costs that your primary insurance may not fully cover.

**Question: Does the BasicWellness Plan cover prescription drugs?**

Answer: The BasicWellness Plan covers a variety of drugs mandated by the Patient Protection and Affordable Care Act (PPACA). These include:

- Contraceptives: Pills, patches, injections, and devices like diaphragms and cervical caps.
- Preventive Medications: Aspirin for certain age groups, folic acid for women, and iron supplements for infants.
- Vaccinations: Flu shots, hepatitis vaccines, and other immunizations.
- Screening Medications: Drugs used in screenings for conditions like high cholesterol and certain cancers.
- Smoking Cessation: Medications like Chantix and bupropion

These prescription drugs are covered at no cost to the insured individual under the BasicWellness Plan.

### Sidebar

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

- Smoking Cessation: Medications like Chantix and bupropion

These prescription drugs are covered at no cost to the insured individual under the BasicWellness Plan.

**Question: Will the PPL BasicWellness Plan affect my other health insurance?**

Answer: No, it won't affect your eligibility for other health insurance. If you are receiving services from a healthcare provider that are not considered preventive under the BasicWellness Plan, your other insurance will be billed for those services. If you aren't sure about whether a service is covered under the BasicWellness Plan, you can provide both your BasicWellness Plan card information and your other insurance card information to your provider.

**Question: Will I be automatically enrolled in the PPL BasicWellness Plan if I don't work within the boroughs of NYC or the counties of Nassau, Suffolk or Westchester?**

Answer: No, the BasicWellness Plan only applies in New York City and the counties of Nassau, Suffolk, and Westchester.

**Question: Will the PPL Flex Card Plan affect my other health insurance?**

Answer: No, it won't affect your eligibility for other health insurance.

**Question: What is the PPL Flex Card Plan?**

Answer: It's a plan where PPL puts money on a Flex Visa Card, for every hour you work, to use for medical expenses or to pay for other eligible expenses like transit and dependent care.

**Question: Will I be automatically enrolled in the PPL Flex Benefit Plan if I**

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

you work, to use for medical expenses or to pay for other eligible expenses like transit and dependent care.

**Question: Will I be automatically enrolled in the PPL Flex Benefit Plan if I don't live in downstate wage parity regions?**

Answer: No, the PPL Flex Benefit Plan only applies in New York City and the counties of Nassau, Suffolk, and Westchester.

**Question: Will I have full health insurance coverage with just the PPL BasicWellness Plan and Flex Card Plan?**

Answer: No, the BasicWellness Plan only covers preventive care (screenings and immunizations) and offers financial relief for critical Illness diagnosis and off-the-job accidents. It won't cover visits to treat injuries or illnesses.

**Question: Can I use the PPL Flex Card to pay for health insurance premiums with other insurances?**

Answer: No, the PPL Flex Card cannot be used to pay for health insurance premiums. It can only be used for certain eligible medical expenses, including deductibles, copayments, prescription drugs and coinsurance, as well as transit and dependent care.

**Question: Can I use the PPL Flex Card to pay for medical expenses?**

Answer: Yes, you can use it for things like deductibles, copayments, and coinsurance, but not for health insurance premiums.

**Question: How will Coordination of Benefits work with the PPL BasicWellness Plan?**

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

coinsurance, but not for health insurance premiums.

**Question: How will Coordination of Benefits work with the PPL BasicWellness Plan?**

Answer: Coordination of Benefits rules are set by each health insurance company. It is our understanding that if you have other health insurance coverage, your providers will need to bill the BasicWellness plan first only for the preventive services described above, and will not need to bill the BasicWellness plan first for services not covered by that plan. However, to be sure, you should contact your other insurance company and ask about their policies. In addition, if you aren't sure about whether a service is covered under the BasicWellness Plan, you can provide both your BasicWellness Plan card information and your other insurance card information to your provider.

## PPL SecureHealth Plan

**Question: Why is PPL offering this health insurance?**

Answer: As a large employer, PPL must offer health insurance to full-time employees who work more than 130 hours a month.

**Question: When do I become eligible for the PPL SecureHealth Plan?**

Answer: You will become eligible for the PPL SecureHealth Plan after you work 130 hours in a month. Coverage will begin the month after you first worked 130 hours. Once you are eligible to enroll, you will receive a SecureHealth Plan welcome package in the mail.  After enrolling, your benefits will go into effect on the first day of the following month.

**Question: How does the PPL SecureHealth Plan affect my other health**

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

welcome package in the mail. After enrolling, your benefits will go into effect on the first day of the following month.

**Question: How does the PPL SecureHealth Plan affect my other health insurance?**

Answer: If you are eligible to enroll in the PPL SecureHealth Plan, you might not be eligible for other health insurance like New York's Essential Plan. It depends on if the cost of the SecureHealth Plan is more or less than 9% of your household income. Call NY State of Health at 1-855-355-5777 or visit **NY State of Health** to check your options.

**Question: How will the PPL SecureHealth Plan affect my Medicaid coverage?**

Answer: If you qualify for Medicaid, New York State will determine whether Medicaid or PPL's SecureHealth Plan is the more cost-effective choice. If it is PPL's Secure HealthPlan, Medicaid will pay for you to have the SecureHealth Plan. If Medicaid is the more cost-effective option, you will stay on your Medicaid plan.

**Question: How do I get health insurance while waiting to be eligible for the SecureHealth Plan?**

Answer: Waiting for the SecureHealth Plan doesn't affect your eligibility for other health insurance. Call NY State of Health at 1-855-355-5777 or visit **NY State of Health** to find out your options. You can also ask your previous employer about the option to continue your previous coverage with COBRA.

Understanding PPL's Systems

Timekeeping

Payroll & Payment

Benefits & HR

employer about the option to continue your previous coverage with COBRA.

Case 1:25-cv-01689-FB-LKE   Document 96-1   Filed 06/16/25   Page 102 of 176 PageID #: 1519



### CARE

Start Here

Programs

FAQs

Caregivers

Organizations

### RESOURCES

Blog

Podcasts

Videos

### COMPANY

About Us

News and Events

Our Services

Careers

Accessibility

© Copyright 2025 PPL LLC All Rights Reserved.   Privacy Policies   Cookie Policy   Terms of Use

    

# Exhibit E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

Philip Calderon, on his own behalf and
on behalf of all others similarly situated,

                      *Plaintiff,*

    -   against -

Public Partnerships, LLC,


                      *Defendant.*

---

**25-cv-____ ( )**

**Class and Collective Action COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Philip Calderon, individually and on behalf of all others similarly situated, by his undersigned attorneys The Legal Aid Society and Katz Banks Kumin LLP, as and for his Complaint, allege as follows:

**Preliminary Statement**

1.    Plaintiff Philip Calderon is a personal care assistant ("Personal Assistant") employed by Public Partnerships, LLC ("PPL"). He provides home care services through the New York State Medicaid Consumer Directed Personal Assistance Program ("CDPAP"), a New York State Medicaid program that allows Medicaid members who are eligible for home care services ("Consumers") to choose and hire their own personal caregiver. This program sustains consumers' lives in their communities and pays critical wages to the Personal Assistants whose work is essential to the Consumers' well-being.

2.    On April 1, 2025, New York State transitioned from using hundreds of fiscal intermediaries to administer CDPAP to PPL as the single intermediary for thousands of Personal Assistants. This haphazard transition has jeopardized the ongoing care of thousands of program Consumers and threatened the livelihoods of thousands more Personal Assistants.

3. PPL has failed to pay Mr. Calderon and tens of thousands of other Personal Assistants across New York on time, for all their time worked, or at the correct rate in violation of federal and state wage laws. At the time of this filing, PPL has failed to pay Mr. Calderon any wages for his full-time work since April 1, 2025. Although Mr. Calderon has reported all his work hours to PPL, the company has not paid him because of what multiple company representatives have described to him as an "IT problem."

4. Likewise, other Personal Assistants in the Class and Collective that Mr. Calderon seeks to represent have faced a dizzying array of technical problems reporting their hours and receiving their pay, including: the inability to access PPL's timekeeping app, Time4Care; the inability to clock-in for their shifts when starting work outside their Consumer's homes; time entries not properly storing in Time4Care or disappearing after entry; automatically being clocked out of shifts when working overnight; and the rejection of time entries or timesheets based on PPL's mistaken identification of a problem with a Consumer's enrollment or authorization status. The different challenges faced by Personal Assistants are all expressions of a single problem: PPL's wholly inadequate infrastructure for onboarding, scheduling, paying, and communicating with employees.

5. PPL has put Mr. Calderon and tens of thousands of other Personal Assistants and their families in dire financial straits. This action seeks to put an end to PPL's ongoing wage violations.

**PARTIES**

6. Plaintiff Philip Calderon is a twenty-five-year-old individual residing in Richmond County, New York. He works full-time for PPL caring for his father in Richmond County.

7. Defendant Public Partnerships, LLC ("PPL") is a limited liability company

2

organized under the laws of Delaware with its principal place of business in Georgia.

8. Pursuant to a contract entered into with the State of New York, PPL operates as the payroll administrator and the joint employer of the Personal Assistants working under CDPAP throughout New York State under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").

9. Under that contract, PPL determines the terms and conditions of employment for Personal Assistants providing home care services for Consumers under CDPAP, As such, PPL is an enterprise as defined in Section 3(r)(1) of the FLSA, 29 U.S.C. § 203 (r)(1), and as an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1)(A), 29 U.S.C. § 203(s)(1)(A), in that the Defendant's employees are engaged in interstate commerce and Defendant's annual gross volume of business done exceeds $500,000.00.

10. Upon information and belief, PPL promulgates employment policies, including compensation policies, for all Personal Assistants working under CDPAP in New York State.

11. PPL employs Plaintiff and similarly situated Personal Assistants within the meaning of the FLSA and the NYLL.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over Plaintiff's claims under the FLSA pursuant to 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. § 216(b).

13. Pursuant to 29 U.S.C. § 216(b), Plaintiff has consented in writing to become a party to this lawsuit. Plaintiff's written consent form is attached hereto as Exhibit A.

14. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because these claims are so closely related to Plaintiff's claims under the FLSA that they

3

form part of the same case or controversy under Article III of the United States Constitution.

15. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

16. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because it is the judicial district in which a substantial part of the events giving rise to the claims occurred, as it is where the Plaintiff works for PPL.

## BACKGROUND

17. New York created the New York State Medicaid CDPAP program to allow Consumers to select and train their caregivers to assist them with navigating the challenges of daily life created by age, disability, or illness while remaining in their communities.

18. Consumers in the program can receive care from family members, members of their communities, and others with whom they have personal relationships or with whom they feel most comfortable having in their homes. The ability to hire family, friends, neighbors, or community members who speak the same language is especially beneficial for Consumers in light of the highly personal nature of the care they receive and which they require to remain at home and retain their independence.

19. Under New York's regulations, Personal Assistants may provide "personal care services," including "(1) bathing of the patient in the bed, the tub or in the shower; (2) dressing; (3) grooming, including care of hair, shaving and ordinary care of nails, teeth and mouth; (4) toileting; this may include assisting the patient on and off the bedpan, commode or toilet; (5) walking, beyond that provided by durable medical equipment, within the home and outside the home; (6) transferring from bed to chair or wheelchair; (7) turning and positioning; (8) preparing of meals . . . ; (9) feeding; (10) administration of medication by the patient, including prompting

4

the patient as to time, identifying the medication for the patient, bringing the medication and any necessary supplies or equipment to the patient, opening the container for the patient, positioning the patient for medication and administration, disposing of used supplies and materials and storing the medication properly; (11) providing routine skin care; (12) using medical supplies such as walkers and wheelchairs; and (13) changing of simple dressings." 18 N.Y.C.R.R. § 505.14(a)(5)(ii)(a).

20. Personal Assistants may also assist with "home health aide services," defined as "simple health care tasks, personal hygiene services, housekeeping tasks essential to the Consumer's health and other related supportive services." 18 N.Y.C.R.R. § 505.28(b)(10).

21. Such tasks include, for example, "performance of simple measurements and tests to routinely monitor the Consumer's medical condition; performance of a maintenance exercise program; and care of an ostomy after the ostomy has achieved its normal function." *Id*.

22. For Consumers who require assistance with both "personal care services" and "home health aide services," participation in CDPAP means that they can get all of their care at home from one type of aide.

23. Personal Assistants in the traditional personal care program may not assist with home health aide services, forcing certain individuals in that program to coordinate additional assistance through Certified Home Health Agencies or Private Duty Nursing. In practice, this restriction means that CDPAP represents the only opportunity for certain Consumers to continue to receive care in the community.

24. Significantly more than 25% of Personal Assistants' work requires them to perform manual labor, such as physically lifting or moving Consumers with limited mobility, helping Consumers use the restroom and bathe, performing physical tasks such as cooking and cleaning,

5

and driving Consumers or helping them navigate public transportation.

25.     The popularity of CDPAP has meant that as of January 1, 2025, the program supported 280,000 New York State residents and employed over 300,000 Personal Assistants.

26.     From 2015 until April 1, 2025, CDPAP Personal Assistants were paid by one of hundreds of fiscal intermediaries across New York State that provided payroll administrative services. In April 2024, this arrangement changed significantly when New York State mandated that as of April 1, 2025, there could only be one fiscal intermediary for the entire state.

27.     The New York State Department of Health ("DOH") awarded the contract to PPL.

28.     The transition of CDPAP from hundreds of fiscal intermediaries to PPL has been highly chaotic, primarily due to PPL's incompetence and mismanagement.

29.     On January 17, 2025, DOH announced that the deadline for all CDPAP Consumers to complete the enrollment process was March 28, 2025. This gave hundreds of thousands of CDPAP Consumers and Personal Assistants a little over two months to enroll or register.

30.     The January announcement, however, did not explain what would happen to any CDPAP Consumer or Personal Assistant who had not begun or completed the enrollment or registration process by the deadline: that Personal Assistants would not be paid and that Consumers would lose their caregivers.

31.     It was not made clear to Consumers or Personal Assistants that failure to register with PPL by March 28, 2025, could have catastrophic consequences for continuing care and employment.

32.     Many Consumers and Personal Assistants received no notice of the requirement to enroll or register with PPL at all.

33.     In the period immediately prior to PPL's assumption of its contractual

6

responsibility, it rapidly became clear that a very rocky onboarding process for hundreds of thousands of Consumers and Personal Assistants would mean that sizeable portions of both groups would not be fully registered and transitioned to PPL by April 1, 2025.

34. This meant that thousands of vulnerable New Yorkers would face an abrupt cessation of care on April 1.

35. In a failed attempt to rectify the system and avoid disaster, Governor Hochul extended the enrollment period to April 30 (from March 31), offering to have PPL pay Personal Assistants retroactively once the enrollment process was completed—despite laws prohibiting such practices.

36. Since PPL assumed its role as employer and fiscal intermediary on April 1, Personal Assistants and Consumers have reported catastrophic systemic failures in PPL's enrollment, payroll, timekeeping, and communications infrastructure requiring hours on the phone in efforts to remedy countless errors.

37. As a result, PPL has subjected tens of thousands of Personal Assistants to wage theft leaving them uncompensated or undercompensated for weeks, in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, Articles 6 and 19 of the New York Labor Law, , and the New York Wage Parity Act, Public Health Law § 3914-C ("Wage Parity Act").

38. PPL's payroll and timekeeping infrastructure is beset by glitches, technical errors, and policy choices that make it difficult or impossible to enroll in the system, report hours worked, and approve time. This has resulted in PPL failing to pay Personal Assistants for their time worked.

39. Under PPL's system, Personal Assistants are required to report their hours to PPL either through an app ("Time4Care"), through an automated telephone system ("Telephony"), or

7

by faxing, mailing, or emailing paper timesheets. Consumers (or their designated representatives) must approve their Personal Assistants' hours before PPL releases payment.

40. The flaws in these systems are so profound that they constitute a feature not a bug. Personal Assistants experience problems with all these reporting methods.

41. The Time4Care app is unreliable, routinely failing to record time entirely or erasing time that has been entered.

42. Personal Assistants accurately report their time but later find that entire shifts or parts of shifts have inexplicably disappeared when Consumers are asked to approve their weekly pay.

43. Similar problems exist with the Telephony system. The email address Consumers are instructed to use for sending in paper timekeeping records often cannot receive messages because it is full.

44. The PPL system creates other problems for Personal Assistants, including the routine loss of overnight hours, rounding errors, rejections of overlapping shifts, inflexible location requirements, and deleted bank account numbers for direct deposit.

45. On information and belief, thousands and likely tens of thousands of Personal Assistants work overnight shifts to care for homebound and vulnerable Consumers who require and are authorized to receive 24-hour care.

46. But PPL's system automatically clocks out these overnight workers at midnight, resulting in lost pay.

47. In an attempt to remedy this error, PPL began to instruct Personal Assistants to clock out at 11:59 p.m. and clock back in at midnight.

48. For "sleep-in" workers who often work shifts of several days and are entitled to

8

eight hours of sleep time, this workaround forces them to lose precious sleep during arduous shifts to secure the pay they have earned.

49. For Personal Assistants working "split shifts" and therefore on duty all night, this workaround may interfere with tasks they must perform for Consumers.

50. Time4Care and Telephony round time entries into 15-minute blocks rather than recording exact working hours. This results in payments that differ from the actual hours Personal Assistants worked and should be paid for.

51. Time4Care and Telephony will not accommodate overlapping work shifts. When two Personal Assistants are on the clock during the same 15-minute block, either because a Consumer is authorized to receive care from two Personal Assistants simultaneously or because of a shift change, both Personal Assistants have had their entire shifts rejected by PPL.

52. When a Personal Assistant's shift starts outside of the Consumer's home, such as when they meet their Consumer at a medical appointment, they are often unable to clock in.

53. Personal Assistants have submitted direct deposit paperwork multiple times only to find the information deleted. This delays the availability of funds and requires Personal Assistants to repeatedly submit the same information to PPL's system.

54. Other rampant errors in the PPL system affect both Personal Assistants and Consumers.

55. These issues with the PPL system result in payment mistakes that must be corrected.

56. Consumers have found that PPL undercounts their Personal Assistant's hours or lists the wrong Personal Assistant in the Consumer's portal (including confidential information such as the individual's complete social security number).

9

57. Many Designated Representatives of Consumers, such as guardians or healthcare proxies, have reported that PPL does not allow them to approve pay for Personal Assistants.

58. Other Consumers have found that they cannot approve time at all because PPL's system has incorrectly marked them as lacking CDPAP care authorization by the Consumer's Managed Long Term Care Plan.

59. Still others have seen time that was originally approved later designated as "denied" without any warning or notice.

60. Indeed, for some Personal Assistants, the first time their Consumers learn that their Personal Assistant's time was "denied" is when the Personal Assistant receives a check that is far less than expected and the Consumer goes back online seeking answers. If Consumers cannot approve their Personal Assistant's time, their Personal Assistants go unpaid.

61. Even when Personal Assistants are paid, the payments they receive are frequently late or incorrect.

62. Many Personal Assistants are not paid the requisite time-and-a-half for the overtime hours they worked.

63. Personal Assistants have also been denied overtime pay when PPL omitted the final day of a pay period from a weekly payment causing Personal Assistants' hours to be reduced to below 40 for the week.

64. Some Personal Assistants who worked overtime report receiving only their regular hourly pay, without the required overtime premium.

65. Despite the array of defects in its computer systems, PPL limits the number of times a Personal Assistant can submit a paper timesheet.

66. Recently, Personal Assistants who have tried to email timesheets to the address

provided by PPL have received bounce-back messages stating that "Delivery has failed to these recipients or groups" with the explanation that their timesheets cannot be delivered because "The recipient's mailbox is full and can't accept messages now."

67.     Personal Assistants then are advised to "Please try resending your message later or contact the recipient directly." They are not told whom to contact directly or how to reach that person.

68.     Personal Assistants and Consumers have made repeated efforts to bring these issues to PPL's attention to no avail.

69.     To fix timekeeping or other payroll problems, Personal Assistants and Consumers are told they can call PPL to open a ticket. Getting through to a PPL representative by phone has proven to be exceedingly difficult.

70.     When able to leave a call back number, Personal Assistants and Consumers wait weeks for the promised return call. Often, no call ever comes.

71.     When Personal Assistants and Consumers can reach a person at PPL, their problems remain unresolved.

72.     The representative frequently gives Personal Assistants and Consumers general assurance that the problem will be solved or that they will submit a ticket. Personal Assistants and Consumers later learn the problem has not been addressed.

73.     Because many of these problems interact, workers employed by PPL are forced to spend an inordinate amount of time struggling with PPL's inadequate systems to receive the pay they have earned.

74.     Personal Assistants and the Consumers they care for report spending countless hours in often fruitless attempts to remedy the many issues created by PPL's deeply flawed

11

systems. They spend hours searching for workarounds in attempts to navigate an impenetrable process.

75. For example, many English-speaking Consumers and Personal Assistants now select foreign language options when calling PPL because they have learned that this workaround increases the likelihood of reaching a person before the line disconnects.

76. The resulting delays and underpayments are not just an inconvenience; they are a serious burden for low-wage workers who provide an essential service to vulnerable New Yorkers.

77. Many Personal Assistants live paycheck to paycheck and cannot afford to work without a guarantee of timely payment.

78. These workers are the lynchpin that keeps disabled New Yorkers in their homes. They do a hard job that is difficult to replace. There is a well-documented shortage of home care workers throughout New York State.

79. Personal Assistants who cannot afford to work for free have begun to leave the program.

80. Though Personal Assistants want to continue providing care, their financial circumstances do not permit many of them to weather the long delays and uncertainty that PPL has created.

81. Consumers are increasingly experiencing interruptions in their personal care services as PPL's mismanagement of the program continues.

82. Despite the requirements of the FLSA, NYLL, and the New York Wage Parity Act, PPL has failed to pay an astounding number of Personal Assistants their wages each week.

83. Caring Majority Rising, a coalition of people with disabilities, older adults,

12

caregivers, and home care workers, surveyed over 650 Personal Assistants and Consumers since April 1 when PPL became the state-wide fiscal intermediary.

84. A majority of those responding to Caring Majority Rising reported underpayments on either the first or second payroll weeks. Many of these workers reported receiving no payment whatsoever since the April 1 transition.

85. The problems are not limited to Personal Assistants who have been unable to navigate the byzantine transition from their prior fiscal intermediaries to PPL. A majority of workers responding to Caring Majority Rising were either fully registered with PPL or had completed their portion of the registration process and are awaiting final confirmation from PPL, yet they reported that they remain unpaid for their essential work.

**Plaintiff Philip Calderon**

86. The experience of Plaintiff Philip Calderon illustrates how PPL is violating both federal and state wage laws with respect to him and other Personal Assistants.

87. Mr. Calderon is a Personal Assistant who provides home care services for his father, a Consumer under CDPAP.

88. Mr. Calderon and his father were fully registered and enrolled with PPL before the April 1 transition.

89. Mr. Calderon has continued to work around forty hours per week as a Personal Assistant since that date.

90. PPL has not paid Mr. Calderon anything for his services, even though he has recorded his time on PPL's timekeeping application, faxed time records to PPL, and contacted PPL by phone many times to remedy the issue.

91. Mr. Calderon's father requires home care services because of his severe arthritis.

13

He can walk with the assistance of a cane or walker but requires Mr. Calderon's assistance to complete basic life tasks.

92.     Mr. Calderon spends significantly more than 25% of his work time on manual tasks. He physically assists his father through their home, including up and down stairs, and when his father sits or stands. He helps his father toilet and bathes him. He cooks for his father, cleans the home, and drives his father to appointments or to go grocery shopping.

93.     Before PPL was Mr. Calderon's fiscal intermediary, he and his father worked with another fiscal intermediary organization called Freedom Care. Mr. Calderon did not experience any problems with wage payments.

94.     Starting on or around April 1, 2025, after completing the mandatory training on Time4Care provided by PPL, Mr. Calderon began tracking his time working for his father using Time4Care.

95.     The Time4Care application allows Personal Assistants such as Mr. Calderon to clock-in and clock-out for their shifts, and to transmit their work hours to PPL.

96.     Although Mr. Calderon was able to clock-in and clock-out of Time4Care, his time entries were accompanied by an error message indicating he would not be paid.

97.     The message read: "Consumer is not enrolled with MCO/State on Time Entry's Date of Service. Consumer is not enrolled during Time Entry's Date of Service."

98.     Mr. Calderon's father enrolled with PPL prior to the April 1 transition date. His father had provided PPL with his authorization for home care services. When his father checked his account on PPL's website, it indicated he was enrolled and authorized to receive care.

99.     Mr. Calderon repeatedly tried to contact PPL. Despite numerous calls, he struggled to reach a representative of the company.

14

100.    On two occasions when Mr. Calderon was able to reach a PPL representative by phone, the company representatives told him that the error message was itself an error in PPL's IT system, and that he did not need to take any additional action to be paid.

101.    In addition to using Time4Care, Mr. Calderon submitted his weekly timesheet to PPL by fax on or around April 19. The preliminary injunction in a suit brought by CDPAP Consumers, *Engesser et al. v. McDonald, the New York State Department of Health,* directed Personal Assistants that they could submit time records for payment by fax or email.

102.    Mr. Calderon has still not been paid any wages for no less than approximately 169 hours of work caring for his father since April 1, 2025.

103.    PPL's failure to pay Mr. Calderon has caused him and his family financial hardship.

104.    Mr. Calderon lives with his father and mother, both of whom have disabilities and receive disability insurance.

105.    Mr. Calderon's income from his home care work is an important part of how his family meets their basic expenses. Without it, he has had to use credit and savings to cover expenses.

106.    If PPL does not pay him soon, Mr. Calderon worries his family will not be able to meet their basic expenses.

107.    Mr. Calderon is not alone. PPL's conduct with respect to Mr. Calderon is typical of what tens of thousands of other Personal Assistants in New York have experienced since PPL became their employer on April 1, 2025. Like him, they have not been paid or been underpaid because of PPL's dysfunctional systems for timekeeping, payroll, and communications.

108.    By the conduct described in this Complaint, Defendant willfully committed widespread violations of the FLSA, the NYLL, and the Wage Parity Act.

15

## COLLECTIVE ACTION ALLEGATIONS

109. Plaintiff brings the First Claim for Relief, the FLSA claim, on behalf of himself and those individuals who may opt into the "FLSA Collective" defined as: "All current and former Personal Assistants for Defendant within Westchester, Nassau, and Suffolk Counties, and the five boroughs of New York City and who have not been paid on time for all hours worked at the required rate as a result of Defendant's illegal and improper pay practices, employed between April 1, 2025 through the date of final judgment in this matter."

110. The current and former employees described above are situated similarly to Plaintiff Calderon within the meaning of the FLSA, 29 U.S.C. § 216(b) and, therefore, the First Claim for Relief herein may be brought and maintained as an "opt-in" collective action pursuant to Section 16(b) of the FLSA.

111. At all relevant times, the FLSA Collective has substantially similar job requirements and pay provisions, and have been subjected to Defendant's decisions, policies, practices, procedures, and rules, which include Defendant's willful failure and refusal to pay wages on time for all hours worked at the legally-mandated rate—including but not limited to failure to pay the federal minimum wage and legally-required overtime.

112. Defendant PPL is liable under the FLSA for, *inter alia*, failing to properly compensate the FLSA Collective.

113. Common proof applicable to Plaintiff and the other workers will show that Defendant failed to pay minimum and overtime wages as required by the FLSA to Plaintiff and other similarly situated workers.

114. This cause of action is also maintainable as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), because the prosecution of separate actions by individual members of

16

the FLSA Collective would create a risk of inconsistent or varying adjudications with respect to individual current and former employees which would establish incompatible standards of conduct for Defendant.

115.    The names, last known addresses, and cell phone numbers of the proposed FLSA Collective members are available to Defendant. Defendant should be required to provide Plaintiff a list—including names, last known addresses, cell phone numbers, and email addresses if known—of all current and former employees who could be members of the proposed FLSA Collective.

116.    Notice of and an opportunity to join this lawsuit should be provided to all potential opt-in Plaintiffs both by First Class Mail to their last known address and by online posting, as well as by other practicable means including but not limited to text messaging, as soon as possible.

## CLASS ACTION ALLEGATIONS

117.    Plaintiff brings the NYLL and Wage Parity Act claims under Second and Third Causes of Action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of persons defined as:

> All persons who have worked as Personal Assistants for Defendant in Westchester, Nassau, and Suffolk Counties, and the five boroughs of New York City, and suffer or have suffered the denial of wages on time for all hours worked at the legally required rate of pay during the period between April 1, 2025 and the date of final judgment in this action (the "Rule 23 Class").

118.    Plaintiff reserves the right to amend and refine the class definition above or add classes and/or subclasses as litigation progresses.

119.    Numerosity: The Rule 23 Class identified is so numerous that joinder of all members is impracticable.

120.    The exact number of Rule 23 Class members is unknown to Plaintiff at this time,

17

but it is believed to be in the tens of thousands. These members can be identified based on Defendant's and CDPAP's records.

121.    Commonality: Common questions of law and fact exist as to all members of the Rule 23 Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Rule 23 Class are:

a.    whether Defendant failed to keep true and accurate time and pay records for all hours worked by Plaintiff and members of the Rule 23 Class;

b.    whether Defendant failed to compensate Plaintiff and members of the Rule 23 Class for all of the work they were required to perform;

c.    whether Defendant failed to compensate Plaintiff and members of the Rule 23 Class on time for all of the work they were required to perform;

d.    whether Defendant failed to compensate Plaintiff and members of the Rule 23 Class at the legally-required rate;

e.    whether Defendant's policy of failing to pay workers was instituted willfully or with reckless disregard of the law; and

f.    the nature and extent of class-wide injury and the measure of damages for those injuries.

122.    These common questions arise, in part, because of the uniform circumstances under which the CDPAP program was transitioned to the single intermediary PPL.

123.    Typicality: Plaintiff's claims are typical of the claims of the other members of the Rule 23 Class. Plaintiff and all other members of the Rule 23 Class sustained damages arising out of Defendant's conduct in violation of the NYLL. The Rule 23 Class members are employed by Defendant as Personal Assistants under CDPAP, enjoy the same statutory rights and protections,

18

and have sustained similar types of damages as a result of Defendant's failure to comply with the NYLL.

124.    Adequacy: Plaintiff will fairly and adequately protect the interests of the members of the Rule 23 Class and has retained counsel competent and experienced in complex class action litigation, including suits involving unpaid overtime and misclassification of workers.

125.    Plaintiff has no interests that are contrary to or in conflict with those of the other members of the Rule 23 Class.

126.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

127.    A class action is superior to other available methods for the fair and efficient adjudication of this action. The Rule 23 Class has been damaged and is entitled to recovery as a result of the Defendant's violation of the NYLL as well as its common and uniform policies, practices, and procedures. A class action is a particularly superior method of adjudication in the context of wage and hour litigation where, as here, class members lack the financial resources to conduct a thorough analysis of Defendant's payroll and compensation practices and to vigorously prosecute a lawsuit in federal court against a corporate defendant. Although the relative damages suffered by individual Rule 23 Class members are not de minimis, such damages are small compared to the expense and burden of individual prosecution of this litigation. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendant's practices.

128.    This action is properly maintainable under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

129.     Plaintiff intends to send notice to all members of the Class to the extent required

19

by Fed. R. Civ. P. 23(c)(2). The names and addresses of the class members are available from Defendant's records.

130. At all times during his employment, Plaintiff and members of the Rule 23 Class were Defendant's "employees" as defined in Section 3(e)(1) of the FLSA, 29 U.S.C. § 203(e)(1), and in NYLL §§ 2, 651(5) and 190(2).

131. At all relevant times during Plaintiff's employment, Defendant was an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d), and NYLL §§ 2, 651(6) and 190(3).

132. Class Members were and are manual laborers who are paid hourly rates, and PPL maintains control over their employment and payroll.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF THE FAIR LABOR STANDARDS ACT
(Brought on behalf of Plaintiff and the FLSA Collective)

133. Plaintiff realleges all allegations in the preceding paragraphs as if fully set forth here.

134. Section 6(a) of the FLSA, 29 U.S.C. §206(a), provides that no employer engaged in commerce shall pay its employees less than the applicable minimum wage rate for all hours worked.

135. Section 7(a) of the FLSA, 29 U.S.C § 207(a), provides that no employer engaged in commerce shall employ an employee for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of 40 hours at a rate not less than one and one-half times the regular rate at which she is employed.

136. Section 16 of the FLSA, 29 U.S.C. § 216(b), provides that any employer who violates the provisions of 29 U.S.C. § 207 shall be liable to the employee or employees affected

20

in the amount of their unpaid compensation and an additional equal amount as liquidated

damages.

137.    Defendant is an enterprise engaged in commerce. 29 U.S.C. § 203.

138.    At all times since April 1, 2025, Defendant has employed or jointly employed all

members of the FLSA Collective.

139.    Defendant has willfully failed to timely pay the FLSA Collective the legally

required minimum wage and overtime rates, in violation of the FLSA.

140.    Plaintiff and the FLSA Collective are entitled to the full amount of their unpaid

minimum wages, unpaid overtime, in an amount to be determined at trial, and an equal amount

of liquidated damages, in addition to costs, and reasonable attorney's fees.

**SECOND CLAIM FOR RELIEF:**
**VIOLATIONS OF NEW YORK LABOR LAW**
(Brought on behalf of Plaintiff and Members of the Rule 23 Class)

141.    Plaintiff realleges all allegations in the preceding paragraphs as if fully set forth

here.

142.    Under Article 19 of the NYLL, NYLL § 652, employers must pay each employee

it suffers or permits to work no less than the minimum wage for all hours worked.

143.    Under Article 36 of the New York Public Health Law, NYLL § 3614-C, an

employer of home care workers must pay each home care worker no less than a prescribed living

wage rate.

144.    Under Article 6 of the NYLL, NYLL § 193, an employer may not make deductions

from the wages of an employee unless such deductions are authorized by law or are for the benefit

of an employee and consented to, including—as codified in the No Wage Theft Loophole Act—

by failing to pay workers at all.

21

145. Under Article 6 of the NYLL, an employer must pay manual workers on a weekly basis, not later than seven calendar days after the end of the week in which the wages are earned, and failing to timely pay such manual workers entitles employees to liquidated damages for late payment.

146. Pursuant to regulations issued by the State Commissioner of Labor, an employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided by the FLSA. 12 N.Y.C.R.R. § 142-2.2.

147. Pursuant to regulations issued by the State Commissioner of Labor, an employer shall pay a spread of hours premium of an extra hour's pay for every day worked in excess of ten hours. 12 N.Y.C.R.R. §§ 137-1.7, 142-2.4.

148. Defendant, through the conduct described above, has violated multiple of the above provisions of the NYLL and its accompanying regulations.

149. Defendant has employed Plaintiff and members of the Rule 23 Class within the meaning of the NYLL since April 1, 2025.

150. Plaintiff and members of the Rule 23 Class are manual workers within the meaning of the NYLL.

151. Defendant has willfully failed to timely pay Plaintiff and members of the Rule 23 Class at the legally required rate for all hours worked as required by the NYLL, including but not limited to by failing to pay the minimum wage as set by Public Health Law § 3614-C, overtime pay, and spread of hours premiums, and by paying Plaintiff late.

152. Plaintiff and members of the Rule 23 Class are entitled to their unpaid minimum wages and unpaid overtime, in an amount to be determined at trial, and an equal amount of liquidated damages in addition to fees and costs, as well as liquidated damages for late payment

of wages.

**THIRD CLAIM FOR RELIEF:**
**VIOLATION OF THE NEW YORK HOME CARE WORKER WAGE PARITY ACT:**
**BREACH OF CONTRACT AND UNJUST ENRICHMENT**
(Brought on behalf of Plaintiff and Members of the Rule 23 Class)

151. Plaintiff realleges all allegations in the preceding paragraphs as if fully set forth here.

152. The New York Home Care Workers Wage Parity Act, N.Y. Pub. Health Law § 3614–c, requires Licensed Home Care Services Agencies and other employers in New York City and the surrounding counties to pay all home care aides providing Medicaid-covered care, including CDPAP Personal Assistants, an "applicable minimum rate of home care aide total compensation" in order to receive Medicaid reimbursements for that care. *Id*. § 3614–c(2); *see also id*. § 3614–c(1)(d) (defining "[h]ome care aide" to include "home health aide[s]" and "personal care aide[s]").

153. Upon information and belief, Defendant entered into a contract with the New York State DOH that required Defendant to pay Plaintiffs and Rule 23 Class Members wages as required by New York State Public Health Law § 3614-c ("New York State Contract"), in as much as Plaintiff and Rule 23 Class Members are home care aides hired by Defendant to perform Medicaid-reimbursable services under CDPAP in Westchester, Nassau, and Suffolk Counties and the five boroughs of New York City.

154. Pursuant to the New York State Contract, Defendant subsequently entered into agreements with the Plaintiff and members of the Rule 23 Class that require Defendant to pay Plaintiff and Class Members' wages as required under N.Y. Public Health Law § 3614-c ("Individual Agreements").

155. Upon information and belief, the schedule of prevailing rates of wages and benefits

23

to be paid all workers furnishing labor pursuant to the New York State Contract and Individual Agreements was included in and formed a part of those contracts and agreements.

156. Beginning on April 1, 2025, Plaintiff and Rule 23 Class Members furnished labor to Defendant in furtherance of Defendant's performance of the New York State Contract.

157. Defendant willfully paid Plaintiff and Rule 23 Class Members less than the prevailing rates of wages and benefits to which they were entitled, and breached its obligation to pay all wages due as required by N.Y. Public Health Law § 3614-c.

158. Defendant, by its policies, practices, patterns, and procedures, was unjustly enriched at the expense of Plaintiff and Rule 23 Class Members by failing to pay Plaintiff and Rule 23 Class Members all minimum wages due under the New York Home Care Worker Parity Act, N.Y. Public Health Law § 3614-c.

159. Plaintiff and Rule 23 Class Members, as third-party beneficiaries of Defendant's contract with the New York State Department of Health to pay wages as required by the New York Home Care Worker Wage Parity Act, are entitled to relief for the breach of this contractual obligation, plus interest.

24

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of themselves, the FLSA Collective, and the Rule 23 Class, demand a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself, the FLSA Collective, and the Rule 23 Class, respectfully requests that this Court enter a judgment providing the following relief:

(a) Certifying this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure with respect to the Second and Third Claims for Relief;

(b) Declaring this action to be maintainable as a collective action pursuant to the FLSA with respect to the First Claim for Relief;

(c) Designating Plaintiff Calderon as representative of the Rule 23 Class, and counsel of record as Class Counsel;

(d) Issuing proper notice to the Class at Defendant's expense;

(e) Declaring that the practices complained of in this action are unlawful under New York Labor Law, Articles 6 and 19, the supporting New York State Department of Labor regulations, and the New York Home Care Worker Wage Parity Act;

(f) Permanently enjoining Defendant from further violations of the FLSA, the NYLL, and the New York Home Care Worker Wage Parity Act;

(g) Ordering Defendant to pay all unpaid wages and liquidated damages pursuant to the FLSA, NYLL Articles 6 and 19, §§ 650 *et seq.*, the supporting New York State Department of Labor regulations and New York common law, and the Wage Parity Act;

(h) Ordering the payment of attorneys' fees pursuant to 29 U.S.C. § 216(b) and New York Labor Law §§ 198 and 663;

25

(i)  Ordering the payment of the costs and disbursements of this action; and

(j)  Ordering such other relief, in law or equity, as this Court deems just and proper,

including all relief authorized by the FLSA, the NYLL, and the Wage Parity Act.

Dated:  April 25, 2025
      New York, New York

                                             Respectfully submitted,

                                             ____/s/ B. Franco Olshanksy____
                                             B. Franco Olshansky

                                             **THE LEGAL AID SOCIETY**

                                             Richard Blum
                                             Rebekah Cook-Mack
                                             Belkys Garcia
                                             Rebecca Antar Novick
                                             49 Thomas Street, Fl 5
                                             New York, NY 10013
                                             (332) 227-7291
                                             bfrancoolshansky@legal-aid.org
                                             rblum@legal-aid.org
                                             rcook-mack@legal-aid.org
                                             bgarcia@legal-aid.org
                                             rantar@legal-aid.org

                                             **KATZ BANKS KUMIN LLP**

                                             Hugh Baran (he/him)
                                             Emma Walters (she/her)
                                             Katz Banks Kumin LLP
                                             111 Broadway, Suite 1702
                                             New York, NY 10006
                                             (646) 759-4501
                                             Baran@katzbanks.com
                                             Walters@katzbanks.com

                                             *Counsel for Plaintiff*

26

**SECTION 216(b) FAIR LABOR STANDARDS ACT AUTHORIZATION**

I, Phillip Calderon Jr., consent to be a Plaintiff in this lawsuit pursuant to § 216(b) of the Fair Labor Standards Act.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Staten Island, New York
    April 25, 2025

*Philip Calderon*
Philip Calderon (Apr 25, 2025 06:10 EDT)

Philip Calderon Jr.

# Exhibit F



MY ACCOUNT     LOGOUT     SUBSCRIBE

CRAIN'S NEW YORK BUSINESS

A CRAIN FAMILY BRAND

MENU

Home  >  Health Pulse

April 28, 2025 12:57 PM

# Caregivers file wage theft suit against PPL amid troubled home care consolidation

AMANDA D'AMBROSIO

 EMAIL    SHARE    TWEET    SHARE

REPRINTS



Bloomberg News

Home care workers are taking Public Partnerships LLC to federal court over allegations that the company has mismanaged payments for tens of thousands of caregivers amid the state's rocky home care consolidation.

Public Partnerships LLC, or PPL, became the sole payroll-processing entity for workers within the consumer-directed personal assistance program on April 1, replacing roughly 600 third-party businesses which previously carried out that task. Since then, home care users and workers have accused the company of missing paychecks and routinely underpaying caregivers, many of whom are low-income and rely on regular paychecks to cover rent and groceries.

Caregivers backed by the Legal Aid Society filed a class-action lawsuit in a Brooklyn federal court on Friday, alleging that PPL has mishandled their payments since taking over. Workers allege that they have been unable to reliably clock in on PPL's timekeeping app,

that they've been paid incorrectly for overnight shifts and that PPL has lost or deleted timesheets, according to the complaint.

---

**RELATED**



**Around 130,000 home care workers have been paid amid state consolidation**



**30,000 recipients have yet to re-enroll in home care program after fraught transition**



**Who's News: See the latest New York health care promotions and hires**

---

"The different challenges faced by personal assistants are all expressions of a single problem: PPL's wholly inadequate infrastructure for onboarding, scheduling, paying and communicating with employees," the lawsuit said.

Lacey Hautzinger, a spokeswoman for PPL, said that the company is reviewing the filings and cannot comment further on pending litigation.

"We're committed to ensuring consumers continue to receive care, personal assistants are paid on time and payments follow state and federal requirements to protect the integrity of the CDPAP program," Hautzinger said.

PPL's payment challenges have emerged in the weeks since it took over payroll, with caregivers filing a similar case in a federal court in Rochester last week. The lawsuits are the latest hiccup in the state's troubled home care consolidation, which aims to cut costs within the estimated $11 billion program. Opponents of the consolidation say that the transition was too rushed, putting the roughly 280,000 older individuals and people with disabilities who used the program in harm's way.

Philip Calderon, a 25-year-old caregiver in Staten Island and lead plaintiff on the case, said he has not been paid all month despite working 40-hour weeks to provide home care services to his father, according to the lawsuit. Calderon has recorded his hours in the timekeeping system and faxed timesheets to the company, but hasn't been paid because of an error message that company representatives chalked up to an IT problem, the complaint alleges.

Meanwhile, PPL has touted its progress in sending workers their paychecks. The company has paid at least 155,000 caregivers more than $240 million this month, according to data released Friday. The sum marks a fraction of the at least 250,000 workers who have started registering with the new payment platform.

**RECOMMENDED FOR YOU**

Jamaica Hospital Medical Center forges ahead on state-funded cancer center

At a Glance: May 27

New gene-editing technique could come with fewer collateral health consequences

Sponsored Content: Quick Take with Crowe's Angie Hipsher-Williams and Josh Reid

## Most Popular

| 1 | City could see wave of applications to build backyard, basement apartments next month |
|---|---|
| 2 | Prominent Midtown tower gets just a two-year mortgage |

| | |
|---|---|
| **3** | **EmblemHealth exec says GOP budget bill a recipe for sky-high health costs** |
| **4** | **New office towers in Queens downgraded due to high vacancy rate** |
| **5** | **Boerum Hill's mysterious 'Castle' changes hands for first time in four decades** |

## GET OUR NEWSLETTERS

Staying current is easy with Crain's news delivered straight to your inbox, free of charge. Click below to see everything we have to offer.

| Enter Business Email | SIGN UP HERE |

## SUBSCRIBE TODAY!

Don't miss the chance to get the biggest news first! Stay connected to New York business news in print and online

SUBSCRIBE

## CONNECT WITH US

   

Our Mission

*Crain's New York Business is the trusted voice of the New York business community—connecting businesses across the five boroughs by providing analysis and opinion on how to navigate New York's complex business and political landscape.*

---

# CRAIN'S NEW YORK BUSINESS

A CRAIN FAMILY BRAND

## CONTACT US

685 Third Avenue
New York, NY 10017
1-877-824-9379

Contact us/ Help Center

Staff directory

Crain jobs

## EVENTS

Submit Your Event

All Upcoming Events

Crain's Events

Past Crain's Events

Webcast Archives

Livestreams

Corporate Membership

## RESOURCES

Advertise with Us                    Crain's Content Studio

Crain's New York Business app

AdChoices

Newsletters

Sitemap

Reprints

Corrections and Clarifications

**LEGAL**

Terms and Conditions

Privacy Policy

Privacy Request



Copyright © 1996-2025. Crain Communications, Inc. All Rights Reserved.

# Exhibit G

# SPECTRUM NEWS 1

  

77° Syracuse, NY    EDIT

WATCH LIVE    |    ⊙

LATEST NEWS    WEATHER & TRAFFIC    POLITICS    AROUND SYRACUSE    SPORTS    PUBLIC SAFETY    PODCASTS    OUR JOURNALISTS

Search 🔍

## STATE OF POLITICS
Read up on New York politics with our Capital Tonight team.



*Assemblyman David Weprin spoke in the Legislative Office Building on Tuesday in support of increasing the number of fiscal intermediaries that oversee the state's $9 billion Consumer Directed Personal Assistance Program. (Spectrum News 1/Kate Lisa)*

**POLITICS**

# Lawmakers, Hochul clash on CDPAP legislative fix before session ends

BY KATE LISA | NEW YORK STATE
UPDATED 8:12 AM ET MAY. 21, 2025 | PUBLISHED 7:36 PM ET MAY 20, 2025





State lawmakers said Tuesday they won't back down from a legislative fight to address persistent issues with the transition of a $9 billion Medicaid home care program — even though Gov. Kathy Hochul has indicated she's not open to compromise.

And a federal judge extended a preliminary injunction until June 20 to give people who rely on the Consumer Directed Personal Assistance Program for home care and their personal assistants more time to enroll with company Public Partnerships LLC, which took over April 1.

As the program's transition to one statewide fiscal intermediary, down from about 600,

on the Consumer Directed Personal Assistance Program for home care and their personal assistants to... ...enroll with company Public Partnerships, which took over April 1.

As the program's transition to one statewide fiscal intermediary, down from about 600, continues to face legal challenges, lawmakers introduced a bill to create a new class of smaller companies to assist PPL.

"We have to do something," Senate Health Committee chair Gustavo Rivera told *Spectrum News 1.* "...This is a failed, failed transition. What doesn't make sense is to continue the failed transition and lying to the public about it, which is what the governor, commissioner of health and PPL are doing right now."

Thousands of workers and program recipients have not completed enrolling with PPL, and many workers say they have not gotten paid properly since the company took over.

A PPL spokesperson said the company researches all reports of inaccurate paychecks, contacts workers immediately and the vast majority of claims were due to incorrect timesheets.

"PPL is committed to helping all consumers and PAs understand and adhere to program rules when submitting timesheets for payment, with education and training available through various channels," the spokesperson said.

A growing number of Republicans and Democrats are pushing for reforms and a focus on regional support before session ends in mid-June, and said they frequently receive calls about CDPAP.

The new bipartisan bill would allow independent living centers that serve as subcontractors to PPL, or have operated since Jan. 1, 2024, to act as independent fiscal intermediaries. Two-thirds of senators have signed onto Rivera's other measure to license FIs, which unanimously advanced through the Health Committee on Tuesday.

Senate Majority Leader Andrea Stewart-Cousins said Democrats in the chamber intend to do something this session, but haven't discussed the proposal as a conference.

thirds of senators have signed onto Rivera's other measure to license FIs, which unanimously advanced through a health committee on Tuesday.

Senate Majority Leader Andrea Stewart-Cousins said Democrats in the chamber intend to do something this session, but haven't discussed the proposal as a conference.

"We will be looking at how it's not only being implemented, but if there's anything that we should or could do, we will certainly look at that," she told reporters.

Assembly Health Committee chair Amy Paulin said the Legislature expects to negotiate with the governor's office about the issue in the coming weeks. But she added the 150-member chamber will likely run out of time, and a deal may need to be included in an end-of-session omnibus bill, known in Albany as the "big ugly."

"If PPL continues to present so many problems for both PAs and for consumers, we're going to have to do something," she told *Spectrum News 1. "*Hopefully there will be the 'big ugly' at the end, maybe something will be in there if we can. The governor doesn't seem to recognize there's an issue, but the rest of us seem to."

A spokesperson with Gov. Hochul's office has defended PPL's current system and said the legislation would be akin to going backwards.

"The governor is deeply committed to addressing the needs of disabled and vulnerable New Yorkers," Hochul's spokesperson Sam Spokony said in a statement. "That's why we'll continue protecting CDPAP for the people who need it — not the unethical middlemen who profited off the old system for far too long. The old system left vulnerable home care users at risk of a fiscal crisis because administrative middlemen spent the past 10 years building their own profits while wasting and abusing taxpayer funds. It simply makes no sense to bring back more middlemen after just two months of much-needed reform. The new structure will protect CDPAP consumers and ensure the program is fiscally sustainable – and the data shows that it's already being well managed. The state's new single FI issued paychecks to over 99% of registered personal assistants who submitted timesheets before the latest pay period deadline."

The judge in the U.S. District Court for the Eastern District of New York ordered the state

the data shows that it's already being well managed. The state's new single FI issued paychecks to over 99% of registered personal assistants who submitted timesheets before the latest pay period deadline."

Case 1:25-cv-01689-FB-LKE    Document 96-1    Filed 06/16/25    Page 144 of 176 PageID #: 1561

The judge in the U.S. District Court for the Eastern District of New York ordered the state Health Department and the New York Legal Assistance Group — which represents independent living centers in the suit filed in late March — to negotiate a new extension agreement.

"The bottom line here is that there are still many people who aren't enrolled with PPL, many PAs who aren't onboarded, and many PAs who aren't being paid correctly," said Elizabeth Jois, a supervising attorney with NYLAG. "We need the state to use all its resources to fix these issues."

A spokesperson with Hochul's office said the extension does not have any impact on the ongoing transition.

Earlier in the day, dozens of CDPAP users and workers held a rally in Albany recounting their paycheck struggles and loss of care since the transition took effect. Several lawmakers who approved the transition in the first place joined them, saying they voted in last year's budget to address fraud and abuse in the system, not break it.

Lindsay Miller, executive director of the New York Association on Independent Living Centers, said the 11 centers subcontracted with PPL to support CDPAP consumers staffed up expecting to serve 47,000 consumers of more than 210,000. The centers were staffed up expecting to serve more than 79,000 of program recipients by the end of the year.

Miller said PPL isn't telling consumers that independent living centers are available to help them, or doesn't refer consumers to other facilitators when they ask. Miller said several CDPAP users have told her a representative with PPL told them using a different facilitator wasn't necessary.

"The independent living centers are starting to look at laying off staff, unfortuantely, and many of these are trained staff are people with disabilities that have worked in the CDPAP

CDPAP users have told her a representative with PPL told them using a different facilitator wasn't necessary.

"The independent living centers are starting to look at laying off staff, unfortuantely, and many of these are trained staff are people with disabilities that have worked in the CDPAP program for decades and there's no work for them and no income coming in, so the independent living centers can't continue to support the staffing," she added.

A PPL spokesperson said the company honors the request of all CDPAP consumers who ask for a change.

"The consumer always has the option to choose their facilitator," according to PPL. "If a consumer requests a change in facilitator, PPL will honor their request and assign the consumer to that facilitator, which includes ILCs."

---

## YOU MAY ALSO BE INTERESTED IN



STATE OF POLITICS

### New York attorney general fines Walmart over shipping realistic looking toy guns to state

NEW YORK STATE | 17 MINUTES AGO



STATE OF POLITICS

### Hochul: Statewide shootings down 9% so far in 2025 compared to same period last year

NEW YORK STATE | 2 HOURS AGO



POLITICS

### Trump's speech to West Point graduates mixes praise, politics and grievances

NEW YORK STATE | 2 DAYS AGO







Case 1:25-cv-01689-FB-LKE    Document 96-1    Filed 06/16/25    Page 146 of 176 PageID #: 1563

NEW YORK STATE | 17 MINUTES AGO

NEW YORK STATE | 2 HOURS AGO

NEW YORK STATE | 2 DAYS AGO







**POLITICS**

## N.Y. senator, staffer bike 206 miles to Albany for Bike to Work Day

NEW YORK STATE | 3 DAYS AGO

**STATE OF POLITICS**

## New York House GOP cheers tax bill while Democrats decry it

NEW YORK STATE | 4 DAYS AGO

**POLITICS**

## First on NY1: Torres introduces bill to block use of U.S. funds to detain certain individuals overseas

WASHINGTON, D.C. | 5 DAYS AGO



SPECTRUM NEWS | CONTACT | ABOUT | RSS | SITEMAP | FAQ | ADVERTISE WITH US | CAREERS | TERMS | YOUR PRIVACY RIGHTS | CALIFORNIA CONSUMER PRIVACY RIGHTS | CALIFORNIA CONSUMER LIMIT THE USE OF MY SENSITIVE PERSONAL INFORMATION | DO NOT SELL OR SHARE MY PERSONAL INFORMATION/OPT-OUT OF TARGETED ADVERTISING | CERTIFICATIONS

   

© 2025, Charter Communications, all rights reserved.

# Exhibit H



**SALE! 25¢ for 3 Months**          **Sign in**

**New York**      **Capital Region**      **Hudson Valley**      **Business**      **Opinion**      **Entertainment**

**BREAKING**                                                    17m ago

**Fire at Saratoga track**

**Teen driver arrested after police chase that in…**

**NEW YORK // NEW YORK GOVERNMENT**

# CDPAP glitches continue with pay errors, lapsed health insurance

Private company's takeover of home care program beset by numerous technical problems and red tape headaches

By **Raga Justin**, *Capitol Bureau*

April 28, 2025

   



Maria Perrin, president of Public Partnerships LLC., has joined state health officials in expressing confidence that the company will be able to handle the transition. Consumers and health care aides say otherwise.

Will Waldron/Times Union

🎧 Listen Now:  CDPAP glitches continue with pay errors, lapsed h

1x

5:52

🎚 Everlit

ALBANY — Problems continue to plague the administrative transition of a multibillion-dollar Medicaid program to a vendor hand-picked by New York officials, including some home care aides who say they have been left without health insurance indefinitely.

The popular Consumer Directed Personal Assistance Program serves over 250,000 people with long-term medical needs, and employs over 200,000 more people who get paid through the complex health coverage program. The program allows Medicaid recipients who are eligible for home care services to hire their own personal caregiver, including family members.

**ADVERTISEMENT**
Article continues below this ad

The program has ballooned in recent years, causing state officials to address what they have said has been a massive spike in expenses and allegations of fraud. The

solution they settled on was to turn over the administration of the program over to a single company, Public Partnerships LLC.

But the company's takeover has been beset by numerous technical problems and red tape headaches, according to multiple people who care for their loved ones through the program. Now, some aides say their paychecks come late or are incorrect, while others told the Times Union their aides' pay has been slightly reduced as a result of the shift to Public Partnerships.

Other aides said their own health insurance has lapsed and they have gotten conflicting accounts of when it will resume. Seeking clarity, they are often bounced from the private company's representatives to the state Department of Health, only to be told that no one has answers.

Samuel, an aide in Brooklyn who asked not to be identified by his last name, said he was told his new health insurance through Public Partnerships, offered by a private company called Leading Edge, would kick in on May 1 before pushing back the start date a month.

He is currently uninsured and has been told his only option is to purchase private insurance — a costly move.

"Unfortunately, that's the situation we're in," a Public Partnerships representative told Samuel last week during a call about his health insurance, according to a recording of the conversation.

"Two months without being able to go to a doctor or access health services, which is crazy," Samuel said. "It's an utter mess."

Those problems have been extensively documented in lawsuits filed against Public Partnerships and the state Department of Health. One federal lawsuit filed earlier this week in western New York alleges widespread wage theft and violations of state labor laws, including "unpaid minimum wages, unpaid overtime compensation, unpaid spread of hours, unpaid call-in pay, unpaid split shift pay, unpaid bonuses as an earned wage, and damages related to untimely wage payments."

**ADVERTISEMENT**
Article continues below this ad

Even if aides are getting paid, the paychecks are sometimes incorrect. Laurie, a former nurse who is taking care of her son through the program, said she has spent hours on the phone with Public Partnership representatives fixing minor technical issues, like a shift she worked that was not reflected in her pay for the week because it was held up for processing.

The computer system used by the company is also not user-friendly and Laurie, who requested her last name not be used, said she often feels like she's jumping through hoops and running into unnecessary and burdensome administrative red tape.

"I am just so annoyed with it. The hours you put in just getting things to work — there's no rulebook," she said. "I will go on with this until I get so sick of it that I'll just

leave and take my son out of the system. And the state wins, because then they're saving money."

The ongoing troubles have been occurring as the state agreed to a preliminary injunction delaying some key registration deadlines associated with the administrative transition to Public Partnerships. A federal lawsuit filed earlier this month in the Eastern District of New York will allow consumers until May 15 to enroll with the company, while home care aides will have until June 6.

**ADVERTISEMENT**
Article continues below this ad

The preliminary injunction also allows certain fiscal intermediaries to continue employing and compensating a portion of home care aides who were not able to meet the original registration deadline of April 1.

"What I find surprising, shocking even, is that the people on the second floor (in the governor's office) continued to ignore that we knew what was going to be the case," said state Sen. Gustavo Rivera, a Bronx Democrat, referring to Gov. Kathy Hochul's administration. "It was a boneheaded thing from the beginning."

Rivera, who chairs the Senate's Health Committee, has long been opposed to the transition, often characterizing it as hasty and ill-advised.

A spokeswoman for the Department of Health referred questions about the administration of the program to a spokeswoman for Public Partnerships, Lacey Hautzinger.

ADVERTISEMENT

Article continues below this ad

In a statement, Hautzinger pointed to "many resources" the company offers to help patients and aides with timesheet management, listing a call center open Monday through Saturday, in-person appointments at the company's offices, and daily webinars with live question-and-answer sessions.

Neither the company nor Health Department officials offered an explanation for some of the snafus that have beset the program, including lapsed health care coverage.

Helen Schaub, a vice president with the influential health care union 1199SEIU, said the complaints from patients and home care aides alike have been troubling, but

added that the former companies involved in the industry, often referred to as "fiscal intermediaries," deliberately made the transition rockier than it needed to be.

When asked whether the union still has confidence in the vendor, Schaub offered a more cautious endorsement of the company.

**ADVERTISEMENT**
Article continues below this ad

"At the end of the day … do they have the right system? Is this the right company? I think that story is still being told," Schaub said. "But in terms of how to move forward, at this point, we think the only way forward is through."

Multiple lawsuits had been filed alleging that the union played a role in urging New York to overhaul the home care program and to choose Public Partnerships to oversee it.

TU

**Sign up for Capitol A.M. Roundup**

Follow New York politics with this weekday newsletter.

**Email**

Enter your email

**Sign Up**

By signing up, you agree to our [Terms Of Use](#) and acknowledge that your information will be used as described in our [Privacy Policy](#).

April 28, 2025



## Raga Justin

**CAPITOL BUREAU**

 

Raga Justin is an investigative reporter covering politics and policy with the Capitol Bureau, where she was previously a Hearst fellow. She is a native Texan and University of Texas at Austin graduate and has worked for the Hearst Connecticut Media Group, the Dallas Morning News in Washington, D.C., and the Texas Tribune. Send tips, feedback or rants to raga.justin@hearst.com.

## Most Popular

1. **State trooper fired after failed drug test sues to get job back**

2. **Teen struck and killed by train in Rotterdam**

3. **Knit 1, purl 2 — family teaches, not just sells, at Colonie Center shop**

4. **Firefighters battle fire at Saratoga Race Course**

5. **Turkish migrant admitted raping 15-year-old runaway girl in Albany**

## Editors' Picks



**REVIEW**

# Regent in Saratoga a fine destination for French fare



**NEWS**

# What happened first this month? Test your news knowledge.

**CULTUR**

**Seni**
**of ch**
**home**

## Let's Play

 **Bongo**        **Really Bad Chess**        **Typeshift**        **Pile-Up Poker**



    

Top ⌃

About                                                            ⌄

Contact                                                          ⌄

Services                                                         ⌄

Account                                                          ⌄

HEARST *newspapers*    © 2025 The Hearst Corporation    Terms of Use    |    Privacy Notice    |    Interest Based Ads    |

 Your California Privacy Rights

# Exhibit I



☰  **Send It To 7**   **News**   **Health**   **Weather**   **Sports**   **Community**

# CDPAP issues affect local woman caring for disabled son



The money has stopped coming in from a state program that helped support a Jefferson County mother caring for her disabled son.

By Chad Charette
*Published: May 8, 2025 at 2:18 PM EDT*



PHILADELPHIA, New York (WWNY) - A state program has kept a Jefferson County mother above water as she stays home taking care of her adult son, who has a traumatic brain injury. But, after a change to the program, the money has stopped coming in.

Playing cards and going for a walk around the block. It's what an average weekday looks like for Janna Cook and her son, Benjamin.

Eight years ago, days like this were anything but certain.

"He's a walking miracle really," said Janna.

In 2017, Benjamin was in an ATV accident. Doctors gave him a 5% chance of survival, but he pulled through.

Now he lives with a traumatic brain injury that has affected his memory and motor skills. Through the state's Consumer Directed Personal Assistance Program (CDPAP), Janna has become his full-time caregiver.

"God wanted him here for some reason. We have big support from this wonderful community we live in," she said.

The state is supposed to pay Janna about $1,200 every two weeks to help with Ben's care.

However, ever since Governor Hochul mandated caregivers report their hours through a company called Paid Partnership LLC, or PPL, in April, Janna hasn't been paid. The company's app just doesn't have a spot for her to put in hours.

"At least 160 hours are built up at this point," said Janna.

Janna has been forced to dip into her savings to cover essentials like groceries. She says her phone calls to the state aren't helping.

"I don't want to get emotional. That's just not right," she said. "Will I have to apply for food stamps?"

It's not an isolated incident either.

7 News reached out to state Assemblyman Ken Blankenbush, who has been critical of "Albany's mismanagement." His spokesperson confirmed several constituents have contacted the assemblyman with CDPAP issues. 7 News has received multiple calls on the matter as well.

"It's not just about us not getting paid. It's about other patients not getting services because people are quitting on them," said Janna.

Janna says she can only weather one more month without pay before she runs into serious financial trouble.

*Copyright 2025 WWNY. All rights reserved.*

## Most Read

⏵ **Garage, truck a total loss in Watertown fire**



▶ **JCC to offer Degrees at No Cost for adults ages 25-55**



**Universities cutting sports, others adding ahead of $2.8 billion NCAA antitrust settlement**



▶ **NY Assemblymember proposes bills for 4-day work week**



▶ **Lowville homeowner worked to quell flames, crews save house from fire**

▶ **Record Breaking Catish Caught in Dexter**

▶ **Hammond honors its fallen one by one**

▶ **Lowville community marks Memorial Day with a parade**

## Latest News

▶ **Another cool down is on the way as rain returns**

**Another cool down is on the way as rain returns**

▶ **Police: Man drove over 70 MPH down Bradley Street, faces menacing charges**

**Police: Man drove over 70 MPH down Bradley Street, faces menacing charges**

▶ **Reported gun violence in NYS reaches lowest level since 2006**

▶ **3 face drug charges stemming from Morristown traffic stop**

**3 face drug charges stemming from Morristown traffic stop**

▶ **JCC to offer Degrees at No Cost for adults ages 25-55**

Home
Weather
Community
Send It To 7

News
Sports
Watch Live
About Us

**WWNY**
120 Arcade St
Watertown, NY 13601
(315) 788-3800

WWNY FCC Public File          Public File Questions: wwny@wwnytv.net          WNYF-CD FCC Public File

WWNY-CD FCC Public File          FCC Applications          EEO Report          Closed Captioning/Audio Description

Terms of Service          Privacy Policy          Advertising          Digital Marketing

Click here to learn more about our approach to artificial intelligence.

A Gray Local Media Station © 2002-2025



# Exhibit J



An official website of New York State.   Here's how you know ⌄

# Department of Health

**Individuals/Families**   **Providers/Professionals**   **Health Facilities**   **Health Data**   **About Us**   **Search**

You are Here: Home Page > 2025 Press Releases > CDPAP Update: New York State Department of Health Provides Update on Latest CDPAP Transition Progress

# CDPAP Update: New York State Department of Health Provides Update on Latest CDPAP Transition Progress

## Nearly 200,000 Consumers Have Taken Action in Advance of April 1 CDPAP Transition Deadline, Including Approximately 150,000 Consumers Who Have Started or Completed Registration with PPL

## Nearly 160,000 Personal Assistants Have Started or Completed Registration

## Department Highlights Wins Over Legal Challenges to Legislatively Mandated CDPAP Transition

ALBANY, N.Y. (March 20, 2025) — The New York State Department of Health today announced the latest progress made on the Consumer Directed Personal Assistance Program (CDPAP) transition to a new statewide fiscal intermediary. Since the start of the transition on January 6, nearly 200,000 CDPAP consumers have taken action in advance of the April 1 transition deadline. This includes approximately 150,000 consumers who have either started or completed the registration process with Public Partnerships LLC (PPL) and approximately 45,000 who are in the process of transitioning from CDPAP to Personal Care Services (PCS). Additionally, nearly 160,000 CDPAP personal assistants have either started or completed the registration process. Home care users who choose to switch to PCS have the option to register with PPL in the future if they decide to return to CDPAP.

"Hundreds of thousands of CDPAP consumers statewide are taking the steps to secure their care by transitioning to PPL or choosing to switch to Personal Care Services as we remain on track for the April 1 deadline," **State Health Commissioner Dr. James McDonald said.** "For those who have not yet transitioned, don't delay. As companies continue to work to disrupt this transition by pushing a misinformation campaign, the dedicated DOH staff, PPL and its facilitators will continue to deliver the facts so home care users can make the best choice for themselves and their families."

registration process with Public Partnerships LLC (PPL) and approximately 45,000 who are in the process of transitioning from CDPAP to Personal Care Services (PCS). Additionally, nearly 160,000 CDPAP personal assistants have either started or completed the registration process. Home care users who choose to switch to PCS have the option to register with PPL in the future if they decide to return to CDPAP.

"Hundreds of thousands of CDPAP consumers statewide are taking the steps to secure their care by transitioning to PPL or choosing to switch to Personal Care Services as we remain on track for the April 1 deadline," **State Health Commissioner Dr. James McDonald said.** "For those who have not yet transitioned, don't delay. As companies continue to work to disrupt this transition by pushing a misinformation campaign, the dedicated DOH staff, PPL and its facilitators will continue to deliver the facts so home care users can make the best choice for themselves and their families."

The Department is also highlighting wins over legal challenges levied against the transition to a single statewide fiscal intermediary. To date, the court rulings on the challenges to the CDPAP amendment, the Department's Request for Proposal, and the selection of PPL as the single Fiscal Intermediary have been resolved in the Department's favor and have had no impact on the timing of the transition.

Most recently, federal district courts in New York have outright dismissed two lawsuits challenging the CDPAP amendment and a request for injunction was denied:

- *Violette Jeannot v. New York State:* The Eastern District Judge held that the plaintiffs had no legal standing to bring the case and lacked sufficient evidence.
- *Principle Homecare LLC v. McDonald:* The Southern District Court concluded the plaintiffs failed to state a claim under any constitutional theory. Subsequent requests for a stay or restraining order in this case were denied by the trial court and the Second Circuit.
- *Glidedowan LLC d/b/a All-American Home Care Agency, Inc. v. NYSDOH:* The Western District Court held that Plaintiff could not show a likelihood of success on of its constitutional claims and denied Plaintiff's motion for an injunction.
- *Eckert v. McDonald:* Petitioners sought a preliminary injunction to halt the Department of Health's implementation of the statewide FI contract with PPL, including the transition of all CDPAP consumers to the selected statewide fiscal intermediary. On March 13, the Supreme Court of Cattaraugus County denied the Petitioners' request for an injunction, allowing the Department to continue transitioning all CDPAP consumers to PPL by April 1.

The transition is proceeding on track toward the April 1 deadline, as the Department continues to combat misinformation spread by companies seeking to disrupt the legislatively mandated transition. The Department recently sent a letter to the Alliance to Protect Home Care, Inc ("Alliance") urging them to take action to publicly call on Fiscal Intermediaries (FIs) in New York to refrain from spreading false, deceptive or coercive information regarding the transition and to publicly commit to working with all stakeholders, including member organizations and financial contributors, to ensure New York consumers and PAs have accurate information regarding the CDPAP transition.

Additionally, Cease and Desist letters were issued to Fiscal Intermediaries (FIs) and Licensed Home Care Service Agencies (LHCSAs) who are alleged to be providing false, deceptive or coercive information about CDPAP and PCS options to consumers and workers. At least two organizations cited in complaints has made financial contributions to the Alliance, which purports to be committed to protecting the integrity of home care services.

Additionally, [Cease and Desist](#) letters were issued to Fiscal Intermediaries (FIs) and Licensed Home Care Service Agencies (LHCSAs) who are alleged to be providing false, deceptive or coercive information about CDPAP and PCS options to consumers and workers. At least two organizations cited in complaints has made financial contributions to the Alliance, which purports to be committed to protecting the integrity of home care services.

LHCSAs and FIs have been directed to immediately cease and desist from making the following statements or taking the following actions:

- Providing false information to consumers about the requirements of the Statewide Fiscal Intermediary transition.
- Charging a fee to potential personal care workers for the minimum 40-hour training and assessment to become a personal care assistant.
- Falsely telling PAs that they can provide personal care services (PCS) to their family member currently participating in CDPAP, in violation of 18 NYCRR 505.14.
- Falsely telling PAs that they can provide PCS without meeting PCS requirements, including training and other assessments, registrations, and background checks.
- Falsely telling consumers that as of April 1, 2025, they no longer qualify for CDPAP services, or that their PA will no longer qualify to provide PA services.
- Falsely telling PAs or consumers that a personal care worker in a LHCSA can provide the same services as a PA under the CDPAP in violation of scope of practice regulations.

**PPL President Maria Perrin said,** "For months, we've been fighting misinformation that is causing harm to vulnerable New Yorkers. This week, a protest organized by the interest group Caring Majority Rising blocked people from accessing our office for help with their CDPAP benefits. We implore these groups to stop fueling uncertainty and confusion and work collectively for the benefit of consumers who need care."

**Here are the facts:**

**Fact:** Consumers and caregivers MUST register with PPL. Completing registration before April 1 guarantees caregivers can continue to be paid for providing these vital services

**Fact:** Eligibility for CDPAP will NOT change. New Yorkers currently enrolled in CDPAP will keep their services.

**Fact:** CDPAP consumers keep their trusted caregiver. Remember, Personal Assistants must transition to the Statewide Fiscal Intermediary before April 1.

**Fact:** The transition saves taxpayers $1 billion a year. This is a commonsense effort that protects services for CDPAP consumers while reducing wasteful administrative spending going to middlemen and Medicaid fraud.

**Fact:** PPL will operate in New York State. The CDPAP Statewide Fiscal Intermediary will have 8 offices across the State and has hired more than 1,200 people.

PPL continues its engagement with consumers to promote registration through direct outreach. Personal Assistants who register with PPL before March 28 are eligible for a $100 bonus.

**Fact:** PPL will operate in New York State. The CDPAP Statewide Fiscal Intermediary will have 8 offices across the State and has hired more than 1,200 people.

PPL continues its engagement with consumers to promote registration through direct outreach. Personal Assistants who register with PPL before March 28 are eligible for a $100 bonus.

PPL is offering Personal Assistants competitive wages and a robust benefits package that includes paid time off, holiday pay, overtime, participation in a health benefits plan and 401(k) plan, paid professional development training, paid family leave and more.

PAs whose consumers live in Bronx, New York, Kings, Queens, Richmond, Nassau, Suffolk, and Westchester counties also receive a flex card with funds to use on medical and dental expenses, medications, transportation and other health related expenses.

In addition to the nearly 150,000 consumers who have either completed or started the registration process, PPL's support center has fielded approximately 940,000 inbound calls to assist consumers with questions and PPL has also conducted more than 105,000 outgoing calls through its direct outreach efforts. The Department expects registration will continue to accelerate in advance of the April 1 transition deadline.

PPL continues to support consumers and PAs through its various channels of support, including a New York-based call center and registration sessions available both virtually and in person.

PPL currently has welcomed an additional facilitator, Crown of Life Care, to support the transition efforts, bringing the total to 42 facilitators, including 11 Independent Living Centers, supporting the transition efforts. Through this diverse alliance, New York will deliver a stronger CDPAP and ensure New Yorkers in the program will receive the high-quality care they need.

**Jacqueline Morales, Administrator and CEO of Crown of Life Care, a newly approved CDPAP facilitator working with PPL said**, "CDPAP is a vital lifeline for so many New Yorkers, and we're thrilled to partner with PPL to continue serving those in need We are passionate about providing holistic, compassionate care that supports individuals in maintaining their health, independence, and overall well-being at home. This opportunity reaffirms our commitment to empowering patients and their families with the highest standard of personalized care. We look forward to making a meaningful impact and continuing this mission in collaboration with PPL."

PPL will continue its outreach, but consumers and personal assistants must complete their registration before April 1 through one of the following options:

**Option 1:** Call PPL's support center at 1-833-247-5346 or TTY: 1-833-204-9042 and a PPL team member will help you complete the process.

**Option 2:** Access PPL@Home by going to PPL's website at pplfirst.com/cdpap.

**Option 3:** Work with PPL or another approved CDPAP facilitator, including Independent Living Centers (ILCs), who can guide you through the process. A list of approved CDPAP facilitators can be found here: CDPAP Facilitators | PPL First.

**Option 2:** Access PPL@Home by going to PPL's website at ppl first.com/cdpap.

**Option 3:** Work with PPL or another approved CDPAP facilitator, including Independent Living Centers (ILCs), who can guide you through the process. A list of approved CDPAP facilitators can be found here: CDPAP Facilitators | PPL First.

The State Department of Health continues to promote registration and maintains information on the CDPAP transition webpage.

PPL continues to actively engage with consumers through promotion and outreach activities. PPL's activities have included radio ads, print ads in 24 publications across 12 languages, thousands of fliers delivered to community and senior centers and in-person community registration sessions. Complete information about the transition and registration can also be found on PPL's website, including Frequently Asked Questions.

PPL currently has nine direct language lines up and running with native speakers available across an additional 35 languages in house and access to hundreds more through their interpretation translation services and facilitator network.

When PPL receives a call on the main line from an individual requesting a non-English language, the agent will first look to identify a PPL staff member that speaks the language. If one is not available, they can choose to utilize the interpretation service or be referred to a facilitator that has the language capability.

The reforms being made in New York directly address the runaway costs of the program and root out fraud and abuse, including a recently discovered $68 million fraud scheme and hundreds of millions more lost to administrative middlemen.

Revised: March 2025

## Department of Health

### General Information

James V. McDonald, M.D., M.P.H., Commissioner

About the Department of Health

Meetings & Webcasts

Employment Opportunities

Wadsworth Center

### Current Issues/Info

Abortion in NYS: Know Your Rights

Climate Change and Health

COVID

Donate Life - Enroll Today!

Drinking Water Protection Program

### Help

Help Increasing the Text Size in Your Web Browser

File Formats Used on this Web Site

Disclaimer

Privacy Policy

Accessibility

### Language Assistance

English

Español (Spanish)

中文 (Chinese)

Русский (Russian)

ইংরেজি (Bengali)

Italiano (Italian)

Meetings & Webcasts

Employment Opportunities

Wadsworth Center

AIDS Institute

New York State Veterans Homes

Helen Hayes Hospital

NY State of Health (Health Plan Marketplace)

New York State Physician Profile

New York State Public Health Corps

Contact

Councils and Boards

Grants & Funding Opportunities

Laws & Regulations

Press Releases, Reports & Publications

Freedom of Information Law (FOIL)

Forms

Donate Life - Enroll Today!

Drinking Water Protection Program

Ending the Epidemic

Exposure to Smoke from Fires

Lesbian, Gay, Bisexual and Transgender Health

Long COVID

Maternal Mortality

Master Plan for Aging

Medicaid in New York State

Office of Drug User Health

Polio

Respiratory Syncytial Virus (RSV)

School Vaccination Fraud

Vaping and E-Cigarettes

Wastewater Surveillance

WIC Program

Disclaimer

Privacy Policy

Accessibility

Русский (Russian)

ইংরেজি (Bengali)

Italiano (Italian)

Kreyòl Ayisyen (Haitian-Creole)

한국어 (Korean)

יידיש (Yiddish)

العربية (Arabic)

Polski (Polish)

Français (French)

أردُو (Urdu)

Website Language Translations

---

**CONNECT WITH US**

─── **CONNECT WITH US** ───

 FACEBOOK     X    ▶ YOUTUBE    ⊙ INSTAGRAM    •• FLICKR    in LINKEDIN    @ THREADS

🌐 **Translation Services**    This page is available in other languages

| | | |
|---|---|---|
| **English** | **Español** | **中文** |
| **繁體中文** | **Русский** | **ייִדיש** |
| **বাংলা** | **한국어** | **Kreyòl Ayisyen** |
| **Italiano** | **العربية** | **Polski** |
| **Français** | **اردو** | |

# Exhibit K

ADDENDUM TO APRIL 25, 2025 LETTER TO GOVERNOR HOCHUL

The following was shared verbally with officials from PPL, NYS Department of Health, NYS Medicaid Office, NYLAG, and others over Zoom on May 22, 2025.

SUGGESTIONS FOR PPL TO IMPROVE CONSUMER AND PA EXPERIENCE

*Items written in bold would make the greatest impact for my PAs and I

CLOCKING IN AND OUT (Make it easier with fewer steps)

1. Decrease number of times to confirm on Telephony and Time4Care, because currently after PAs confirm their end time, they still have to confirm two or three additional times.
2. Take out the thing about 15 minutes and t- (a bunch of numbers?). This sounds like a medical billing code and the PAs have no idea what that means and there are not multiple options possible, so why even ask and  confuse people?
3. Spanish has now been added to Telephony as an option which is great, but maybe consider adding more languages and also having separate phone numbers for each language so that choosing your language is not one more step.
4. Allow people to clock in and out on the same minute because the shift is supposed to start and end at the same time (i.e. 8 am).

PAYROLL

1.  **Make overnight shift 1 shift instead of 2 (with date listed according to clock in, not the clock out date—you could note the clock out date as well  but on the same line, as part of the same shift, with the clock out time.)**
2.  Organize dashboard better so shifts are easier to find. There has already been a change as I have noticed they are now chronological which is a huge help!. An additional step could be to color code the ones that need approval, the ones that have been denied (by PPL), the ones that have been approved, etc.
3.  Make Time4Care app interface easier to navigate with all previous shifts on one list, chronologically, with their status (paid, pending consumer approval, etc). Make sure this matches consumer dashboard. Also make it easier for PAs to understand their pay and deductions and make it easier to request paper paystub's. My PAs all complain about how difficult it is for them to track the payment status of their shifts.
4. Remove the take the tour intro page from Time4Care and just have one place on the dashboard for taking the tour, getting help, and viewing the trainings.

5. **What can be done to make the experience more like what it was with my old FI where we had a Timekeeper doing all this for us and we were able to get in touch with them within two hours if there was any issue? Someone who knew our situation and could fix it on the spot? Can former FI be involved with this and continue to assist us? Can they send us an EVV to sign and return as we did before when there was a problem? Or, can consumers have an option of having a Timekeeper at PPL assigned to approve their shifts on their behalf? And/or, can all consumers have a designated liaison who they can reach out to at PPL or one of the subcontractors who can assist them on a more personal level with any issues that arise? If there can be a Timekeeper or liaison assigned, please ensure their caseload is low enough so they can provide a high quality of personalized service.**

6. **If it's unfeasible to provide this to everyone, consider offering this higher level of customer support (such as above suggestions) at least for people who demonstrate or state that they are unable to effectively manage this? And those who have 24 hours in split shifts or who have 3 or more different PAs?**

7. **Allow use of both cell and land line for Telephony because sometimes one is dead or not getting reception. Or someone is on the other line. Or I am sleeping and I have my cell phone in bed. Or I am out in the community during a shift change and the PA has to meet me out of the home.**

8. On manual entries on Time4Care, sometimes clicking submit, confirm, OK is not enough because it just says in review indefinitely or it disappears. I am speaking about cases when everything has been entered correctly and there is no overlap with another PA schedule. This needs to be fixed so that PAs don't have to keep clicking on it over and over or redoing it and waiting anxiously to see if it will be approved.

9. Timesheets:: make it easier to quality for them, easier to access and find them, easier to mail them in such as taking a picture and sending an email to a designated person, make sure they are processed quickly, and easier for the consumer or PA to know it has been received and processed or a place to contact if there's a problem.Also the form itself is almost impossible to write on because the boxes are so small. It should have larger font and be simpler.

10. Fix the issue that arises when you are approving shifts on an iPhone (some of us can't use a computer) and there are so many shifts they don't fit on one page (21 per week in my case). Every time you approve one shift, it takes you back to the first page and then to previous shifts and you have to navigate back to where you were, one shift at a time. If I am looking at page 2 and approving shifts, it should stay right there until I'm done.

OTHER

1. **Benefits in downstate wage parity region! My PAss have no idea what's going on and are very anxious with many questions. Please make this clearer.  Where is their benefit card and how and when can they start using it? Will the pay extend back to April 1? Where is their $100 bonus for signing on before the deadline? What is going on with their insurance? Have they automatically been enrolled in a new one? Will they be kicked off their old one? When does this transition happen and where can they find out more about what the insurance offers? How do they**

**go about claiming PTO? What is going on with 1199? Some of them formally joined prior to the transition and others did not but all were promised by former FI, Concepts of Independence, that they would have union protection meaning their wages would not go down as a result of the transition. They are now confused as to whether they are in the union or not, whether dues are being taken out, and what, if anything, 1199 would offer, or whether their pay rate could differ if they choose to be in the union. All this info should be readily available to the PAs in their native language and there should be a specific number they can call for HR that is easy to access where they can go with their questions.**

Thank you for hearing me out and considering my ideas! Please feel free to reach out to me with any follow up questions or to discuss this matter further.

Gabrielle Broder

Gabrielle_eve@hotmail.com

917-301-0683