UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
                      :

LIZA ENGESSER, ET AL.,       :   25-CV-1689 (FB)
                      :

           Plaintiffs,   :
                      :   United States Courthouse

      -against-         :   Brooklyn, New York
                      :

                      :

JAMES V. MCDONALD,        :   August 6, 2025
                      :   11:00 a.m.

          Defendant.   :

- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR FAIRNESS HEARING
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For Plaintiffs:          PATTERSON BELKNAP WEBB & TYLER LLP
                     1133 Avenue of the Americas
                     New York, New York 10036
                     BY:   LISA CLEARY, ESQ.
                           CAITLIN ROSS, ESQ.

                     NEW YORK LEGAL ASSISTANCE GROUP
                     100 Pearl Street, 19th Floor
                     New York, New York 10004
                     BY:   ELIZABETH JOIS, ESQ.

For Alice Cucuta:        BENESCH FRIEDLANDER COPLAN &
                     ARONOFF, LLP
                     1155 Avenue of the Americas, 26th Fl
                     New York, New York 10036
                     BY:   EDWARD WIPPER, ESQ.

For Patricia Rodriguez
and Ardijana Redzovic:   GIBSON, DUNN & CRUTCHER, LLP
                     200 Park Avenue
                     New York, New York 10166
                     BY:   AKIVA SHAPIRO, ESQ.

APPEARANCES (CONTINUED:)

For the Defendant:       NEW YORK STATE
                         OFFICE OF THE ATTORNEY GENERAL
                         28 Liberty Street
                         New York, New York 10005
                         BY:  RACHEL PAM SUMMER, ESQ.
                              SAMANTHA LEIGH BUCHALTER, ESQ.

Court Reporter:
Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter
(718) 613-2274
JamieStanton.edny@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

               *     *     *     *     *

          (In open court.)

          THE COURTROOM DEPUTY:  This is a civil cause for a Zoom Fairness Hearing in Engresser versus McDonald.

          I ask counsel if you can state your appearances. I ask plaintiffs' counsel if you can please begin with the appearances.

          MS. CLEARY:  Thank you, Mr. Inelli.

          Lisa Cleary from Patterson Belknap Webb & Tyler, LLP.

          MS. ROSS:  Kate Ross, also from Patterson Belknap Webb & Tyler, LLP.

          MS. JOIS:  Good morning, Your Honor.  This is Elizabeth Jois from the New York Legal Assistance Group.

          THE COURT:  And we have our state representatives

here, I'm sure?

MS. SUMMER:  Yes, Your Honor.  This is Rachel Summer from the Office of the New York State Attorney General for defendant.

MS. BUCHALTER:  Samantha Buchalter, also from the Office of the New York State Attorney General.

THE COURT:  Great.  Anybody else wish to chime in here?  We have a lot of other people sitting around the room, but I think we are okay so far.

MR. SHAPIRO:  Good morning, Your Honor.  I don't know if you want to hear appearances from counsel for the objectors as well at the time.

THE COURT:  Well we are going to, of course, deal with it all naturally, but if you are here, you might as well, you know, do it now.

MR. SHAPIRO:  Thank you, Your Honor.  Akiva Shapiro from Gibson, Dunn & Crutcher on behalf of objectors Ardijana Redzovic, that's A-R-D-I-J-A-N-A, R-E-D-Z-O-V-I-C, and Patricia Rodriguez.

THE COURT:  Very good.

So here's what I --

MR. WIPPER:  Good morning, Your Honor.  One more, I'm sorry.  Edward Wipper, Benesch Friedlander Coplan & Aronoff on behalf of objector Alice Cucuta, C-U-C-U-T-A.  Thank you, Judge.

THE COURT: So we have two counsel for two of the objectors. I only knew there was one before, but I'm glad to see you all here.

Let's see how we go in the process of this by making a few preliminary comments.

First of all, I want to thank everybody's cooperation. Obviously, this is not simple. I am doing this from my summer home in Greece, and I guess there is some risk involved in doing that. So far so good. And we are going to be able to manage this, I think, appropriately, with the wonderful technology we're blessed with in this stage of our world. So let's hope for the best. Now, if something happens where I once again get, you know, interfered with, who knows what, I have our trusted IT person here to make sure that everything will be able to reconvene, I assume. I worry about that, but so far so good.

Mike, everyone can here me, no problem? Okay, good.

So let me begin, I guess, by asking Patterson Belknap and the state about this, well, you may call it, technical thing we have to deal with because the A.G. has told us that they want to have a 90-day period of time to reflect upon all of this. Let's try to deal with all of that first.

My only thinking is that after we finish our proceedings today and I listen to everybody and carefully take stock in everything, I'm going to have to put some words down, I'm going to have to write something. I think I want to do that especially in this high profile public interest case. I have to deal with the objections and I have to really make sure that I am satisfied with the counsel fee dynamics, which is a separate obligation I have. And it's going to take a little bit of time. I will try to get it done in a few days time for me to do that. And then we have this ninety day period to deal with before this can become fluently effective, I guess, whatever I do.

I just want to be comfortable that anything that we have in place now will continue to place until all of that is taken care of. I guess another way of saying that is that the preliminary injunction we have will be continued until this is finally resolved. I think I want to make sure that there's no gaps here, there's no glitches, and no technical problems.

So let me hear first from the state and Patterson Belknap about whether or not we are going to agree that everything will stay in place until we can render our decision, until the order is signed, until we deal with the A.G.'s possible objections.

Patterson Belknap, I am going to just refer to you

collectively, maybe you can tell me first your thoughts, and then I will hear from the state.

MS. JOIS: Good morning, Your Honor. This is Elizabeth Jois from the New York Legal Assistance Group on behalf of plaintiffs.

Can you hear me okay, Your Honor?

THE COURT: I can.

MS. JOIS: Great.

Yes, so on this ninety day -- on this request that the Court preliminarily approve the settlement pending a ninety-day period, it is very important to plaintiffs that the relief that we have all worked so hard to negotiate with each other is not unduly delayed.

THE COURT: Correct.

MS. JOIS: We believe it is meaningful that people get notice of their rights as quickly as possible.

THE COURT: I am going to interrupt.

I'm not disagreeing with you at all. I've got to write a decision here, and I'm not going to do it in ninety days time, I will try to get it done very quickly. But I just want to make sure everything we have will stay in place until my decision is rendered, until we sign off on it, and then we have to deal with the ninety day. I want to make sure that we are not going to have any problem in the interim, that's all.

I assume I'm speaking correctly for everybody?

MS. BUCHALTER: Your Honor, if I may. Samantha Buchalter for defendant.

The provisional approval that the parties agree the Court should grant after this fairness hearing and the order that you are speaking of, that will allow for the relief to go forward that all parties want to go forward, that is in the process or in the middle of it. It's the provisional approval that will allow that to go forward under the stipulation of settlement, rather than on continuation of the amended PI. The amended PI --

THE COURT: I am going to be -- I may not be able to get a decision out today, so we are agreeable that nothing is going to change until I have an opportunity to do that and approve of it, right?

MS. BUCHALTER: Yes, Your Honor.

THE COURT: That's obvious, okay.

And as far as the ninety-day provision is concerned, everything will stay in place, we are going to be -- hopefully be approving of everything or, you know, to my satisfaction, we will issue the order and then we do have this ninety-day interim, which we have to just let it stay out there, I guess, what else can I do? You tell me.

MS. BUCHALTER: Yes, Your Honor, we agree with that. The provisional approval will allow that we can wait

until Your Honor issues an order for provisional approval, and then the ninety-day period would be --

THE COURT: Yes, and everything will stay in place. I will issue the provisional order and we will have a period of time thereafter where we are going to wait for the ninety-day period and at least everything will be operational at the time I issue the order, subject to whatever can possibly happen thereafter by the A.G.

Am I speaking too fast? We all agree?

MS. JOIS: Yes, Your Honor.

MS. BUCHALTER: Yes, Your Honor.

THE COURT: I am just making a record. I just want to make sure we cover everything carefully.

Having said that, I think we really now, of course, want to do what the hearing is all about, is listen to the objections. And, obviously, I am going to have to rule on them so I want to make sure that I get them down clearly today, that's the purpose of the hearing here.

I have a few that have been submitted to me in writing. And now we know we have two fine attorneys who are going to be speaking on behalf of their concerns, we're going to hear them out. But I would like to know the batch of objections that we are dealing with right now. From what I --

MS. CLEARY: Your Honor, on behalf of the

plaintiffs -- Judge Block's screen --

THE COURT:  So let me ask first, who was it that the objections are?

MS. CLEARY:  Your Honor, before we address the objections on behalf of the class that we represent, we believe it would be helpful to address the consumers who are members of the class to express what has been accomplished by this settlement as important background for those who are not objectors that are joining this call to understand what the settlement means, to have that information in hand before we move.

THE COURT:  If anybody want to talk about what we have in place, you know, I am reading your papers and you agree on everything except -- there are a couple of nuances, one dealing with the ninety-day provision.  And then there is a question of the counsel fees and the state wants no reference made to the counsel fee issue except you agree that there will be counsel fees.  And I think that's correct.  I am going to have to go over it to make sure I'm satisfied.  We can talk about the counsel fee issue a little bit here.  But, you know, if, I think somebody just wants to really just lay out to the public what your agreement is at the present time, I'm willing to, you know, let you do that.

Does that make sense?  Somebody wishes to really sort of go through the ropes a little bit?

MS. ROSS: Thank you, Your Honor.

THE COURT: Who is it that wishes to volunteer to do that?

MS. ROSS: My name is Kate Ross. And I am representing the plaintiffs and class on behalf of Patterson Belknap as pro bono counsel and, as you know, we are joined with our co-counsel the New York Legal Assistance Group which we will refer to as NYLAG.

Today we are requesting that Your Honor provisionally approve the class settlement proposed by the parties subject to a ninety-day period to give the Government officials an opportunity to object under the class action.

THE COURT: And as far as the counsel fee issue is concerned, I think it's correct that we're not going to have the agreement say anything about what I'm going to do on the counsel fee because I have to separately decide that, we agree on that?

MS. ROSS: Yes, yes, Your Honor.

THE COURT: Okay. Anything else? Go ahead.

MS. ROSS: Yes, Your Honor.

I would like to briefly just overview the terms of the settlement so that the consumers understand what has been happening under it and what will happen.

THE COURT: Great.

MS. ROSS:  And can also address fees.

So to start with the settlement, in broad terms, the settlement provides substantially all the relief that we sought at the beginning of this lawsuit which includes a four-month extension of time for CDPAP consumers to transition to PPL with the ability to get PA backpay and Medicaid Act compliant notice to consumers who are in danger of losing their CDPAP services with fair hearing rights.

Just to put in context what these terms represent, when we filed this case, it was literally the eve of DOH's original transition deadline at the end of March and at that time consumers were facing an enormous number of barriers transitioning themselves and their PAs.  Others hadn't even heard of the transition or didn't know what it meant.  So we brought a very narrow set of claims under the Medicaid Act and due process clause where we exclusively sought an injunction to stay enforcement of the law requiring transition to one physical intermediary until consumers were given timely and adequate notice of their need to transition to maintain their CDPAP services as well as an opportunity to be heard.

Pursuant to Your Honor's order certifying the class, the class consists of all consumers who are in receipt of CDPAP services in March 2025 and who, one, received services from a prior FI after April 1st or, two,

who, A, were authorized for CDPAP services in the month of June, 2025 and, B, did not receive any CDPAP services in that same month and, C, didn't switch to another long-term care service.

And just as a snapshot of how our settlement has helped this class, when we filed, we estimated that around 60,000 consumers hadn't even started the transition with tens of thousands more stuck in limbo trying to get themselves or their PAs transitioned or get their PAs paid. We understand from the numbers published by DOH that 230,000 consumers have fully registered with PPL, 80,000 of which have ultimately decided to transition to another care program, and 230,000 PAs have been paid by PPL backpay for hours worked since April 1st.

We want to take a minute to thank the consumers who are in the audience with us today for joining this hearing and also for sharing your feedback with us throughout the case. Your feedback has been enormously helpful. We hear that some of you have raised concerns that there are ongoing problems with PPL and there are still payment issues for PAs and we know that the challenges you faced in the beginning of the transition were really, really difficult. But we just want to be clear that this lawsuit never sought to contest DOH's right to appoint a Fiscal Intermediary or the propriety of choosing PPL as a Fiscal

Intermediary.

It also was not about allowing consumers to go back to their prior FIs on a permanent basis. What our goal was in this lawsuit was to ensure that the 280,000 consumers in March who were in CDPAP in March had a clear and fair opportunity to transition to PPL or another care program if they wished and that they'd received the notice and opportunity to be heard that are required under the law if they're facing a termination in services.

This is what we understand has happened and what will happen under the amended PI and settlement. The settlement provides for a multistage process for providing notice that failure to act by the new August 1st transition deadline could jeopardize a consumer's CDPAP services with fair hearing rights and individualized outreach to particularly vulnerable consumers.

We understand from DOH, based on new data that was gathered, that pursuant to this process the vast majority of MLTC consumers who did not have services in June have taken steps to restart their services and only 16 percent haven't taken action and therefore, pursuant to the settlement, will receive notices of intent to disenroll with fair hearing rights.

Additionally, under the settlement, we provide -- the settlement provides resources for consumers already

enrolled in PPL, including enhanced facilitator training and access to PPL systems. DOH also released guidance last week on key topics that are very important to maintaining continuity of care. And the settlement also provides for continued data sharing between the parties to ensure that the transition concludes smoothly.

In exchange, the class members are releasing their claims against DOH in the State of New York arising from the conduct challenged in this lawsuit under the Medicaid act and due process clause except for reasonable attorneys' fees.

And, Your Honor, we submit that this settlement is fair, reasonable, and adequate under the Bulver factors for two reasons: First, its terms go to the heart of our claims which were centered on Medicaid Act complaint notice and the opportunity to be heard in the event of a termination of services and, second, the negotiations were at arm's length, they were fully informed, they were incredibly intense, and they reflect a mutual effort on both sides to reach common ground and prioritize the safety and the consumers.

So just to conclude, on the settlement, we believe this solution is much, much better than a lengthy litigation that could have taken several months or years to go to judgment which would have only further delayed access to care for the vulnerable consumers that we've been trying to

protect.

THE COURT: Take a deep breath, maybe there is some water there you can take a little sip of, and continue.

And, you know, of course the state, it is in agreement with all of this, but if they wish to supplement to say anything now in addition to what you have effectively articulated, you should have the opportunity to do that.

Anybody wish to say anything further?

MS. SUMMER: No, Your Honor, we have nothing to add. We would just request that the Court approve the settlement. This is Rachel Summer.

THE COURT: Who else wishes to speak?

MS. JOIS: This is Elizabeth Jois from the New York Legal Assistance Group.

I just wanted to report to the Court that we have received four written objections which we have filed on the docket so you should have in front of you. Two of those objections are from CDPAP consumers who are not members of this class. As my colleague, Ms. Ross went over it, not every CDPAP consumer is a member of this class and so while we understand that many consumers have strong feelings, the ones who are not class members don't have a right to object here.

We did also receive two written objections on behalf of class members. Both of those were submitted by

counsel who have also put in notices of appearance in this matter representing Fiscal Intermediaries, businesses that have been put out of business by this change in law.

We believe that both of those objections are based on erroneous understandings of both the claims in this case and the settlement itself, but we understand that those attorneys are here today to speak and could answer any questions about their objections.

I can go over each objection individually if you would like, Your Honor --

THE COURT: Let me suggest this. I think you are maybe getting ahead of your skis because I was going to get to the objections and identify them and make sure we have a clear record of what they are, then asking you folks to react to it, but you beat me to it, to some extent.

So let me first do this. I see on my little machine there's somebody who wants to chat. I don't know exactly what that's all about, but maybe I should open this up to the audience to give people here an opportunity to speak, if anybody wishes to do that, before we get into the objections, which I have a sense of now and we are going to hear from distinguished counsel, and then will give you folks an opportunity to respond to them, and then I am going to have to obviously render a decision.

Does that sound fair to everybody in terms of how

to proceed?

I don't know how many people are here on the Zoom. I know we have a reporter. Maybe she knows how many people are out there, I have no idea, but maybe somebody can give me a sense.

Mr. Inelli, do you know how many folks are here as part of our Zoom meeting?

THE COURTROOM DEPUTY: Currently we have 70 participants.

THE COURT: Let me toss this out to these 70 participants. If anybody wishes to be heard now, whether you have rendered an objection or not, I do think you have the opportunity since you've come here and you are obviously very interested in all of this, that you should be given the opportunity to speak, if anybody wishes to do that.

So I am going to ask Mr. Inelli to process that. I don't know how we do it. Whether you want to raise your hand. But Mr. Inelli, maybe you can help me with all of that at this particular time.

THE COURTROOM DEPUTY: I believe they might be able to unmute themselves if they wanted to address the Court.

MS. JOIS: Your Honor, if I could interrupt for just a moment, I believe there were four individuals who signed up in advance to speak. And just out of a sense of

fairness, it may make sense to start with those four.

I also wanted to note on our screen it says there are 24 people waiting in the waiting room. I don't know if some action needs to be taken to allow them in.

THE COURTROOM DEPUTY: I'm concerned about somebody possibly hacking, which is why I'm very cautious about letting people in. I'm letting them in slowly.

MS. JOIS: Thank you.

THE COURT: Why don't we just hear from the people in the audience first before we get into the specific objections to hear from counsel. There may be some people that wish to speak. I think they should have the right to do that, whatever their thoughts are. Why don't we give them an opportunity to be heard first, and then we can move forward with the objections. All right?

Let's see what happens here. If I get a mass deluge of people, we will deal with it then.

Mike, why don't you see whether there is anybody out there that wishes to talk, we are going to hear about the objections from counsel of course, and we are going to continue with that dialogue, but let's give people who came here the opportunity to speak if they wish to say anything whatsoever. Okay?

THE COURTROOM DEPUTY: Okay, but like I said, I think they can unmute themselves if they wanted to address

the Court.

THE COURT:  So why don't we say that if anybody wants to address the Court now, let them unmute themselves. I don't know how many people will do that.

And then Mike, you can call on them individually, okay?

THE COURTROOM DEPUTY:  Fair enough.

THE COURT:  I don't see anybody that's done that yet.

THE COURTROOM DEPUTY:  If they could raise their hand maybe?

MS. LAWLESS:  It might help if they put their name in the chat, maybe?

THE COURT:  I see one chat.  How do I access that? Can you do that, Mike?

THE COURTROOM DEPUTY:  I'm looking at the chat.  I don't see anybody that wants to speak.

THE COURT:  Should I press that one?  It says chat one.  Should I do it?

THE COURTROOM DEPUTY:  Sure.

MS. CLEARY:  Your Honor, it says hacked by the CCP.

THE COURTROOM DEPUTY:  That's what I am being cautious about.

THE COURT:  I think we are okay here.  We can go

forward with the objections now.

Why don't we do this? Why don't we listen to counsel first, then they can tell us who they represent and the basis of their objections. And I think we should -- I see Mr. Wipper there, I lost the other one, there's some other gentleman out there.

MR. WIPPER: I am happy to let Akiva go first if we're going to lose him. I just want to make sure Akiva is on the phone.

MR. SHAPIRO: I am, yes.

MR. WIPPER: I will give you the floor, Akiva. I will go second.

THE COURT: Go ahead. You guys know each other.

Mr. Shapiro, tell us what your concerns are, make it clear.

MR. SHAPIRO: Thank you, Your Honor.

THE COURT: Have you submitted anything in writing, by the way, I assume you have?

MR. SHAPIRO: Yes. We've submitted a written objection.

THE COURT: Okay.

MR. SHAPIRO: And I am here today speaking on behalf of Ardijana Redzovic and Patricia Rodriguez on whose behalf we submitted written objections. They're both CDPAP consumers and class members and I am here to object to the

proposed settlement in this case.

Before I run through my objections, I do want to commend plaintiffs for bringing this case and their counsel for litigating it as aggressively and thoroughly as they have and for their successes in this case. And I don't want anything that I say today to be taken to undermine or suggest that they have not --

THE COURT: Let me interrupt, which is what I like to do as a Judge, to just add to that.

You know, I had the privilege of presiding over this and watching all of this unfold. For sure, you know, I am not, you know, into the weeds with everything that has happened here. I've left that to the negotiation process. But I witnessed the enormous effort that everybody has made in this most difficult dynamic from the beginning to where we are today. And I am going to say something congratulatory things also in my written decision about that because to me it's an education that I have received with my thanks to counsel, I recognize the significance of the public interest here and the enormous efforts that were made by counsel in all respects and the hard negotiation process that unfolded over many months. And they're to be commended for that. And I am glad to see that you echo my sentiments. We may have disagreements, but certainly we don't disagree about the fact that we had the privilege of dealing with the

professional people at the highest level of our profession who are trying to do some good for the public.

So with that quick speech from the Judge, the floor is yours.

MR. SHAPIRO: Thank you, Your Honor.

And so just to give you a little background on my client Ms. Redzovic is a lifelong resident of New York. She currently lives in Staten Island. She received CDPAP services from a prior Fiscal Intermediary, and her father referred to the transition as "the disaster." He is her caregiver and has been paid only half the time since the family transitioned to PPL a month ago. And as of now, they are still owed money.

Ms. Redzovic wishes to continue receiving CDPAP services through her prior Fiscal Intermediary unless and until such time PPL is able to provide such services without issues and to provide for regular payment of wages to her caregivers on whom she depends for her care.

Ms. Rodriguez is also a lifelong resident of New York, currently resides in Brooklyn. Her daughter is her current caregiver and is the only caregiver with whom she feels comfortable. Ms. Rodriguez had received CDPAP services from a prior Fiscal Intermediary and continues to receive those services or continued to until this past Friday when the August 1st registration deadline hit and she

is now no longer permitted to receive services from her --

THE COURT: Why is that?

MR. SHAPIRO: Because -- and I want to get to this, Your Honor, because I have very much taken concern by -- I shouldn't say concern. I think Your Honor's comments about gaps in service and continued care, nothing will change while Your Honor considers the settlement are critical and I planning on getting to this later, but I will just address it now. The settlement, how it's structured, and the requests that plaintiff and the state have is that as of August 1st, prior Fiscal Intermediaries can no longer service their prior consumers. And so consumers, even though Your Honor, by the plain terms of the class action fairness act, as the Department of Justice submitted, cannot finally approve the settlement for ninety days, because the Department of Justice is investigating, actively investigating the events at issue and that's been made public, they've submitted a statement of interest here, they've submitted a letter saying that they're reviewing, but the way the settlement is structured, it effectively gives the final relief and cuts out current consumers. Now, as of last Friday, they can no longer -- so there is a gap in service and there is a change in circumstance under the settlement agreement, if Your Honor provisionally approves it.

And, you know, fundamentally, and I will get to our other objections, but the most important objection we have is that the Department of Justice has made clear that it is investigating this matter, that it wants and it needs that ninety-day period that the statute gives it and it is critical that there be no gaps in service and no changes until -- unless and until that ninety days passes because the Department of Justice may very well come in with an objection and may very well have new facts that they have uncovered and that may very well change the dynamics.

And consumers should not be forced out of their current situation which is the whole point of this case was to give consumers the opportunity for continuity of care and to remain with their prior fiscal intermediaries until the transition was completed, they should not be forced to either -- out of the program or to transition to PPL now, while the Department of Justice is actively investigating and reviewing the case and may come in with an investigation soon.

So that really to us is the most critical aspect of it. And that really relates to our first objection.

I'm just going to quickly summarize our objections and then quickly respond to a couple of the points that the plaintiffs made in their written response to our objections, because they filed a written response and I think there's

some important points there.

So the issue for us -- or there's two main issues, but the first issue for us is that by plaintiffs' and DOH's Department of Health's, own admission, there are still 11,000 consumers, CDPAP consumers, who have not yet registered with PPL and who, as of last Friday, are being forced either out of the program or to transition, but they haven't transitioned, so they're being forced out of the program by the class settlement. They're effectively being cut out by the settlement. No relief -- or the critical relief that they need, they're not receiving. And there are -- depending on one's calculation -- between 70,000 and 170,000 personal assistants who have not yet signed up with PPL.

THE COURT: Why have they not signed up?

I'm going to interrupt. That's what judges do. It's part of my job description.

Why have they not signed up? If I recall, in the past, that efforts were made to locate everybody. Sometimes it was difficult and impossible to do that, but shouldn't they bear some responsibility here? They have had ample opportunity to know and be informed, especially when they have this distinguished counsel, that they have to register. What has been the glitch?

MR. SHAPIRO: So many of them -- you know, I mean,

as I mentioned, one of my clients actually has transitioned and has still faced payment issues. I think fundamentally, there are -- the problem is that there continue to be significant payment and servicing issues with PPL. So consumers are concerned about and don't want to yet switch over because of that, because they heard and they know that when they switch over, they're not getting paid, there's payment delays, there was a story about thousands of payments that were routed overseas by some employee who had gotten into the system. So there are continuing and significant issues and that is having a, you know, major chilling effect on both consumers and personal assistants.

THE COURT: That hasn't been a problem for the vast number of people who have signed up. Why do these people have particular problems that other people do not have?

MR. SHAPIRO: Your Honor, respectfully, the reporting that we have seen is that it is a major issue. It's a systemic issue. There's thousands and thousands, at minimum, who have not received payment or whose PAs are not showing up to work or dropping out of the program. And so I think that we don't have full and complete access and that's one of the other issues that we raise, that the DOH has been sharing information with plaintiffs' class counsel, but for some inexplicable reason, that is under seal. I don't and

have never understood what the public interest could possibly be or what the justification could possibly be for sealing the information about how well or how not well the transition is going, but because of that, we, meaning class members, who are not represented directly by class counsel, do not have access to that information. So we actually don't know how the transition's going other than the dribs and drabs of information that have been put out which indicate that over 10,000 consumers still have not transitioned, that at least 70,000 personal assistants haven't transitioned, and that there are thousands if not tens of thousands who are having payment problems and are concerned about and are afraid to transition until those are worked out.

THE COURT: But let me ask you this, now: What do you suggest in terms of how they propose all of this can be changed or amended to accommodate your concerns?

MR. SHAPIRO: So it's very simple, Your Honor. We would request -- and I think it's a narrow tweak that will fully protect the remaining and all class members while DOJ's investigating, which is that the aspect of the original preliminary injunction which permitted consumers to elect to remain with their prior Fiscal Intermediaries should remain in effect at least until the ninety days are up and we see what Department of Justice does. There's no

reason -- and it's totally inequitable -- to force class members out of the program while they're waiting to see what the results of that DOJ investigation are.

So that really -- there are other things that we ask for, informational rights. I mean, we would also -- so -- but in terms of the -- the most concrete thing would be to extend the prior preliminary injunction so that they can remain with their prior FIs until the Department of Justice weighs in.

And the second thing is those informational rights, which is to have full and complete access, all the information to the unsealed -- again, there is no business reason and as Your Honor mentioned, this is a case of significant public interest. There's absolutely no basis for hiding the status of the transition from the public, which is what has been done through the sealing of that information.

THE COURT: Well, you know, depending upon what the Department of Justice says, that may change the dynamics. So things are really not, you know, firmed at the present time. We understand that there could be changes.

But let me hear, first, before I speak to Mr. Wipper, what comments we have from anybody here.

Let's start with Patterson Belknap wants to speak first.

MR. SHAPIRO: Your Honor, just if I could very briefly just respond to their written comments?

THE COURT: Yes, I am going to give everyone an opportunity to tell me what it is your concerns are. I will listen to their response. I want to get it down here on record as well as the fact that I have it in writing.

MR. SHAPIRO: No, understood, Your Honor, that's what I'm saying. If you would go give me a couple more minutes, I would like to respond to their --

THE COURT: I thought maybe we could do it where they could speak now.

MR. SHAPIRO: Okay. Of course, Your Honor.

THE COURT: Why don't I hear from them first and then you can respond again, okay?

MR. SHAPIRO: Sure.

THE COURT: Who wishes to speak first?

MS. JOIS: Thank you, Your Honor. This is again Elizabeth Jois with NYLAG.

I first want to address, first, some of the numbers that Mr. Shapiro just provided because I am very happy to tell you that those numbers are significantly better than what was just presented.

To give you a snapshot, at the start of July, when we first told Your Honor that we had this settlement agreement, there are about 11,000 consumers who -- we didn't

have a record that they had received services in the month of June. We are so happy to tell you that after a month of very intense communications that the Department of Health ordered pursuant to the settlement, that number has been drastically cut. So we are now looking at only -- only 16 percent of those 11,000 that the people who are in a managed long-term care plan sort of remain unaccounted for. And, pursuant to this settlement, those people will now get two official notices telling them what steps they would need to take to restart home care services, and letting them know that they can request a fair hearing and be heard by an Administrative Law Judge on whatever their issue is.

THE COURT: I'm glad to hear that, but it's really the question of how do we deal with those who have not been responsive, which is what Mr. Shapiro is concerned about.

MS. JOIS: I think Mr. Shapiro is suggesting that those people need more time and as class counsel, we believe the precise opposite. If we give people who have not been in contact and who are not receiving services months and months and months, those are months without services. What we would like for them to do is receive a legally adequate notice telling them: Here's what's happening to you, you have the right to have a hearing about this, there are resources available to you, you can be represented in that hearing, here's how to request one. And that's what we have

negotiated for them. Because merely saying that somebody who has not been receiving services gets more time without services isn't really a form of relief for them.

I also wanted to address, Mr. Shapiro talked about the much smaller population of individuals who had returned to their prior Fiscal Intermediary under the terms of our preliminary injunction.

And, first, I wanted to be clear that that return to a prior Fiscal Intermediary was not the goal of this litigation, right? It was a temporary measure to try to assist some people while we worked toward an overall resolution for everyone, but it was never the goal of this litigation to keep people forever with a prior Fiscal Intermediary.

The number of such individuals, as the Department of Health has put on the record, on July 1st was about 1,008 hundred people. And of those 92 percent, took whatever steps they needed to in the month of July to either enroll with PPL or choose a different form of home care for themselves.

So we are down to an incredibly small number of those individuals who were with a prior FI and to today have not either registered in PPL or left the program to receive a different form of home care. Each one of them is now going to get a notice telling them what their rights are and

allowing them to have a fair hearing if they would like one.

I know that Mr. Shapiro also mentioned --

THE COURT: So --

MS. JOIS: Yes, Your Honor.

THE COURT: Go ahead. I am going to give Mr. Shapiro an opportunity to -- I think he's anxious, but finish what you were going to say first.

MS. JOIS: Sure.

Mr. Shapiro also mentioned sort of an unknown number of personal assistants who have not yet registered with PPL. And this is -- this is sort of everyone's speculation because nobody has the full list of how many personal assistants existed prior to this transition, so I cannot tell you the precise number or the precise percentage that have registered.

What I can tell you is that my office, since this case began, has been running a hotline. We respond, we get e-mails, we get phone calls, we contact everyone who contacts us.

At the beginning of this case, we were consistently hearing from people who couldn't get through the process. They said, you know, I just can't get through on the phone, there's too many other people calling. For the last month, that has simply not been the story, Your Honor. We continue to hear from people. We continue to

help. The Department of Health continues to address individual cases we bring them, but they are no longer about people's inability to register with PPL. People seem to be able to get through on the phone, they seem to believe able to take the steps necessary. So if somebody hasn't done that, you know, if a personal assistant is choosing not to, that's certainly not something we can address through litigation. Nobody can be forced to take a job.

THE COURT: So Mr. Shapiro, look. You hear the practicalities of what they're dealing with, the efforts that they've made to really reach out and to do whatever common sense tells us can be accommodated in trying to effectuate everything that we want to accomplish.

What's wrong with that? What else can they do? You want to reply to that now, here's your opportunity, then I want to hear from Mr. Wipper.

MR. SHAPIRO: Sure. Thank you, Your Honor.

A couple of quick things. Number one, plaintiffs' very narrow view of their own case now, which is that this was just about providing notice to people, can't be squared with the allegations in their complaint where they highlight, for example, that under applicable law, the transfer from one FI to another shall not diminish any individual's rights, related continuity of care, and even define the class as anyone who's not completed enrollment or

their PA's never completed enrollment. They asked in the original PI, they said the intended purpose was to provide continuity of services.

But the point here is that the case should continue and Your Honor should provide relief until that continuity of care has been accomplished. And first of all, the numbers that were just put out, I don't even follow. This is one of the issues. It's very hard to actually get data and concrete numbers. So there's various percentages and whatnot.

What I do know is that plaintiffs, themselves, allege at paragraph 77 of their complaint that there were 300,000 personal assistants in the program before the transition and they also say in their latest submissions that 230,000 have been paid in the last month. So their own numbers, 70,000 personal assistants have not yet -- have not been paid or have not transitioned over or received payment. And while they say that there's a tiny fraction of people that's left, this is the exact argument the Department of Health made that plaintiffs vociferously countered, forcefully objected to in the preliminary injunction briefing when the DOH said extension of the preliminary injunction isn't necessary because only a tiny fraction of consumers hadn't yet transitioned, plaintiffs responded that defendant ignores that this tiny fraction represents

consumers who are still without services, these consumers are entitled to services, and that substantial compliance is not the -- not the standard under Medicaid and that registration status does not reliably indicate whether consumers are receiving services because lack of PA payment is the proper indicator of harm.

So plaintiff's own words, if PAs, if personal assistants are not being paid, not being paid regularly, not on the program, not a full slate of PAs for each consumer, then the consumers are not receiving services and the transition has not been accomplished and that's fundamentally the problem here.

What we have is a transition that was ongoing, that plaintiffs appropriately and successfully created a bridge for with their preliminary injunctions and now inexplicably are cutting off, before the transition can be completed, leaving out in the cold thousands of consumers who are class members and plaintiffs brought a case on their behalf including my clients and now have a right to the relief that was sought in the complaint, which is the continuity of care, continuity of services --

THE COURT: I get it. I guess what they're saying, basically, is that they really made their very best efforts to do all these things and they just can't do the impossible.

But look, let me suggest this. The purpose of my having this particular proceeding today is to make sure I have a complete record and understanding of the objections and your reactions to it, so that we are doing that. I have your written submissions and now I have your oral arguments in support of that and oppositions to that. And I think that, you know, I will have a good opportunity to really reflect upon all of that, which I will do so expeditiously, and do the best I can to come out with a decision. I think I can't do more than that. The important thing is that everyone is being heard right now.

MR. SHAPIRO: And the critical thing is the ninety-day period from DOJ that, you know, if it's going to mean anything, if the statute means anything, if DOJ's objection or DOJ --

THE COURT: We are not going to be putting the finishing touches to this until the AJ has an opportunity to speak.

MR. SHAPIRO: Exactly. And there should be a status quo extension until that time, respectfully, Your Honor. Thank you so much for the time.

THE COURT: I think we basically have that in place unless I'm missing something.

Why don't I hear from Mr. Wipper at this particular time. You want to add something to the comments

by Mr. Shapiro, this is your opportunity to do so.

MR. WIPPER: Thank you, Your Honor.

Eddie Wipper from on Benesch Friedlander Coplan & Aronoff on behalf of Alice Cucuta.

I will disclose that I also, in this case, have represented her Fiscal Intermediary, Caring Professionals Inc., who really have done (inaudible) work along with the plaintiffs in the case, by getting the bridge that allowed Ms. Cucuta to continue using Caring Professionals when she was unable -- her and her personal representative, her daughter, were unable to reach PPL, to get ahold of PPL, to get PPL to respond to communications or anything else.

My objection, Your Honor --

THE COURT: Let me ask you this, why was that? I'm hearing, you know, that PPL made enormous efforts to try to get people to respond.

MR. WIPPER: That is a great point, Judge. And my presentation to you is going to center around the concept of information. Because information is sorely lacking to the class in this case. PPL says one thing and they do another. Ms. Cucuta's personal representative had called PPL tens, dozens of times trying to get someone on the line from PPL to attend to her needs. But PPL says we made enormous efforts to get ahold of people. The state says -- the state throws out numbers. How many people have been cared for?

How many people are registered? How many PAs are registered? But everything seems to be under seal and in a black box. And I think when you heard Ms. Jois present her presentation, I think you heard her stating that the numbers were what she understood from the reporting of the Department of Health.

Now, Your Honor raised a great point. How do we know, how do we know or how can we account for the fact that we've gotten all the information that's practical? Everything is so disbursed. Everything is so -- everything is so spread out. We can't possibly know.

Your Honor, we have suggested, our firm, both in our capacity representing Caring Professionals earlier, if there was a simple way to get ahold of the information as to how many PAs existed at the time that April 1st, the original deadline rolled around and how many PAs -- and how many consumers existed and were receiving care, we could then take those names, match them up, and make sure that each and every person who wanted to receive CDPAP services was receiving CDPAP services. And the name of the game was the very small amount of managed care organizations, insurance companies, that were both approving the people who were receiving the services, the consumers, and paying their personal assistants. That's what we told everyone. Very simple. And the state represented to everyone that they

were having regular meetings with the MCOs. I believe they said weekly. They had access to the MCOs and they had ability to get that information from the MCOs.

But somehow and for some reason, everyone is simply relying on representations put on the record orally as to what the actual numbers are. This is not only a public issue of concern; this is a public issue of concern that relates to the most vulnerable population of people one could imagine: Elderly and disabled people who are receiving the most personal type of home care one can receive from family members. And the stated goal of the entire litigation was to leave no one behind. But yet --

THE COURT: I think that -- let's get down to the specifics. You don't think they've made the proper effort to reach out to people and to make this transition come to pass and you think that they could have given better information if they did precisely what? I want to hear what you suggest.

MR. WIPPER: Yes. If they go to the MCOs, to the managed care organizations, and get the proper reporting of each individual, and they have that information, that received CDPAP services and just like the current FIs do, go to those people directly, like the settlement agreement says they're supposed to do, and ask them: Do you wish to continue with the CDPAP services?

If we've learned one thing from this process, passive outreach does not work with this group of people. Setting up call centers does not work with this group of people. And the way we know that is because the mandate that the prior FIs got from the state when they started was that you have to set up community outreach, you have to plant yourself in the neighborhoods and you have to figure out who needs the services and who's going to get them.

Now, I'm not advocating that -- I'm not going to be PPL's business advisor and tell them to set up at Goddard Community Center down the block from my apartment and see who on the Upper West Side needs services, but what I am advocating, Your Honor, is that before any settlement is approved, that you get real information, hard information -- not we understand that someone reports -- as to who the consumers were, who their PAs were, and where each of those individuals is now.

It is not -- and I have another entirely other piece to our objection, but it is not equitable to rely on a black box of information and representations when there is real information available from managed care organizations as to who is getting services and as to who is not getting services. And until that time, we need to extend the order that's already expired under the plain terms of the settlement.

Akiva made great point, and he is 100 percent right. We haven't extended the PI past the August 1st. Somehow nobody's really responding to what you said in your original presentation. What you said was -- what you said was let's extend out further, but nobody gave any detail to say, yes, the world as it was on August 1st, where people who are not yet fully registered would continue until the settlement is finalized, you haven't gotten agreement on that issue. So my --

THE COURT: Let me just stop there. Let me interrupt.

So I have a lot of equitable powers here and it seems that like in the competent thing is to really keep everything in place and to keep everything in place until we get to the end, to the finish line, all right? And I think I want to do that and I don't see any reason why I should not do that. That would satisfy your immediate concerns and I may ultimately disagree with you, I may agree with you, but I need to have some continuity here, though, without having, you know, things become discombobulated, but when we have a general understanding that we have something in place here which we were satisfied with, which should continue, until we ultimately resolve this matter. I don't understand why there seems to be some opposition to my doing that.

Let me hear from counsel first, and then we can

continue with our discussion.

MR. WIPPER:  I have objections to finish.  Is that okay?  Because I just want to -- I have --

THE COURT:  Can I just deal with this particular issue?  Because the trouble --

MR. WIPPER:  Yes, I just want to make sure you come back to me.  That's fine.

MS. JOIS:  Thank you, Your Honor.

The terms of the existing amended preliminary injunction that you signed, I believe, at the end of June or early July, on its face, the amended preliminary injunction is in place until August 15th.

THE COURT:  Correct.

MS. JOIS:  The terms of that injunction included several intermediary dates.  And so there was a date by which notice had to go out to large numbers of people. There was a date by which a different letter went out to all PPL recipients and there was a date by which anyone still receiving services from a prior FI had to switch to some other form of home care or to PPL.  And that date has already passed.

So the amended PI is currently in place and remains in place unless Your Honor does something different until August 15th, but the dates, the intermediary dates set forth in the amended PI have already passed.

THE COURT: They've come and gone really with the August 15th deadline. Is there any reason why that should not be extended until we get this thing finally resolved?

MS. JOIS: I'm sorry, can you repeat that question, Your Honor?

THE COURT: The August 15th deadline that we're talking about now, and I'm not exactly a hundred percent clear the importance of that deadline, but it seems that we could extend that.

Is there a problem with doing that?

MS. JOIS: Your Honor, I don't believe plaintiffs see any problem with doing that. We just want to be clear the intermediary dates that have already passed have already passed.

THE COURT: I understand what you are saying.

MS. JOIS: On our side, we don't have any objection --

THE COURT: Tell me specifically again what was supposed to happen up to August 15th so we have a very focused issue here.

MS. JOIS: Sure, Your Honor.

I'm sorry, it would take me a minute to find the precise dates for everything, but in early July, the Department of Health was required to order MCOs and counties to send communications to anyone who was still with a prior

FI and anyone who had not had record of receiving any services.

Those two -- those communications went out in early July in order to tell people what steps they needed to take by August 1st and to let them know everything that was available to them to help them, that they could reach out to the Department of Health directly, they could reach counsel, they could reach some preexisting resources, call facilitators or the iCare network. That happened in early July.

Also in July, the Department of Health gave instructions to all of the managed long-term care plans ordering them to make these significant contacts to members of the class. So those were home visits, calls, all that sort of thing.

Also in July, the Department of Health --

THE COURT: I understand that. And maybe I'm confused and you can help me out. We extended this to August 15th for some particular reason and maybe you can educate me again why exactly we did that.

MS. JOIS: Sure. So the pieces of the PI that sort of remain relevant because they have not already changed are meetings between counsel. We have the ability to individually escalate issues, so if any consumer comes to us with a problem, we send a list to the Department of

Health and they respond to us on what they have done to resolve the issue for that client, that remains in place until August 15th.

But I think what Mr. Wipper and Mr. Shapiro are talking about is the ability to continue to get paid by a different FI which is only -- you know, the original deadline for that was that it couldn't happen after April 1st. Under the terms of our PI, it got extended. And then under the amended PI, was extended only until August 1st. So that has ended.

THE COURT: I guess they want to open that up now and that's what they're really advocating here.

Let me hear the rest --

MS. CLEARY: Your Honor, before Mr. Wipper speaks, I think it is critical to say --

THE COURT: Your voice is the one voice that's not coming clear to me. So yell at me.

MS. JOIS: I think what my colleague is trying to share is, you know, again the number of individuals who used to be served by a prior FI and who have not switched to something else is extremely small, including, for instance, Mr. Wipper's client herself, is now registered with PPL. So to open up, I believe what I hear --

THE COURT: So Mr. Wipper, continue your comments?

MR. WIPPER: I appreciate that, Judge. There's a

whole other issue of --

THE COURT: Let's hear from Mr. Wipper now and then we'll hear your concluding comments that I think I am satisfied that I have given everybody the opportunity to be heard. Go ahead.

MR. WIPPER: Thank you, Judge.

There is a whole other issue of information that our client believes and we believe needs to be communicated to the class and that needs to be resolved before any settlement is approved.

There isn't just one investigation going on, Your Honor. It's not just the DOJ that's investigating the CDPAP, call it, disaster. The state senate is having a hearing on August 21st and they've invited stakeholders including the state to speak. State Senator Skoufis and State Senator Rivera have -- the heads of the investigations of the health care committee -- have convened a hearing and are investigating all the issues surrounding CDPAP. They are collecting information from FIs, from the state, from PPL. There are going to be members including Caring Professionals' COO who are going to be testifying in two weeks. In fact, Judge, I, myself, am headed to Greece next week and I am coming back early in order to be with my client for that testimony.

THE COURT: Well, I have to interrupt. Now we're

getting personal.  Where in Greece are you going?

MR. WIPPER:  I am flying to Crete with my 12 year old who is turning 13 and then heading back to Athens for a couple days before I come home.

THE COURT:  I would be more than willing to invite you to my wonderful villa near Athens, but I don't think I can do that under the circumstances.

MR. WIPPER:  That is true.  And certainly not if you grant the request that I'm making which is similar to Mr. Shapiro's, which will extend this case out a lot further.

Your Honor --

THE COURT:  So let's wrap it up now.  Go ahead.

MR. WIPPER:  We believe it's inequitable to, number one, push for a settlement that gives releases to the state related to these claims, certainly without knowing all of the information that's available or that will become available by virtue of the investigations that are going on. That's number one.

Number two, it's also inequitable to not tell the class in the notice that there are presently investigations going on that could have --

THE COURT:  Somebody is interrupting name Christy Johnson.  I have no idea what that's about.

MR. WIPPER:  That's okay.  No problem.

It is also inequitable not to specifically tell the members of the class at least in a notice that there are DOJ and state senate investigations presently going on at the same time that could affect the interpretation of their release of this.

Yes, Your Honor, were you going to say something? I don't want to interrupt you.

THE COURT: Let me suggest this because I think that we're getting technically challenged a little bit now.

Here's what I want to do. I think I've given everybody a pretty good opportunity to really educate me and to really articulate your concerns. I have your written submissions. I have the oral testimony now.

I want to give you folks an opportunity if you want to put anything else in writing, to give you a week's time to do that so that you may want to make some further comments in writing which you are welcome to do. And if you do so, see if you can do it by next week because I want to try to get cracking on this as soon as possible. Okay? Does that make sense?

MS. CLEARY: Your Honor, before we end, I would like to say two things about Mr. Wipper's comments.

Are you able to hear me?

THE COURT: I am going to let everybody comment now. Let's see if we can wrap it up, okay?

MS. CLEARY: So first, Mr. Wipper and Mr. Shapiro allege that the DOJ is investigating in this matter. That, as far as we're aware, is not a correct statement. The only action the Department of Justice has taken is to file a statement of interest in this matter, and asked for the CAFA notice to be provided which has now occurred by the Department of Health.

THE COURT: I understand that.

MS. CLEARY: So that is, in my view, not a correct statement.

Second --

MR. WIPPER: I can clear that up. They're investigating.

MS. CLEARY: Second --

THE COURT: Look, whether they are investigating or not is really academic because they haven't had an opportunity to be heard one way or the other.

Anything else?

MS. CLEARY: Second, Your Honor, there is a senate hearing. A senate hearing is not an investigation. It's a hearing where people will be permitted to testify. And we believe that Mr. Wipper and Mr. Shapiro are taking liberties with respect to those events when, in fact, this lawsuit is about giving our clients notice and an opportunity to be heard before services are discontinued. And in this

settlement, we have achieved the goal of providing our clients with such relief.  And therefore the fact that Mr. Wipper and Mr. Shapiro, who also entered appearances in this case representing Fiscal Intermediaries with their own self-interest in continuity of provision of services in connection with the CDPAP hearing, and today appearing on behalf of consumers, one of whom, Mr. Wipper suggested, was having an impossible time accessing PPL services, in fact, was ably able to do so in the recent past.

So we take the position that there's a self-interest in connection with the comments from Mr. Shapiro and Mr. Wipper in representing both consumers and Fiscal Intermediaries.

THE COURT:  All right --

MR. SHAPIRO:  Your Honor, can I respond briefly to that?  Oh, sorry.

THE COURT:  Please, we are not going to spend here the next couple of days, so I am going to give everybody a fair opportunity, but we have to come to the point where I've heard enough, realistically speaking.

So if you want to make some parting comments now, let's do so, but we're going to try to wrap it up.

Go ahead.

MS. JOIS:  Your Honor --

THE COURT:  Let's see if there was anybody else,

Mr. Shapiro, who wants to comment who is sitting here at the table and let's try to move it along.  I'm getting to the point where I'm looking forward to having a souvlaki in a little while because it's about 7:30 in Greece.  Go ahead.

MS. JOIS:  Your Honor, I just wanted to raise two things.

First, a very important element of this settlement from the Department of Health is that there be clarity on whether Your Honor -- Your Honor's decision before August 15th.  And so I know you just said you would give people a week to supplement with any further written comments, and we were wondering if that could be a shorter time period because --

THE COURT:  Well, look, look, look, look.  I've got work to do, all right?  But I think that we can give people a week.  It's okay.  It doesn't mean I'm not going to work before I get those comments.  We're going to obviously start working right away to try to get this thing wrapped up, but let people have an opportunity to have their last words if they want.  Okay?

Anything else?

MS. JOIS:  Your Honor, the other thing I wanted to raise with you is just that there were two other individuals not represented by attorneys who had signed up to speak at this hearing and I want to make sure -- us lawyers like to

talk a lot, but I wanted to make sure they had the opportunity to speak if they still wished to.

THE COURT: I threw it open to the floor. If the folks are here and want to speak, they can have the opportunity to do so. Anybody here?

So I have their submissions. I will look at those, right?

Anybody else? Let's not beat it to death. I think I have a pretty good idea what's going on and I think we could pretty much wrap it up. By all means, you can send something to me in writing, if you wish to do that. Try and do it as quickly as possible because obviously I am going to start working on this right away.

And I just want to end by just confirming the counsel fee dynamic. Under the law I have to really give my opinion to it, though it seems that you folks have agreed on it, what you have submitted seems to me to be well worth -- and the efforts you put into this, it seems to be an extraordinary effort on your part.

But is it true that Patterson Belknap is going to give the, I guess, NYLAG the monies that you pro bono are going to be receiving? I just want to confirm that.

MS. CLEARY: Yes, Your Honor.

THE COURT: So that's understood, right?

MS. CLEARY: Yes.

THE COURT:  And, you know, if you do that, what really impresses me is really acting at the highest level of your professional responsibilities here, so that's to be commended.

And I will take a look at the counsel fee things. My initial reaction is I see it perfectly appropriate, but I have to take a separate look at it as well and we will take a look at that.

Anything else you wish to say before we wrap it up?

MS. CLEARY:  Your Honor, on behalf of the plaintiffs, we would like to thank Your Honor for the efforts you have made in getting us to this point today, encouraging the parties to discuss settlement, and being open to hearing from us in connection with confidential --

THE COURT:  I am going to say some nice things about all of you in my written decision.  I think you deserve something in writing from me.  But I will add, on a little bit of aspect of this, something that has nothing to do with the price of tea in China, but for some reason I visited Dracula's castle a couple of days ago and that was built in the 15th century.  And as I was going up the winding staircases, it just struck me that they didn't build this with me in mind because I don't think anybody my age was climbing up those stairs and in those hallways.  But

what impressed me is I want to Bucharest, I don't know if you have been there, and it's a beautiful city and the castle is a piece of history which, as you probably know, is now part of the folklore of Dracula.

And I recommend all of you folks to do it.  If I can do it, so can you, if you have the opportunity.  It was an extraordinary experience that I had to go and try to meet Dracula.

I think Dracula is an appropriate way to end this conversation.  I thank all of you.  I think we have had an appropriate and productive hearing here.  Hopefully you all agree.  And I think I can press the button that says leave the meeting right now unless somebody has some comments to conclude.

Thank you all very much.

MS. SUMMERS:  Your Honor, Rachel Summers for defendant.  We just wanted to echo plaintiffs comments and thank the Court for its time looking into this case.

THE COURT:  It's all good seeing you here.  I wish you all could come to Greece, but the technology we have is just extraordinary in allowing me to do this instead of having to take a plane back to Brooklyn.  I think we were able to do it effectively.  I had some concerns about that, but it looks like we were able to do that.

So thanks for everybody's cooperation who was out

there.  You will hear from me hopefully soon.

This ends our meeting.

(Matter concluded.)

*     *     *     *     *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Jamie Ann Stanton                    August 6, 2025
_____     _____
JAMIE ANN STANTON                              DATE

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter